FILED

2011 JUL 27 PM 12: 40

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY_____

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

June 2010 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. CR 11-72(A)-DDP |
| Plaintiff, | F I R S T |
| | S U P E R S E D I N G |
| v. | I N D I C T M E N T |
| MHER DARBINYAN, | [18 U.S.C. § 1962(d): Racketeer |
| aka "Mike," | Influenced and Corrupt |
| aka "Hollywood Mike," | Organizations Conspiracy; |
| aka "Little Mike," | 18 U.S.C. § 1201(c): Conspiracy |
| aka "Capone," | to Commit Kidnapping; 18 U.S.C. |
| aka "Caps," | § 1201(a): Kidnapping; 18 U.S.C. |
| aka "Maher," | § 1951(a): Conspiracy and |
| PARAMAZ BILEZIKCHYAN, | Interference with Commerce by |
| aka "Parik," | Threats and Violence; 18 U.S.C. |
| aka "P," | § 1344: Bank Fraud; 18 U.S.C. |
| aka "Parnamas | § 1028A: Aggravated Identity |
| Bileziktsian," | Theft; 18 U.S.C. § 1029: Access |
| aka "Bleziktsian Paramas," | Device Fraud; 18 U.S.C. § 371: |
| KARO YERKANYAN, | Conspiracy; 18 U.S.C. |
| aka "Guilty," | § 1001(a)(2): False Statement; |
| aka "Gator," | 18 U.S.C. § 1014: False Statement |
| aka "Kane," | on a Loan Application; 18 U.S.C. |
| ARMAN SHAROPETROSIAN, | § 1028: Identity Theft; 21 U.S.C. |
| aka "Horse," | § 846: Conspiracy to Manufacture |
| aka "Dzi," | and Possess with Intent to |
| HAYK KARAYAN, | Distribute Marijuana; 21 U.S.C. |
| aka "Hayko," | §§ 841(a)(1), (b)(1)(B)(vii), |
| aka "Whisper," | (b)(1)(C): Manufacture and |
| ARMAN TANGABEKYAN, | Possession with Intent to |
| aka "Spito," | Distribute Marijuana; 18 U.S.C. |
| aka "Spitak," | § 1955: Conducting Illegal |
| aka "Villager," | Gambling Business; 18 U.S.C. |
| aka "Thick Neck," | § 922(g)(1): Felon in Possession |
| aka "Armancho," | of a Firearm/Ammunition; |
| | 18 U.S.C. § 2: Aiding and |
| | Abetting; 18 U.S.C. § 1963: |
| | Forfeiture; 18 U.S.C. § |
| | 981(a)(1)(C): Forfeiture; 28 |

| | |
|---|---|
| 1 | EMIL AIRAPETIAN, )<br>   aka "Clever," )<br> | U.S.C. § 2461(c): Forfeiture; 18<br>U.S.C. § 982(a)(2): Forfeiture; |
| 2 |    aka "Emo," )<br>ARMEN HOVANISSIAN, ) | 18 U.S.C. § 1028(b)(5); 18 U.S.C.<br>§ 1029(c)(1)(C): Forfeiture; 21 |
| 3 |    aka "Sniper," )<br>   aka "Arm," ) | U.S.C. § 853: Forfeiture] |

```
 1   EMIL AIRAPETIAN,                )    U.S.C. § 2461(c): Forfeiture; 18
        aka "Clever,"                )    U.S.C. § 982(a)(2): Forfeiture;
 2      aka "Emo,"                   )    18 U.S.C. § 1028(b)(5); 18 U.S.C.
     ARMEN HOVANISSIAN,              )    § 1029(c)(1)(C): Forfeiture; 21
 3      aka "Sniper,"                )    U.S.C. § 853: Forfeiture]
        aka "Arm,"                   )
 4      aka "Armen Hovanessian,"     )
     ROMAN TEROGANESYAN,             )
 5      aka "Lil Boy,"               )
        aka "Rome,"                  )
 6      aka "Roman Teroganesian,"    )
        aka "Arthur Teroganesian,"   )
 7   EDGAR KHACHATRYAN,              )
        aka "Gunner,"                )
 8      aka "Lil Gunner,"            )
        aka "Edo,"                   )
 9   GARIK GALSTYAN,                 )
        aka "Stomper,"               )
10      aka "Stomps,"                )
     HARUT TOROSYAN,                 )
11      aka "Menace,"                )
        aka "Harout Torosyan,"       )
12   SOUREN SEROBYAN,                )
        aka "Suro,"                  )
13   VAZGEN TOPADZHIKYAN,            )
        aka "Lucky,"                 )
14   ARA FERMANYAN,                  )
        aka "Casper,"                )
15      aka "Cass,"                  )
     DAVID MURADYAN,                 )
16      aka "Stranger,"              )
        aka "Davo,"                  )
17   KAREN MARKOSIAN,                )
        aka "Kar,"                   )
18      aka "Garen,"                 )
     KAREN ZAKARYAN,                 )
19      aka "Kond,"                  )
        aka "Gond,"                  )
20      aka "Kondik,"                )
        aka "Kar,"                   )
21   ARTUR PEMBEJIAN,                )
        aka "Cham,"                  )
22   ARAM PETROSIAN,                 )
        aka "Tot,"                   )
23      aka "Toto,"                  )
     ARMAN KARAYAN,                  )
24   OGANES TEROGANESYAN,            )
        aka "Hovo,"                  )
25      aka "Hovik,"                 )
        aka "Oganes Terognesyan,"    )
26   JACK GAMBARYAN,                 )
        aka "Zhak Gambarian,"        )
27      aka "Speedy,"                )
     RAYMOND TARVERDYAN,             )
28      aka "Rye,"                   )
        aka "Ray,"                   )
```

```
 1   VAHE MNATSAKANYAN,                    )
         aka "V,"                          )
 2       aka "Vahik,"                      )
     ARMANDO MORENO,                       )
 3       aka "Mando,"                      )
         aka "Monkey,"                     )
 4       aka "Blackie,"                    )
     ANDRANIK ALOYAN,                      )
 5       aka "Andy,"                       )
         aka "Ando,"                       )
 6   LUSINE OGANDGANYAN,                   )
         aka "Lusine Ogandjanian,"         )
 7       aka "Luso,"                       )
     GUSTAVO ORTEGA,                       )
 8       aka "Bam Bam,"                    )
         aka "Bams,"                       )
 9       aka "Gus,"                        )
     GAGIK ZHAMKOCHYAN,                    )
10       aka "Manic,"                      )
         aka "Panther,"                    )
11       aka "Gago,"                       )
         aka "Gag,"                        )
12   SUREN TOROSYAN,                       )
         aka "Suro,"                       )
13       aka "Sunny,"                      )
     GRACHIA NALBANDYAN,                   )
14       aka "Raider,"                     )
         aka "Puffy,"                      )
15       aka "Crazy,"                      )
     EDGAR YERKANYAN,                      )
16       aka "Edo,"                        )
     KARINE MKRTCHYAN,                     )
17   RAFAEL PARSADANYAN,                   )
         aka "Raffi,"                      )
18       aka "Raffo,"                      )
     SIMON ANTONYAN,                       )
19       aka "Simo,"                       )
         aka "Sim,"                        )
20   GAREN CHOULDJIAN,                     )
         aka "Misak,"                      )
21   GRIGOR GARIBYAN,                      )
         aka "Gokor,"                      )
22   ARTUR GABRELYAN,                      )
         aka "Rubo,"                       )
23       aka "Art,"                        )
     ANDRANIK BAKHCHADJIAN,                )
24       aka "Ando,"                       )
         aka "Andranik Bakhcadjian,"       )
25   VARTENIE ANANIAN,                     )
     RAFAEL GONZALEZ-MUNOZ JR.,            )
26       aka "Cisco,"                      )
         aka "the Drink,"                  )
27   KHACHATUR ARAKELYAN,                  )
         aka "Khecho,"                     )
28   KARAPET JOEY KARAMUSYAN,              )
         aka "Karo,"                       )
```

3

```
 1   HAROUTIOUN ARTHUR MELKONIAN, )
        aka "Art,"                 )
 2      aka "Art from Montebello," )
     ARSEN AYRANJIAN,              )
 3   ADAM DAVOODIAN,               )
        aka "Aram,"                )
 4   ARAM KHACHATRYAN,             )
     TIGRAN SARKISYAN,             )
 5      aka "Tiko,"                )
     MIGUEL AGUSTIN RAMIREZ,       )
 6      aka "Mugsy,"               )
        aka "Mugs,"                )
 7   HAGOP YAMALYAN,               )
        aka "Hago,"                )
 8   MANUK TERZYAN,                )
        aka "Max,"                 )
 9   KAREN HESHAM SAMAWI,          )
        aka "Karen Hesham,"        )
10   JULIO CESAR RIVAS,            )
        aka "July,"                )
11      aka "Biggie,"              )
        aka "Big Boy,"             )
12   ZHIRAYR KARAYAN,              )
        aka "Zhiro,"               )
13      aka "Jerry,"               )
     SARKIS AVEDISIAN,             )
14      aka "Sako,"                )
     VARTAN AVEDISSIAN,            )
15      aka "Vardan,"              )
        aka "Voicebox,"            )
16   JOSEPH MARES,                 )
     CATRINA BALDERRAMA,           )
17   VARDAN AMIRKHANYAN,           )
     HOVANNES IGARIAN,             )
18      aka "Hovo,"                )
     NAIRA ASTGHIK TEROUNIAN,      )
19   ARNOLD MORADIANS,             )
        aka "Arno,"                )
20   DEBRA MAY-LAWSON,             )
        aka "Sugar,"               )
21   RAFAEL ROGER ZENDEJAS,        )
     STEVEN WILSON,                )
22      aka "Stutters,"            )
     GEVORK KASABYAN,              )
23      aka "Kash,"                )
     MARAT SHAKHRAMANYAN,          )
24   FNU LNU,                      )
        aka "Musho," and           )
25   FNU LNU,                      )
        aka "David Petrosov,"      )
26                                 )
                   Defendants.     )
27   _____)

28
```

The Grand Jury charges:

### GENERAL ALLEGATIONS AND DEFINITIONS

At all times relevant to this Indictment, the following definitions apply:

1.   As used in this Indictment, "personal identifying information" means any name, address, date of birth, social security number, mother's maiden name, access code, driver's license number, personal identification number ("PIN"), telephone number, signature, and other means of identification commonly provided by an individual in connection with obtaining access to a bank account.

2.   As used in this Indictment, "access device" means any card, plate, code, account number, electronic serial number, mobile identification number, PIN, or other telecommunications service, equipment, or instrument identifier, or other means of account access that can be used, alone or in conjunction with another access device, to obtain money, goods, services, or any other thing of value, or that can be used to initiate a transfer of funds, as more fully defined in Title 18, United States Code, Section 1029(e).

3.   As used in this Indictment, "counterfeit access device" means any access device that is counterfeit, fictitious, altered, or forged, or an identifiable component of an access device or a counterfeit access device, as more fully defined in Title 18, United States Code, Section 1029(e).

4.   As used in this Indictment, "unauthorized access device" means any access device that is lost, stolen, expired, revoked, cancelled, or obtained with intent to defraud, as more fully defined in Title 18, United States Code, Section 1029(e).

5.   As used in this Indictment, "device-making equipment" means any equipment, mechanism, or impression designed or primarily used for making an access device or a counterfeit access device, as more fully defined in Title 18, United States Code, Section 1029(e).

6.   As used in this Indictment, a "skimming device" is a device that can be attached to a debit or credit card keypad or a point-of-sale terminal to record the information, including account numbers, from the magnetic strips of cards that are swiped into the keypad.   A skimming device will also record the key strokes entered into the keypad, including pin numbers and access codes corresponding to the cards.   The information recovered from a skimming device can then be used to create counterfeit and unauthorized access devices, thereby allowing money to be withdrawn from an account holder's bank account without the account holder's consent, knowledge, or authorization.

7.   As used in this Indictment, "identification document" means a document made or issued by or under the authority of the United States Government, a State, a political subdivision of a State, a sponsoring entity of an event designated as a special event of national significance, a foreign government, a political subdivision of a foreign government, an international governmental or an international quasi-governmental organization

which, when completed with information concerning a particular individual, is of a type intended or commonly accepted for the purpose of identification of individuals, as more fully defined in Title 18, United States Code, Section 1028(d).

8.   As used in this Indictment, "false identification document" means a document of a type intended or commonly accepted for the purposes of identification of individuals that (a) is not issued by or under the authority of a governmental entity, or was issued under the authority of a governmental entity but was subsequently altered for purposes of deceit; and (b) appears to be issued by or under the authority of the United States Government, a State, a political subdivision of a State, a sponsoring entity of an event designated by the President as a special event of national significance, a foreign government, a political subdivision of a foreign government, or an international governmental or quasi-governmental organization, as more fully defined in Title 18, United States Code, Section 1028(d).

9.   As used in this Indictment, "means of identification" means any name or number that may be used, alone or in conjunction with any other information, to identify a specific individual, including, among other things, (a) any name, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number; or (b) unique electronic

1    identification number, address, or routing code, including a PIN,
2    as more fully defined in Title 18, United States Code, Section
3    1028(d).

COUNT ONE

[18 U.S.C. § 1962(d)]

<u>THE RACKETEERING ENTERPRISE</u>

1.   At all times relevant to this Indictment, defendants MHER DARBINYAN, also known as ("aka") "Mike," aka "Hollywood Mike," aka "Little Mike," aka "Capone," aka "Caps," aka "Maher" ("DARBINYAN"); PARAMAZ BILEZIKCHYAN, aka "Parik," aka "P," aka "Parnamas Bileziktsian," aka "Bleziktsian Paramas" ("BILEZIKCHYAN"); KARO YERKANYAN, aka "Guilty," aka "Gator," aka "Kane" ("K. YERKANYAN"); ARMAN SHAROPETROSIAN, aka "Horse," aka "Dzi" ("SHAROPETROSIAN"); HAYK KARAYAN, aka "Hayko," aka "Whisper" ("H. KARAYAN"); ARMAN TANGABEKYAN, aka "Spito," aka "Spitak," aka "Villager," aka "Thick Neck," aka "Armancho" ("TANGABEKYAN"); EMIL AIRAPETIAN, aka "Clever," aka "Emo" ("AIRAPETIAN"); ARMEN HOVANISSIAN, aka "Sniper," aka "Arm" ("HOVANISSIAN"); ROMAN TEROGANESYAN, aka "Lil Boy," aka "Rome," aka "Roman Teroganesian," aka "Arthur Teroganesian" ("R. TEROGANESYAN"); EDGAR KHACHATRYAN, aka "Gunner," aka "Lil Gunner," aka "Edo" ("E. KHACHATRYAN"); GARIK GALSTYAN, aka "Stomper," aka "Stomps" ("GALSTYAN"); HARUT TOROSYAN, aka "Menace," aka "Harout Torosyan" ("H. TOROSYAN"); SOUREN SEROBYAN, aka "Suro" ("SEROBYAN"); VAZGEN TOPADZHIKYAN, aka "Lucky" ("TOPADZHIKYAN"); ARA FERMANYAN, aka "Casper," aka "Cass" ("FERMANYAN"); DAVID MURADYAN, aka "Stranger," aka "Davo" ("MURADYAN"); KAREN MARKOSIAN, aka "Kar," aka "Garen" ("MARKOSIAN"); KAREN ZAKARYAN, aka "Kond," aka "Gond," aka "Kondik," aka "Kar" ("ZAKARYAN"); ARTUR PEMBEJIAN, aka "Cham" ("PEMBEJIAN"); ARAM PETROSIAN, aka "Tot," aka "Toto"

("PETROSIAN"); ARMAN KARAYAN ("A. KARAYAN"); OGANEŞ TEROGANESYAN, aka "Hovo," aka "Hovik," aka "Oganes Terognesyan" ("O. TEROGANESYAN"); JACK GAMBARYAN, aka "Zhak Gambarian," aka "Speedy" ("GAMBARYAN"); RAYMOND TARVERDYAN, aka "Rye," aka "Ray" ("TARVERDYAN"); VAHE MNATSAKANYAN, aka "V," aka "Vahik" ("MNATSAKANYAN"); ARMANDO MORENO, aka "Mando," aka "Monkey," aka "Blackie" ("MORENO"); ANDRANIK ALOYAN, aka "Andy," aka "Ando" ("ALOYAN"); LUSINE OGANDGANYAN, aka "Lusine Ogandjanian," aka "Luso" ("L. OGANDGANYAN"); and GUSTAVO ORTEGA, aka "Bam Bam," aka "Bams," aka "Gus" ("ORTEGA"), and others known and unknown to the Grand Jury, were members and associates of the Armenian Power criminal organization ("Armenian Power"), whose members and associates engaged in, among other things, murder, attempted murder, kidnapping, robbery, extortion, conspiracy to traffic in controlled substances, bank fraud, access device fraud, identity theft, and illegal gambling.  At all relevant times to this Indictment, the Armenian Power criminal organization operated within the Central District of California and elsewhere.

2.   Armenian Power, including its leadership, members, and associates, constitutes an "enterprise," as that term is defined in Title 18, United States Code, Section 1961(4) -- that is, a group of individuals associated in fact, although not a legal entity, which is engaged in, and the activities of which affect, interstate and foreign commerce.  Armenian Power is an international organized crime group, with its leadership based in Los Angeles, that operates throughout the United States, including the Central District of California, and internationally.  The enterprise constitutes an ongoing

organization whose members function as a continuing unit for a common purpose of achieving the objectives of the enterprise.

3.   Armenian Power, or "AP" as it is commonly referred to by its members and associates, originated in Los Angeles County in the 1980s.  Armenian Power was formed in the East Hollywood district of Los Angeles as a street gang whose membership consisted primarily of individuals of Armenian descent, as well as of other countries within the former Soviet bloc, in response to other ethnic street gangs in the area.  From its inception, members and associates of Armenian Power have been involved in various violent criminal acts, including murders, attempted murders, kidnappings, robberies, extortions, and witness intimidation, as well as drug trafficking and crimes involving fraudulent activity.

4.   Today, Armenian Power has been designated under California state law as a criminal street gang and is believed to have over 250 documented members, as well as hundreds of associates.  Armenian Power members and associates generally frequent locations and businesses in Los Angeles County, including the district of Hollywood, and the cities of Glendale, Burbank, North Hollywood, West Hollywood, and Van Nuys.  Control of territory within these areas, however, is not as important to Armenian Power members and associates as maintaining "hang outs" to plan and commit crimes and further Armenian Power's purpose of enriching its members and associates.  Armenian Power members and associates typically use "hang outs" that are owned or operated by people who permit Armenian Power members and associates to use

1  such locations due to fear, intimidation, or association with
2  Armenian Power.

3       5.    Members of Armenian Power generally join the
4  organization after spending a period of time as associates of the
5  organization, during which time they are expected to put in
6  "work," in other words, commit violent acts, carry firearms, and
7  otherwise assist more senior Armenian Power members in committing
8  crimes.   Members normally join Armenian Power by being "jumped
9  in," in other words, by being beaten by other Armenian Power
10  members for a short period of time, or by being "walked in," in
11  other words, by being vouched for or sponsored by a member of
12  Armenian Power.   Armenian Power gang members typically identify
13  themselves through use of gang tattoos, tagging or graffiti, gang
14  signs, gang art, street names or monikers, and gang clothing.

15       6.    Leadership and power within Armenian Power is generally
16  based on a combination of seniority and notoriety for committing
17  criminal acts.   Members of Armenian Power who have spent extended
18  sentences in jail or prison and who have developed relationships
19  with members of powerful prison gangs generally carry more power
20  and status within the gang.   Also, members who are known to have
21  committed acts of violence against others tend to wield more
22  power and authority within Armenian Power.   At times, there have
23  been disputes and rivalries between members and associates of
24  Armenian Power regarding power, authority, and leadership within
25  the criminal enterprise, but members and associates of Armenian
26  Power nonetheless generally act in concert to oppose rival
27  criminal organizations and individuals.

28

7.    To enrich its members and associates, and preserve, protect, enhance, and expand the power of the Armenian Power criminal enterprise, Armenian Power members and associates regularly carry out violent criminal acts, including murders, attempted murders, kidnappings, robberies, extortions, and witness intimidation.  In order to carry out violent criminal acts, eliminate rivals, intimidate and threaten others, and promote the overall power and criminal reputation of the Armenian Power criminal enterprise, Armenian Power members and associates acquire and maintain firearms, ammunition, and other weapons, and distribute firearms, ammunition, and other weapons to Armenian Power members and associates.

8.    Because one of the purposes of the Armenian Power criminal enterprise is to enrich its members and associates, Armenian Power members and associates engage in a wide variety of crimes intended to unlawfully generate revenue, including kidnappings, robberies, extortions, drug trafficking, bank fraud, access device fraud, identity theft, and illegal gambling.  In order to effectively commit these crimes, Armenian Power members rely extensively on a wide network of associates to assist in carrying out their crimes.  For instance, with regard to bank fraud, Armenian Power relies on members and associates with the knowledge and ability to unlawfully obtain bank customer information, forge checks, and recruit check cashing "runners" to illegally cash or deposit checks.  Further, with regard to access device fraud, Armenian Power relies on members and associates with the knowledge and ability to create fraudulent debit cards and credit cards.  Armenian Power's network of associates is an

13

important part of its ability to successfully carry out a wide-array of criminal activities.  In carrying out fraud crimes, members and associates of Armenian Power use, control, and possess personal identifying information, access devices, unauthorized access devices, counterfeit access devices, device-making equipment, including skimming devices, identification documents, false identification documents, and means of identification, among other things.

9.    Armenian Power is closely associated with an organization known as the "Mexican Mafia," or "EME," which is Spanish for the letter "M."  As such, Armenian Power is sometimes referred to as "AP-13," with the number "13" representing the thirteenth letter of the alphabet, the letter "M."  The Mexican Mafia is an organized group of individuals that controls much of the distribution of narcotics and other criminal activities within California state prisons and some federal prisons.  The relationship between Armenian Power and the Mexican Mafia is symbiotic:  The Mexican Mafia, which has large numbers of incarcerated members and associates, provides protection and status to Armenian Power members and associates within prison. In exchange, Armenian Power members and associates assist Mexican Mafia members and associates with collecting money or "taxes" within prison and outside prison, smuggling contraband, including narcotics, into prison, and committing financial and fraud-related crimes outside of prison.  In addition, Armenian Power members and associates and Mexican Mafia members and associates tend to exchange high-value gifts, including vehicles and weapons.

14

10.   Due in part to their prior periods of incarceration -- for robbery, assault with a deadly weapon, financial fraud, and other offenses -- and other connections, defendants DARBINYAN, BILEZIKCHYAN, K. YERKANYAN, HOVANISSIAN, R. TEROGANESYAN, and other members and associates of Armenian Power have forged particularly strong ties to leaders and members of the Mexican Mafia, and they are able to regularly access and communicate with Mexican Mafia leaders.  These strong ties to the Mexican Mafia, as well as their seniority and lengthy experience in committing violent criminal acts, gave defendants DARBINYAN, BILEZIKCHYAN, K. YERKANYAN, HOVANISSIAN, R. TEROGANESYAN, as well as others with close ties to them, an important leadership role in Armenian Power.

11.   Particularly through its leadership, Armenian Power maintains ties to Russia and Armenia, to which most members and associates generally retain strong ethnic and cultural ties. Indeed, although most are fluent in English, Armenian Power members and associates generally prefer to discuss their criminal activities in the Armenian and Russian languages in order to conceal their discussions to the extent possible.  Traditionally, Russian and Armenian organized crime centers on criminal elders and high-level crime bosses, such as a "Thief-in-Law," or, in Armenian, "Gogh."  These "Thieves-in-Law" typically use their authority within Russian and Armenian organized crime to resolve disputes among criminals and others, authorize criminal activity, and receive payments or tribute from organized crime members and others.

1    12.   Within Los Angeles and elsewhere, the leadership of

2  Armenian Power, including, among others, defendants DARBINYAN,

3  BILEZIKCHYAN, K. YERKANYAN, SHAROPETROSIAN, H. KARAYAN,

4  TANGABEKYAN, HOVANISSIAN, and R. TEROGANESYAN, operates as

5  equivalent to a "Thief-in-Law."  Armenian Power leaders authorize

6  and carry out violent acts and large-scale criminal activity,

7  wield power and authority among Armenian organized crime figures

8  and others in the broader Armenian and Eurasian communities,

9  maintain ties with the Mexican Mafia and other non-Armenian

10 criminal groups, and often communicate with high-level Armenian

11 and Russian organized crime figures, both abroad and in the

12 United States.  The leadership of Armenian Power deals directly

13 with traditional "Thieves-in-Law" and other high-level organized

14 crime figures, both within the United States and abroad, in order

15 to resolve criminal disputes and address criminal activities.

16 Because of their large network of members and associates,

17 demonstrated ability to carry out acts of violence, and strong

18 relationship with the Mexican Mafia, Armenian Power leaders

19 interact with traditional "Thieves-in-Law" as co-equals.

20 Moreover, at times, Armenian Power members and associates

21 confront and commit acts of violence against associates of

22 traditional "Thieves-in-Law," and often disregard their criminal

23 authority in favor of the criminal authority of the Armenian

24 Power leadership.

25                      <u>PURPOSES OF THE ENTERPRISE</u>

26    13.   The purposes of the Armenian Power criminal enterprise,

27 including its members and associates, include, but are not

28 limited to, the following:

1        a.   Enriching members and associates of the Armenian

2 Power criminal enterprise through, among other things,

3 kidnapping, robbery, extortion, narcotics distribution, illegal

4 gambling, access device fraud, bank fraud, and other crimes;

5        b.   Preserving and expanding the power and financial

6 profits of the Armenian Power criminal enterprise through

7 intimidation, threats of violence, and actual acts of violence;

8        c.   Promoting, protecting, and enhancing the Armenian

9 Power criminal enterprise and the activities of its members and

10 associates.

11              <u>MEANS AND METHODS OF THE ENTERPRISE</u>

12    14.  Among the means and methods by which defendants and

13 other members and associates of the Armenian Power criminal

14 enterprise participate in the conduct of the affairs of the

15 Armenian Power criminal enterprise are the following:

16        a.  Members and associates of the Armenian Power

17 criminal enterprise commit, attempt to commit, and conspire to

18 commit acts of violence, including murder, kidnapping, robbery,

19 and extortion, to preserve and expand the power and financial

20 profits of the Armenian Power criminal enterprise.

21        b.   Members and associates of the Armenian Power

22 criminal enterprise use violence and the threat of violence to

23 preserve and enhance the power and financial profits of members

24 and associates of the Armenian Power criminal enterprise.

25        c.   Members and associates of the Armenian Power

26 criminal enterprise and their co-conspirators work together on a

27 wide-range of money-making schemes, including, among other

28 things, bank fraud, access device fraud, identity theft,

1   distribution of controlled substances, and illegal gambling, in
2   order to generate criminal proceeds and income for members and
3   associates of the Armenian Power criminal enterprise and their
4   co-conspirators.

5          d.   Members and associates of the Armenian Power
6   criminal enterprise build, maintain, and preserve ties with
7   Mexican Mafia members and associates in order to protect Armenian
8   Power members and associates who are incarcerated, and to
9   promote, protect, and enhance the power and reputation of the
10  Armenian Power criminal enterprise.

11                THE RACKETEERING CONSPIRACY
12         15.  Beginning on a date unknown to the Grand Jury, and
13  continuing to in or around February 16, 2011, in Los Angeles
14  County, within the Central District of California, and elsewhere,
15  defendants DARBINYAN, BILEZIKCHYAN, K. YERKANYAN, SHAROPETROSIAN,
16  H. KARAYAN, TANGABEKYAN, AIRAPETIAN, HOVANISSIAN, R.
17  TEROGANESYAN, E. KHACHATRYAN, GALSTYAN, H. TOROSYAN, SEROBYAN,
18  TOPADZHIKYAN, FERMANYAN, MURADYAN, MARKOSIAN, ZAKARYAN,
19  PEMBEJIAN, PETROSIAN, A. KARAYAN, O. TEROGANESYAN, GAMBARYAN,
20  TARVERDYAN, MNATSAKANYAN, MORENO, ALOYAN, L. OGANDGANYAN, and
21  ORTEGA, and others known and unknown to the Grand Jury, being
22  persons employed by and associated with the Armenian Power
23  criminal enterprise described in Paragraphs One through Twelve of
24  this Count, which constitutes an "enterprise" as defined in Title
25  18, United States Code, Section 1961(4), which enterprise engaged
26  in, and the activities of which affected, interstate and foreign
27  commerce, unlawfully and knowingly combined, conspired,
28  confederated, and agreed together and with each other to violate

                              18

1  Title 18, United States Code, Section 1962(c), that is, to
2  conduct and participate, directly and indirectly, in the conduct
3  of the affairs of the enterprise through a pattern of
4  racketeering activity, as that term is defined in Title 18,
5  United States Code, Sections 1961(1) and 1961(5), consisting of
6  multiple acts indictable under:

7         A.    Title 18, United States Code, Section 1028 (Identity
8  Theft);

9         B.    Title 18, United States Code, Section 1029 (Access
10  Device Fraud);

11        C.    Title 18, United States Code, Section 1344 (Bank
12  Fraud);

13        D.    Title 18, United States Code, Section 1951
14  (Interference with Commerce by Threats or Violence);

15        E.    Title 18, United States Code, Section 1955 (Prohibition
16  of Illegal Gambling Businesses);

17        and multiple acts involving:

18        A.    Extortion, in violation of California Penal Code
19  Sections 32, 182, 518-520, and 664;

20        B.    Kidnapping, in violation of California Penal Code
21  Sections 32, 182, 207-210, and 664;

22        C.    Robbery, in violation of California Penal Code Sections
23  32, 182, 211, and 664;

24        and multiple acts involving the manufacture, distribution,
25  and possession with intent to distribute controlled substances,
26  in violation of Title 21, United States Code, Sections 846 and
27  841(a)(1).

28

It was a part of the conspiracy that each defendant agreed that a conspirator would commit at least two acts of racketeering activity in the conduct of the affairs of the Enterprise.

A. <u>MEANS BY WHICH THE OBJECT OF THE CONSPIRACY WAS TO BE ACCOMPLISHED</u>

The object of the conspiracy was to be accomplished in substance as follows:

1.   Defendants DARBINYAN, BILEZIKCHYAN, K. YERKANYAN, SHAROPETROSIAN, and H. KARAYAN, and others would direct and coordinate the activities of the Armenian Power criminal enterprise, including its members and associates, insofar as those activities included the commission of crimes of violence, including kidnapping and extortion, and fraud-related crimes, including bank fraud and access device fraud.

2.   Defendants DARBINYAN, BILEZIKCHYAN, K. YERKANYAN, SHAROPETROSIAN, H. KARAYAN, TANGABEKYAN, AIRAPETIAN, HOVANISSIAN, R. TEROGANESYAN, E. KHACHATRYAN, GALSTYAN, H. TOROSYAN, FERMANYAN, MURADYAN, MARKOSIAN, ZAKARYAN, PEMBEJIAN, PETROSIAN, O. TEROGANESYAN, GAMBARYAN, and L. OGANDGANYAN, and others would carry out crimes of violence, including kidnapping and extortion, to preserve and expand the power and financial profits of the Armenian Power criminal enterprise.

3.   Defendants DARBINYAN, BILEZIKCHYAN, and SHAROPETROSIAN, who was incarcerated in California State Prison at times during the conspiracy, would direct other members and associates of the Armenian Power criminal enterprise to execute and attempt to execute bank fraud schemes targeting the bank accounts of unwitting victims.  In particular, defendants DARBINYAN,

1  BILEZIKCHYAN, and SHAROPETROSIAN would direct their co-schemers,

2  including defendants TANGABEKYAN, MARKOSIAN, MNATSAKANYAN,

3  MORENO, ALOYAN, L. OGANDGANYAN, ORTEGA, and Karen Hesham Samawi

4  ("Samawi"), to, among other things, obtain, unlawfully and

5  without authorization, (a) bank account information for high-

6  value bank accounts; (b) personal identifying information for the

7  bank customer victims who owned the high-value bank accounts,

8  including names, social security numbers, and dates of birth; and

9  (c) checks for the high-value bank accounts.  The co-schemers

10 would then create fraudulent checks with forged signatures and

11 direct other co-schemers to go to different bank branches to cash

12 and deposit the fraudulent checks.  In this regard, defendants

13 and their co-schemers would often rely on "check runners," whose

14 function was to enter a bank and attempt to cash or deposit a

15 fraudulent check in exchange for a promised fee.  Additionally,

16 defendant DARBINYAN would work with other co-schemers, including

17 defendants PETROSIAN, TARVERDYAN, and ORTEGA, to unlawfully

18 obtain debit card numbers from bank fraud victims using skimming

19 devices installed at stores, and then direct "runners" to

20 unlawfully and without authorization use the debit card numbers

21 to withdraw money from the victims' bank accounts.  Further,

22 defendants BILEZIKCHYAN, K. YERKANYAN, and ALOYAN, and others

23 would use personal identifying information of bank fraud victims

24 to unlawfully and without authorization open bank accounts in the

25 names of the bank fraud victims in order to obtain money from,

26 among other things, fraudulent loans and lines of credit.

27      4.   Defendants DARBINYAN, BILEZIKCHYAN, H. KARAYAN, H.

28 TOROSYAN, SEROBYAN, TOPADZHIKYAN, PETROSIAN, TARVERDYAN, ALOYAN,

1  and ORTEGA, and others often by using skimming devices, would

2  obtain, and direct others to obtain, access devices from

3  unwitting victims, with intent to defraud, and in order to create

4  counterfeit or unauthorized access devices.

5      5.    Defendants DARBINYAN, BILEZIKCHYAN, K. YERKANYAN,

6  SHAROPETROSIAN, H. KARAYAN, HOVANISSIAN, R. TEROGANESYAN,

7  FERMANYAN, A. KARAYAN, O. TEROGANESYAN, GAMBARYAN, TARVERDYAN,

8  and MNATSAKANYAN, and others would manufacture, distribute, and

9  possess with intent to distribute controlled substances.

10      6.    Defendants BILEZIKCHYAN, H. KARAYAN, R. TEROGANESYAN,

11  and GAMBARYAN, and others would conduct, finance, manage,

12  supervise, direct, and own all or part of illegal gambling

13  businesses.

14      7.    Defendants DARBINYAN, BILEZIKCHYAN, and K. YERKANYAN,

15  and others would meet with defendants MORENO and Rafael Gonzalez-

16  Munoz Jr. ("Gonzalez-Munoz Jr."), and other Mexican Mafia members

17  and associates, to discuss relations between the Mexican Mafia

18  and members and associates of the Armenian Power criminal

19  enterprise, and defendants DARBINYAN, BILEZIKCHYAN, K. YERKANYAN,

20  and SHAROPETROSIAN, and others, would provide Mexican Mafia

21  members and associates with money, drugs, and other contraband,

22  as well as direction on committing fraud-related crimes, in order

23  to preserve and enhance the Armenian Power criminal enterprise's

24  relationship with the Mexican Mafia.

25      8.    Defendants DARBINYAN, BILEZIKCHYAN, and K. YERKANYAN,

26  and others would regularly meet with Thieves-in-Law for purposes

27  of addressing disputes among criminal figures and others within

28  the Armenian and Eurasian communities.  DARBINYAN, BILEZIKCHYAN,

1  and K. YERKANYAN, and others would also confront and challenge

2  Thieves-in-Law and their associates with regard to criminal

3  disputes and the Armenian Power criminal enterprise's asserted

4  control of criminal activities involving the Armenian and

5  Eurasian communities within Los Angeles and elsewhere.

6      9.   Defendants DARBINYAN, BILEZIKCHYAN, K. YERKANYAN,

7  SHAROPETROSIAN, H. KARAYAN, HOVANISSIAN, R. TEROGANESYAN, E.

8  KHACHATRYAN, GALSTYAN, H. TOROSYAN, SEROBYAN, FERMANYAN,

9  MURADYAN, MARKOSIAN, ZAKARYAN, PEMBEJIAN, PETROSIAN, TARVERDYAN,

10  and ALOYAN, and others would obtain, use, and possess firearms

11  and ammunition to commit crimes of violence and in order to

12  preserve and enhance the Armenian Power criminal enterprise.

13  B.   OVERT ACTS

14      In furtherance of the racketeering conspiracy, and to

15  accomplish the objects of the racketeering conspiracy, defendants

16  DARBINYAN, BILEZIKCHYAN, K. YERKANYAN, SHAROPETROSIAN, H.

17  KARAYAN, TANGABEKYAN, AIRAPETIAN, HOVANISSIAN, R. TEROGANESYAN,

18  E. KHACHATRYAN, GALSTYAN, H. TOROSYAN, SEROBYAN, TOPADZHIKYAN,

19  FERMANYAN, MURADYAN, MARKOSIAN, ZAKARYAN, PEMBEJIAN, PETROSIAN,

20  A. KARAYAN, O. TEROGANESYAN, GAMBARYAN, TARVERDYAN, MNATSAKANYAN,

21  MORENO, ALOYAN, L. OGANDGANYAN, and ORTEGA, and others known and

22  unknown to the Grand Jury, committed and caused to be committed

23  various overt acts, on or about the following dates, within the

24  Central District of California, and elsewhere, including, but not

25  limited to, the following:

26      Conspiracy to Extort Victim S.M.

27      1.   On or about January 9, 2009, defendant K. YERKANYAN,

28  in a telephone conversation using coded language, discussed with

23

1   defendant HOVANISSIAN, who was incarcerated at the time, a plan

2   to force another jail inmate, victim S.M., to pay them money.

3         2.    On or about January 9, 2009, defendant HOVANISSIAN,

4   in a telephone conversation using coded language, told defendant

5   K. YERKANYAN to call victim S.M. and threaten that HOVANISSIAN

6   would distribute compromising photographs of victim S.M. to other

7   jail inmates unless he paid them money.

8         3.    On or about January 10, 2009, defendant K. YERKANYAN,

9   in a telephone conversation using coded language, told defendant

10   HOVANISSIAN that K. YERKANYAN wanted to visit victim S.M. in jail

11   in order to extort him using the compromising photographs, and

12   HOVANISSIAN said he would send K. YERKANYAN victim S.M.'s

13   information to facilitate this visit.

14     <u>Extortion of Victim M.M.</u>

15         4.    On or about June 27, 2009, defendant SHAROPETROSIAN,

16   in a telephone conversation using coded language, discussed with

17   defendant DARBINYAN seizing and holding victim M.M. until victim

18   M.M.'s father brought them money.

19         5.    On or about June 29, 2009, defendant SHAROPETROSIAN

20   initiated a three-way call with defendant DARBINYAN and victim

21   M.M. and threatened victim M.M. with bodily harm if he did not

22   pay money to SHAROPETROSIAN and DARBINYAN.

23         6.    On or about June 30, 2009, defendant DARBINYAN, in a

24   telephone conversation using coded language, told defendant

25   SHAROPETROSIAN that DARBINYAN had met with victim M.M. and

26   threatened him with physical violence if he did not pay money,

27   and SHAROPETROSIAN said victim M.M. should pay $70,000 to

28   defendant L. OGANDGANYAN and additional money to them.

7.     On or about July 3, 2009, defendant SHAROPETROSIAN, in a telephone conversation using coded language, told defendant DARBINYAN to threaten victim M.M. with physical harm if victim M.M. did not pay money to SHAROPETROSIAN and DARBINYAN.

8.     On or about July 4, 2009, defendant SHAROPETROSIAN, in a telephone conversation using coded language, told defendant DARBINYAN to inform victim M.M. that victim M.M. would be kidnapped for three months if he did not pay money to SHAROPETROSIAN.

9.     On or about July 4, 2009, defendant SHAROPETROSIAN initiated a three-way call with defendant DARBINYAN and victim M.M., and SHAROPETROSIAN and DARBINYAN told victim M.M. that they would kidnap victim M.M. if victim M.M. and his family did not pay money to SHAROPETROSIAN, DARBINYAN, and defendant L. OGANDGANYAN.

10.     On or about July 6, 2009, defendant SHAROPETROSIAN, in a telephone conversation using coded language, discussed with defendant DARBINYAN how much money they intended to obtain from victim M.M. that day using threats of physical harm.

11.     On or about July 6, 2009, defendant DARBINYAN, in a telephone conversation using coded language, told victim M.M. that DARBINYAN would hurt victim M.M. if victim M.M. did not pay him money.

12.     On July 8, 2009, defendant DARBINYAN, in a telephone conversation using coded language, demanded money from victim M.M.

13.     On July 9, 2009, defendants DARBINYAN and SHAROPETROSIAN, in a telephone conversation using coded language,

25

discussed how to obtain money from victim M.M., and SHAROPETROSIAN said that some of the money would go to defendant L. OGANDGANYAN.

14.   On August 30, 2009, defendant SHAROPETROSIAN, using coded language on the telephone, demanded money from victim M.M.

15.   On or about August 31, 2009, defendant SHAROPETROSIAN, in a telephone conversation using coded language, instructed victim M.M. to meet an unindicted co-conspirator to deliver money to her under threat of physical harm.

16.   On or about September 3, 2009, defendant SHAROPETROSIAN, in a telephone conversation using coded language, demanded $100,000 from victim M.M. under threat of physical harm.

17.   On or about September 4, 2009, defendant SHAROPETROSIAN, in a telephone conversation using coded language, told victim M.M. that victim M.M. would be killed.

18.   On or about September 11, 2009, defendants SHAROPETROSIAN and L. OGANDGANYAN spoke with victim M.M. in a three-way call and, using coded language, demanded money from victim M.M. under threat of physical harm.

19.   On or about October 28, 2009, defendant SHAROPETROSIAN, in a telephone conversation using coded language, instructed victim M.M. to make deposits into certain bank accounts and to use either Western Union or Moneygram to send money to SHAROPETROSIAN and his co-conspirators under threat of violence.

20.   On or about October 29, 2009, defendants SHAROPETROSIAN and AIRAPETIAN, in a telephone conversation using coded language, demanded $1,875 from victim M.M. and threatened victim M.M. with violence if victim M.M. did not pay the money.

21.   On or about October 29, 2009, defendant AIRAPETIAN, in a telephone conversation using coded language, arranged a meeting with victim M.M. for the purpose of obtaining money from victim M.M., and, later that day, obtained approximately $1,900 from victim M.M. under threat of physical harm.

22.   On or about October 29, 2009, defendant AIRAPETIAN, in a telephone conversation using coded language, demanded $10,000 from victim M.M. and threatened to disfigure victim M.M. if he did not pay.

23.   On or about October 30, 2009, defendant SHAROPETROSIAN, in a telephone conversation using coded language, instructed victim M.M. to make deposits into particular bank accounts under threat of physical harm.

24.   On October 31, 2009, defendant SHAROPETROSIAN, in a telephone conversation using coded language, demanded $2,000 from victim M.M.

25.   On or about November 1, 2009, defendant SHAROPETROSIAN, in a telephone conversation using coded language, demanded $10,000 from victim M.M.

26.   On or about November 2, 2009, defendant SHAROPETROSIAN, in a telephone conversation using coded language, demanded that victim M.M. take $1,000 to an unindicted co-conspirator that night.

27.   On or about November 2, 2009, victim M.M. paid $500 to the unindicted co-conspirator.

28.   On or about November 2, 2009, defendant SHAROPETROSIAN, in a telephone conversation using coded language, told victim M.M. that SHAROPETROSIAN would slaughter victim M.M. if victim M.M. did not deposit money as directed by SHAROPETROSIAN.

29.   On or about November 4, 2009, defendant SHAROPETROSIAN, in a telephone conversation using coded language, demanded $2,500 in cash from victim M.M. and said he would send someone over to pick up the money from victim M.M.

30.   On or about November 4, 2009, a person known to the Grand Jury picked up $2,000 from victim M.M.

31.   On or about November 6, 2009, defendant SHAROPETROSIAN, in a telephone conversation using coded language, asked victim M.M. whether victim M.M. had sent the money demanded by SHAROPETROSIAN under threat of physical harm using Western Union or Moneygram.

32.   On or about November 12, 2009, defendant L. OGANDGANYAN and others known and unknown to the Grand Jury met with victim M.M. and demanded money from victim M.M.

33.   On or about November 19, 2009, defendant L. OGANDGANYAN, in a telephone conversation using coded language, told victim M.M. that victim M.M. had to pay her money under threat of physical harm.

34.   On or about November 21, 2009, defendant L. OGANDGANYAN, in a telephone conversation using coded language, threatened to kill victim M.M.'s family if victim M.M. did not pay money to L. OGANDGANYAN.

### Conspiracy to Extort Victim L.A.

35.   On or about July 9, 2009, defendants DARBINYAN and BILEZIKCHYAN, in a telephone conversation using coded language, told an unindicted co-conspirator that DARBINYAN and BILEZIKCHYAN needed to catch victim L.A. and physically assault him, and BILEZIKCHYAN said that if they catch victim L.A., there is a lot of money to be made.

36.   On or about July 10, 2009, defendant DARBINYAN, in a telephone conversation using coded language, told defendant MARKOSIAN that DARBINYAN and defendant BILEZIKCHYAN wanted to find victim L.A. and that victim L.A. owed BILEZIKCHYAN approximately $7,000.

37.   On or about July 10, 2009, defendant DARBINYAN, in a telephone conversation using coded language, told an unindicted co-conspirator that if DARBINYAN found victim L.A., they would make money.

### Conspiracy to Extort Victims Z and L.K.

38.   On or about August 20, 2009, defendant DARBINYAN, in a telephone conversation using coded language, told defendant ZAKARYAN that DARBINYAN and defendant K. YERKANYAN were driving to the "Chicken House" restaurant in the Hollywood district of Los Angeles, California, to confront victims Z, L.K., and others, who DARBINYAN and his associates believed owed them money, and ZAKARYAN said he would be there.

39.  On or about August 20, 2009, defendant DARBINYAN, in a telephone conversation using coded language, told defendant MARKOSIAN that DARBINYAN was on his way to Hollywood to confront victims Z, L.K., and others, and MARKOSIAN said he would be there.

40.  On or about August 20, 2009, defendant DARBINYAN, in a telephone conversation using coded language, told defendant PEMBEJIAN that DARBINYAN was on his way to Hollywood to confront victims Z, L.K., and others.

41.  On or about August 20, 2009, defendant BILEZIKCHYAN, in a telephone conversation using coded language, told defendant DARBINYAN to fill the area of the "Chicken House" restaurant with Armenian Power members and associates to intimidate and physically assault victims Z, L.K., and others.

42.  On or about August 20, 2009, defendant DARBINYAN, in a telephone conversation using coded language, told defendant PEMBEJIAN that DARBINYAN and defendant K. YERKANYAN were at the "Chicken House" restaurant and had some firearms but wanted more, and PEMBEJIAN said he would meet DARBINYAN there.

43.  On or about August 20, 2009, defendant BILEZIKCHYAN, in a telephone conversation using coded language, told an unindicted co-conspirator that Armenian Power members and associates would soon arrive at the "Chicken House" restaurant to back up defendants DARBINYAN and K. YERKANYAN, and BILEZIKCHYAN informed the unindicted co-conspirator that DARBINYAN and K. YERKANYAN had firearms.

44.  On or about August 20, 2009, defendants DARBINYAN, K. YERKANYAN, E. KHACHATRYAN, GALSTYAN, H. TOROSYAN, SEROBYAN,

30

FERMANYAN, MURADYAN, and ZAKARYAN, and other members and
associates of Armenian Power, were present at the "Chicken House"
restaurant while in possession of at least five firearms,
including a Springfield Armory model XD .45 caliber handgun, a
Sig Sauer model SP 2340 .40 caliber handgun, an Israel Military
Industries model Baby Desert Eagle .40 caliber handgun, a Heckler
& Koch model USP .40 caliber handgun, and a Glock model 17 9
millimeter caliber handgun, and numerous rounds of ammunition.

45.   On or about August 20, 2009, defendant GAMBARYAN, in
a telephone conversation using coded language, reported to
defendant BILEZIKCHYAN that GAMBARYAN was watching police
officers detaining defendants DARBINYAN and K. YERKANYAN, and
other members and associates of Armenian Power, at the "Chicken
House" restaurant.

46.   On or about August 20, 2009, defendant BILEZIKCHYAN,
in a telephone conversation using coded language, told defendant
GAMBARYAN that defendants DARBINYAN and K. YERKANYAN belong to
Armenian Power and that by going against DARBINYAN and K.
YERKANYAN, victims Z, L.K., and others had gone against Armenian
Power.

47.   On or about August 20, 2009, defendant BILEZIKCHYAN,
in a telephone conversation using coded language, told defendant
GAMBARYAN that BILEZIKCHYAN was going to physically assault
victims Z, L.K., and others for going against Armenian Power.

48.   On or about August 21, 2009, defendant BILEZIKCHYAN,
in a telephone conversation using coded language, told defendant
ZAKARYAN that defendants DARBINYAN and K. YERKANYAN were both
BILEZIKCHYAN's brothers and were members of Armenian Power, and

ZAKARYAN told BILEZIKCHYAN that he had been at the "Chicken House" restaurant with other Armenian Power members and associates, but was able to avoid being arrested.

49.   On or about August 21, 2009, defendant PEMBEJIAN, in a telephone conversation using coded language, told defendant DARBINYAN that he had been in the vicinity of the "Chicken House" restaurant and saw police officers there, and DARBINYAN said that there were many guys from Armenian Power there and that police officers found multiple firearms at that location.

50.   On or about August 21, 2009, defendant DARBINYAN, in a telephone conversation using coded language, told defendant ZAKARYAN that he intended to punish victims Z, L.K., and others for making decisions regarding criminal activity in Los Angeles without DARBINYAN's authorization.

51.   On or about August 21, 2009, defendant DARBINYAN, in a telephone conversation using coded language, told an unindicted co-conspirator that DARBINYAN told victims Z, L.K., and others that DARBINYAN is the only one who lays down the law in Los Angeles, and that when he saw that victims Z, L.K., and others had many people with them, he made a couple of calls and filled the place (referring to the "Chicken House" restaurant) with members and associates of Armenian Power.

52.   On or about August 21, 2009, defendant DARBINYAN, in a telephone conversation using coded language, told an unindicted co-conspirator that when the police arrived at the "Chicken House" restaurant, he told the junior Armenian Power members and associates who were acting tough to shut up so that the police would not violate DARBINYAN's parole.

32

53. On or about August 26, 2009, defendant DARBINYAN, in a telephone conversation using coded language, told defendant SHAROPETROSIAN that he and other members and associates of Armenian Power intended to assault victims Z, L.K., and others at the "Chicken House" restaurant, but police officers showed up and found their firearms.

54. On or about August 27, 2009, defendant DARBINYAN, in a telephone conversation using coded language, told defendant PETROSIAN that victims Z and L.K. were not in a position to make decisions with regard to criminal matters in this town, and that DARBINYAN did not care that victim L.K. was a godson to a Thief-in-Law.

55. On or about August 28, 2009, defendant DARBINYAN, in a telephone conversation using coded language, told defendant ZAKARYAN that DARBINYAN did not care whether victim Z was backed by a Thief-in-Law.

56. On or about September 2, 2009, defendant DARBINYAN, in a telephone conversation using coded language, told an unindicted co-conspirator that he had threatened victim Z and his guys with physical violence, and DARBINYAN told victim Z that he had one week to pay money to DARBINYAN.

57. On or about October 10, 2009, defendant DARBINYAN, in a telephone conversation using coded language, told defendant ZAKARYAN that the police had seized at least four of their firearms at the "Chicken House" restaurant.

58. On or about October 11, 2009, defendant DARBINYAN, in a telephone conversation using coded language, asked defendant MNATSAKANYAN to help DARBINYAN find some firearms because

33

1  DARBINYAN had recently lost some firearms, and MNATSAKANYAN

2  agreed to assist DARBINYAN in this regard.

3          59.    On or about October 12, 2009, defendant DARBINYAN, in

4  a telephone conversation using coded language, told defendant K.

5  YERKANYAN that he had acquired a firearm similar to K.

6  YERKANYAN's firearm with the laser scope that had been left at

7  the "Chicken House" restaurant, and DARBINYAN said he wanted to

8  deliver the firearm to K. YERKANYAN.

9          Conspiracy to Extort Victims S.M. and E

10         60.    On or about November 13, 2009, defendant DARBINYAN,

11  in a telephone conversation using coded language, discussed with

12  defendant BILEZIKCHYAN a plan to extort victim S.M. for money

13  that DARBINYAN believed he was owed and that involved criminal

14  figures in Moscow, Russia, and some Thieves-in-Law, and

15  BILEZIKCHYAN said DARBINYAN should feel free to extort victim

16  S.M. and that BILEZIKCHYAN would physically assault the Thieves-

17  in-Law involved.

18         61.    On or about November 13, 2009, defendant DARBINYAN,

19  in a telephone conversation using coded language, told defendant

20  PEMBEJIAN that DARBINYAN was going to have victim S.M. forced

21  into a car and that he would take $50,000 away from victim S.M.

22         62.    On or about November 13, 2009, an unindicted co-

23  conspirator, in a telephone conversation using coded language,

24  told defendant DARBINYAN that victim E was involved with the

25  money DARBINYAN believed victim S.M. owed to him, and DARBINYAN

26  said he wanted victim E caught and brought to him.

27         63.    On or about November 13, 2009, defendant DARBINYAN,

28  in a telephone conversation using coded language, spoke to

34

1  defendant MARKOSIAN about finding victim E, and DARBINYAN said if
2  MARKOSIAN could not find victim E, then DARBINYAN would find
3  victim E in a sadder manner.

4       64.   On or about November 14, 2009, defendant DARBINYAN,
5  in a telephone conversation using coded language, told defendant
6  PEMBEJIAN that DARBINYAN was going to physically assault victim
7  S.M., and DARBINYAN said he was upset that criminal figures in
8  Moscow were getting involved in this instance.

9       65.   On or about November 14, 2009, defendant DARBINYAN,
10 in a telephone conversation using coded language, told defendant
11 BILEZIKCHYAN that DARBINYAN had found victim E and sent some
12 people to get him, and that DARBINYAN learned that victim S.M.
13 had sent the $50,000 DARBINYAN believed was owed to him to
14 another criminal figure.

15      66.   On or about November 14, 2009, defendant
16 BILEZIKCHYAN, in a telephone conversation using coded language,
17 told defendant DARBINYAN that victim S.M. would bring DARBINYAN
18 the money at issue with a broken hand.

19      67.   On or about November 15, 2009, defendant DARBINYAN,
20 in a telephone conversation using coded language, told an
21 unindicted co-conspirator that DARBINYAN knew that victim S.M.
22 was lying to him and that DARBINYAN was going to punish victim
23 S.M.

24      68.   On or about November 15, 2009, defendant
25 BILEZIKCHYAN, in a telephone conversation using coded language,
26 told defendant DARBINYAN that they would take victim S.M.'s
27 money, and BILEZIKCHYAN said he and DARBINYAN make the justice
28 here.

69.   On or about November 19, 2009, an unindicted co-conspirator, in a telephone conversation using coded language, told defendant DARBINYAN that he was taking defendant TANGABEKYAN to the airport to fly to Las Vegas, Nevada, and meet with victim S.M.

70.   On or about November 22, 2009, defendant TANGABEKYAN, in a telephone conversation using coded language, told defendant DARBINYAN he had spoken with victim S.M. and let victim S.M. know that DARBINYAN was a significant criminal figure in America, and TANGABEKYAN said victim S.M. is going to send the money to DARBINYAN.

71.   On or about November 22, 2009, defendant DARBINYAN, in a telephone conversation using coded language, told an unindicted co-conspirator that they were going to take $50,000 from victim S.M. and that DARBINYAN was going to take additional money as well.

72.   On or about November 22, 2009, defendant DARBINYAN, in a telephone conversation using coded language, told defendant TANGABEKYAN that he was going to take $50,000 from victim S.M.

Kidnapping and Extortion of Victim G.A.

73.   On or about November 25, 2009, defendant BILEZIKCHYAN, in a telephone conversation using coded language, told defendant Tigran Sarkisyan ("Sarkisyan") to pick him up to drive BILEZIKCHYAN to the Downtown district of Los Angeles, California.

74.   On or about November 25, 2009, defendant BILEZIKCHYAN, in a telephone conversation using coded language, told defendant K. YERKANYAN that BILEZIKCHYAN was headed to

36

downtown Los Angeles with defendant Sarkisyan in order to kidnap victim G.A., and BILEZIKCHYAN asked K. YERKANYAN to contact defendants H. KARAYAN and PETROSIAN to advise them to be prepared to assist in kidnapping victim G.A., and K. YERKANYAN agreed to do so.

75.   On or about November 25, 2009, defendant BILEZIKCHYAN, in a telephone conversation using coded language, told defendant K. YERKANYAN to talk to defendant PETROSIAN about where they should take victim G.A. after they seize him, and K. YERKANYAN said he would do so.

76.   On or about November 25, 2009, defendant BILEZIKCHYAN, in a telephone conversation using coded language, told defendant O. TEROGANESYAN that he would be at O. TEROGANESYAN's auto body shop, MR Auto Body Collision, in Los Angeles, California, in about an hour, and O. TEROGANESYAN told BILEZIKCHYAN he would be there for sure.

77.   On or about November 25, 2009, defendant BILEZIKCHYAN, in a telephone conversation using coded language, told defendant Sarkisyan that he was with victim G.A. now and that victim G.A. was not going to come home anymore.

78.   On or about November 25, 2009, defendant BILEZIKCHYAN, in a telephone conversation using coded language, told defendant Suren Torosyan ("S. Torosyan") that BILEZIKCHYAN would need him and asked S. Torosyan to keep his telephone on, and S. Torosyan agreed to do so.

37

79.     On or about November 25, 2009, defendant K.
YERKANYAN, in a telephone conversation using coded language, told
defendant H. KARAYAN that he and others had taken victim G.A.,
who was with them, and H. KARAYAN offered to help the kidnappers.

80.     On or about November 25, 2009, defendant
BILEZIKCHYAN, in a telephone conversation using coded language,
told defendant Sarkisyan that BILEZIKCHYAN had told victim G.A.
that victim G.A. had to pay BILEZIKCHYAN $100,000 in order to be
released and that victim G.A. had to pay BILEZIKCHYAN a total of
$400,000 to avoid being kidnapped in the future.

81.     On or about November 25, 2009, defendant
BILEZIKCHYAN, in a telephone conversation using coded language,
told defendant Sarkisyan that, at the location where they had
taken and held victim G.A., there was a big hole in the ground
and when victim G.A. saw the hole, he started crying in fear for
his life.

82.     On or about November 25, 2009, defendant
BILEZIKCHYAN, in a telephone conversation using coded language,
told defendant Sarkisyan that they had released victim G.A. and
that defendant K. YERKANYAN and others took victim G.A. away from
defendant O. TEROGANESYAN's auto body shop to collect money.

83.     On or about November 25, 2009, defendant
BILEZIKCHYAN, in a telephone conversation using coded language,
told defendant Sarkisyan that BILEZIKCHYAN thought that victim
G.A. might die from a heart attack, and that when victim G.A. saw
that there were a few people with masks involved in his
kidnapping, victim G.A. wet his pants.

84. On or about November 25, 2009, defendant BILEZIKCHYAN, in a telephone conversation using coded language, told defendant S. Torosyan that BILEZIKCHYAN was at defendant O. TEROGANESYAN's auto body shop counting the money that victim G.A. had paid in exchange for his release, and S. Torosyan offered to help them.

85. On or about November 25, 2009, defendant PETROSIAN, in a telephone conversation using coded language, told defendant BILEZIKCHYAN that PETROSIAN was sitting outside victim G.A.'s building waiting for victim G.A. to bring additional money.

86. On or about November 25, 2009, defendant BILEZIKCHYAN, in a telephone conversation using coded language, told defendant PETROSIAN that BILEZIKCHYAN had been worried that victim G.A.'s heart was going to stop while they were holding him.

87. On or about November 25, 2009, defendant BILEZIKCHYAN, in a telephone conversation using coded language, told an unindicted co-conspirator that, prior to BILEZIKCHYAN's kidnapping of victim G.A., a Thief-in-Law had attempted to mediate BILEZIKCHYAN's dispute with victim G.A., but BILEZIKCHYAN did not like the Thief-in-Law's proposed resolution, so BILEZIKCHYAN decided to do things his own way and kidnap victim G.A.

88. On or about November 26, 2009, defendant BILEZIKCHYAN, in a telephone conversation using coded language, discussed with defendant K. YERKANYAN splitting $200,000 in proceeds obtained as a result of the kidnapping of victim G.A.

89. On or about December 24, 2009, defendant H. KARAYAN, in a telephone conversation using coded language, told defendant BILEZIKCHYAN that victim G.A. had a lot of gold hidden, and BILEZIKCHYAN told H. KARAYAN to tell victim G.A. that Monday was the last day to pay the money owed in connection with the kidnapping.

### Additional Acts Of Extortion And Assault

90. On or about August 19, 2006, in the North Hollywood district of Los Angeles, defendant HOVANISSIAN, and others known and unknown to the Grand Jury, pointed a firearm at victim A.M. and yelled "Armenian Power."

91. On or about June 25, 2009, defendant DARBINYAN, in a telephone conversation using coded language, told an unindicted co-conspirator that DARBINYAN was going to physically assault victim G.S. and that DARBINYAN would force victim G.S. to give DARBINYAN forty percent of victim G.S.'s corporation.

92. On or about July 10, 2009, defendant DARBINYAN, in a telephone conversation using coded language, warned defendant MNATSAKANYAN to discipline victim S, otherwise DARBINYAN would call Armenia and have victim S's head taken off.

93. On or about July 15, 2009, defendant SHAROPETROSIAN, in a telephone conversation using coded language, told defendant DARBINYAN that victim M.G. owed SHAROPETROSIAN approximately $37,500, and that if victim M.G. did not pay SHAROPETROSIAN the money, SHAROPETROSIAN would have victim M.G. beaten the next time victim M.G. visits Yerevan, Armenia.

94. On or about July 16, 2009, defendant TANGABEKYAN, in a telephone conversation using coded language, told defendant

DARBINYAN that TANGABEKYAN was observing police officers
conducting a traffic stop of victim K.S., and DARBINYAN told
TANGABEKYAN that DARBINYAN wanted victim K.S. physically
assaulted once police officers had left victim K.S.'s presence.

95.   On or about July 16, 2009, defendant TANGABEKYAN, in
a telephone conversation using coded language, told defendant
DARBINYAN that TANGABEKYAN would continue to watch victim K.S.
and they would eventually get victim K.S.

96.   On or about August 13, 2009, defendant DARBINYAN, in
a telephone conversation using coded language, discussed with
defendant BILEZIKCHYAN a rumor started by victim A.Y. that
BILEZIKCHYAN had threatened an organized crime figure and his
family, and DARBINYAN said he wanted to find victim A.Y. and
physically assault him.

97.   On or about August 19, 2009, defendant DARBINYAN, in
a telephone conversation using coded language, told an unindicted
co-conspirator that he was looking for victim V in relation to a
stabbing involving victim V and DARBINYAN's godson, and DARBINYAN
said that victim V's connections with other Armenian organized
crime figures did not matter and if victim V does not come to see
DARBINYAN, then victim V might as well leave town.

98.   On or about August 19, 2009, defendant DARBINYAN, in
a telephone conversation using coded language, told an unindicted
co-conspirator that he planned to physically assault victim V.

99.   On or about August 19, 2009, defendant DARBINYAN, in
a telephone conversation using coded language, told victim V,
among other things, that in the world of Armenian organized

41

1  crime, victim V does not have enough power to settle any dispute

2  with DARBINYAN.

3       100.  On or about September 6, 2009, defendant

4  BILEZIKCHYAN, in a telephone conversation using coded language,

5  told defendant K. YERKANYAN that there were many Armenians

6  driving luxury cars and wearing expensive jewelry where

7  BILEZIKCHYAN was in Palm Springs, California, and BILEZIKCHYAN

8  told K. YERKANYAN that K. YERKANYAN should join BILEZIKCHYAN in

9  Palm Springs so that they could rob other Armenians and make lots

10 of money.

11      101.  On or about September 8, 2009, defendant DARBINYAN,

12 in a telephone conversation using coded language, told an

13 unindicted co-conspirator that DARBINYAN was planning on

14 kidnapping victim A.Y. from victim A.Y.'s house, and DARBINYAN

15 said he was going to beat victim A.Y. and drag him out of his

16 house.

17      102.  On or about September 28, 2009, an unindicted co-

18 conspirator, in a telephone conversation using coded language,

19 told defendant DARBINYAN that victim G has a lot of money, and

20 that DARBINYAN should tell victim G that DARBINYAN would be

21 victim G's godfather and protect victim G in order to force

22 victim G to give DARBINYAN money, and DARBINYAN said he would

23 call victim G.

24      103.  On or about January 22, 2010, defendant K. YERKANYAN,

25 in a telephone conversation using coded language, told an

26 unindicted co-conspirator that K. YERKANYAN was in Las Vegas,

27 Nevada, and wanted the address for an unspecified victim so that

28 K. YERKANYAN could assault and rob the unspecified victim.

42

104.   On or about January 24, 2010, defendant K. YERKANYAN, in a telephone conversation using coded language, told defendant ZAKARYAN that K. YERKANYAN was going to assault an unspecified victim the next time K. YERKANYAN saw the unspecified victim.

### Acts of Robbery and Witness Intimidation

105.   In or around November 2006, defendant MURADYAN conspired with other Armenian Power gang members to intimidate a witness to a robbery committed by Armenian Power gang members so that the witness would not testify against the Armenian Power gang members involved in the robbery.

106.   On or about June 25, 2007, defendant FERMANYAN, and others known and unknown to the Grand Jury, entered a gas station in Burbank, California, and robbed victim A.M. at gunpoint.

### Acts Regarding Firearm Possession and Distribution

107.   On or about August 6, 2009, defendant DARBINYAN, in a telephone conversation using coded language, told defendant TARVERDYAN that there was a police car following him, and TARVERDYAN warned DARBINYAN that there was a firearm inside the car DARBINYAN was driving.

108.   On or about August 13, 2009, defendant DARBINYAN, in a telephone conversation using coded language, discussed purchasing various firearms, including three firearms for approximately $1,500 each, with defendant PEMBEJIAN.

109.   On or about August 13, 2009, defendant DARBINYAN, in a telephone conversation using coded language, offered defendant ZAKARYAN a firearm for $2,500 and a smaller firearm for approximately $1,500, and ZAKARYAN said he wanted the smaller firearm for sure.

110.   On or about August 14, 2009, defendant DARBINYAN, in a telephone conversation using coded language, told defendant PETROSIAN that defendant ZAKARYAN should bring $1,500 to pay for the firearm, and PETROSIAN agreed to meet DARBINYAN.

111.   On or about August 14, 2009, defendant DARBINYAN, in a telephone conversation using coded language, told defendant TARVERDYAN that DARBINYAN had about two or three firearms that could be easily concealed, and TARVERDYAN said he would pick one up from DARBINYAN.

112.   On or about August 16, 2009, defendant ZAKARYAN, in a telephone conversation using coded language, told defendant DARBINYAN that an unindicted co-conspirator would be bringing two short firearms, and DARBINYAN said he wanted one of the short firearms as soon as possible.

113.   On or about August 16, 2009, defendant DARBINYAN, in a telephone conversation using coded language, told defendant ZAKARYAN that if DARBINYAN is caught by police officers with the short firearm, DARBINYAN would be prosecuted and sentenced to 35 years in prison because the short firearm was an assault rifle.

114.   On or about August 24, 2009, defendant DARBINYAN, in a telephone conversation using coded language, told an unindicted co-conspirator that DARBINYAN liked the firearm that the unindicted co-conspirator had provided to DARBINYAN, and DARBINYAN said that law enforcement officers had recently taken four of their firearms.

115.   On or about September 9, 2009, defendant K. YERKANYAN, in a telephone conversation using coded language, told

44

defendant E. KHACHATRYAN that K. YERKANYAN wanted to purchase a handgun with a silencer for approximately $1,300.

116.   On or about September 15, 2009, defendant DARBINYAN, in a telephone conversation using coded language, told an unindicted co-conspirator to bring DARBINYAN a rifle.

117.   On or about October 13, 2009, defendant DARBINYAN, in a telephone conversation using coded language, told defendant BILEZIKCHYAN that DARBINYAN had been at Hatsatoun restaurant in Glendale, California, earlier that evening when some criminal figures made DARBINYAN mad and he fired a gun that defendant E. KHACHATRYAN had brought with him.

118.   On or about October 13, 2009, defendant BILEZIKCHYAN, in a telephone conversation using coded language, told defendant E. KHACHATRYAN to drive defendant DARBINYAN home following the shooting at Hatsatoun restaurant because DARBINYAN was on parole and would get in big trouble if he were caught shooting a gun.

119.   On or about November 14, 2009, defendant K. YERKANYAN, in a telephone conversation using coded language, spoke with an unindicted co-conspirator about exchanging K. YERKANYAN's current handgun for a ten millimeter handgun.

120.   On or about November 23, 2009, defendant Miguel Agustin Ramirez ("Ramirez"), in a telephone conversation using coded language, offered firearms to defendant DARBINYAN.

121.   On or about November 23, 2009, defendant DARBINYAN, in a telephone conversation using coded language, told defendant PEMBEJIAN that they should stop to see some firearms that defendant Ramirez was offering to DARBINYAN.

122.   On or about November 24, 2009, defendant DARBINYAN, in a telephone conversation using coded language, asked defendant SEROBYAN to pick up firearms from defendant Gevork Kasabyan ("Kasabyan"), and SEROBYAN said he would pick up the guns and put them in the trunk of his car.

123.   On or about November 24, 2009, defendants DARBINYAN and SEROBYAN possessed three firearms, namely, a Smith & Wesson model 638-2 .38 caliber revolver, a Star model 30M 9 millimeter caliber semi-automatic pistol, and an Intratec model Tec-22 .22 caliber semi-automatic pistol, as well as multiple rounds of ammunition.

124.   On or about November 24, 2009, defendant K. YERKANYAN, in a telephone conversation using coded language, agreed to lend his handgun to an unindicted co-conspirator.

125.   On or about November 30, 2009, defendant BILEZIKCHYAN, in a telephone conversation using coded language, reminded defendant K. YERKANYAN to hide his weapon.

126.   On or about November 30, 2009, defendant DARBINYAN, in a telephone conversation using coded language, discussed with defendant PEMBEJIAN delivering an Omega firearm to an Armenian organized crime elder as a gift.

127.   On or about December 1, 2009, defendant DARBINYAN, in a telephone conversation using coded language, made plans with defendant PEMBEJIAN to meet PEMBEJIAN and an Armenian organized crime elder at the Montage Hotel in Beverly Hills to deliver the Omega firearm.

46

128. On or about December 1, 2009, defendant DARBINYAN possessed a firearm, namely, an Omega Arms model Omega III 30-06 caliber bolt action rifle.

129. On or about December 30, 2009, defendants BILEZIKCHYAN and K. YERKANYAN, and others known and unknown to the Grand Jury, met with defendant Gonzalez-Munoz Jr., a member of the Mexican Mafia, and his associates at a restaurant in Glendale, California, and BILEZIKCHYAN received from Gonzalez-Munoz Jr. a gun magazine containing approximately 35 rounds of .45 caliber ammunition.

130. On or about December 30, 2009, defendant BILEZIKCHYAN, in a telephone conversation using coded language, told an unindicted co-conspirator that BILEZIKCHYAN had received as a gift from defendant Gonzalez-Munoz Jr. a .45 caliber high-capacity gun magazine, and that BILEZIKCHYAN and defendant K. YERKANYAN had never seen anything like it.

131. On or about December 30, 2009, defendant BILEZIKCHYAN, in a telephone conversation using coded language, told defendant Marat Shakhramanyan ("Shakhramanyan") to go to the restaurant in Glendale, tell the owner that BILEZIKCHYAN sent him, and take home what the owner gives him.

132. On or about December 30, 2009, acting on behalf of defendant BILEZIKCHYAN, defendant Shakhramanyan picked up a black plastic bag containing the .45 caliber high-capacity gun magazine from the restaurant in Glendale.

133. On or about December 30, 2009, defendant BILEZIKCHYAN, in a telephone conversation using coded language, told defendant O. TEROGANESYAN that defendant Shakhramanyan had

47

1 been stopped and arrested after picking up the .45 caliber high-
2 capacity gun magazine.

3     134. On or about January 19, 2010, defendant K. YERKANYAN,
4 in a telephone conversation using coded language, told defendant
5 E. KHACHATRYAN that junior Armenian Power gang members and
6 associates should bring firearms to a cemetery where other
7 Armenian Power gang members would be gathering later that day.

8     135. On or about January 19, 2010, defendants E.
9 KHACHATRYAN, GALSTYAN, and Grachia Nalbandyan ("Nalbandyan"), and
10 others known and unknown to the Grand Jury, possessed firearms
11 and ammunition, namely, a Sig Sauer P220 .45 caliber semi-
12 automatic handgun, a Maadi Helwan 9 millimeter caliber handgun,
13 and fifteen rounds of ammunition.

14     136. On or about January 19, 2010, defendants BILEZIKCHYAN
15 and K. YERKANYAN, in a telephone conversation using coded
16 language, discussed posting bail for the Armenian Power gang
17 members who had been caught by the police with firearms earlier
18 that day.

19     137. On or about January 19, 2010, defendant BILEZIKCHYAN,
20 in a telephone conversation using coded language, told defendant
21 K. YERKANYAN that BILEZIKCHYAN was concerned that the seizure of
22 firearms earlier that day from Armenian Power gang members meant
23 that the police had been conducting surveillance on Armenian
24 Power gang members.

25     138. On or about January 19, 2010, defendant GALSTYAN, in
26 a telephone conversation using coded language, told defendants
27 BILEZIKCHYAN and K. YERKANYAN that police officers had found

28

1  firearms in the car occupied by defendants E. KHACHATRYAN and

2  GALSTYAN.

3      139.  On or about January 20, 2010, defendant BILEZIKCHYAN,

4  in a telephone conversation using coded language, told an

5  unindicted co-conspirator that the unindicted co-conspirator

6  should not tell anyone that it was BILEZIKCHYAN who posted bail

7  for the Armenian Power gang members caught with firearms on

8  January 19, 2010.

9      140.  On or about January 24, 2010, defendant K. YERKANYAN,

10  in a telephone conversation using coded language, spoke with

11  defendant E. KHACHATRYAN about purchasing another firearm.

12      141.  On or about January 27, 2010, defendant K. YERKANYAN,

13  in a telephone conversation using coded language, told defendant

14  GAMBARYAN that officers had gone to GAMBARYAN's residence at 4055

15  Lankershim Boulevard, #434, in Los Angeles, California, and

16  arrested defendants E. KHACHATRYAN, GALSTYAN, and Grigor

17  Garibyan, and GAMBARYAN informed K. YERKANYAN that there were

18  firearms at his place.

19      142.  On or about January 27, 2010, defendants GAMBARYAN

20  and E. KHACHATRYAN, and other members and associates of Armenian

21  Power, possessed two firearms, namely, a Smith & Wesson model 659

22  9 millimeter caliber handgun, and a Colt model 1908 Automatic .25

23  caliber handgun.

24      143.  On or about February 10, 2010, defendant K. YERKANYAN

25  possessed a firearm, namely, a Beretta model 92FS 9 millimeter

26  caliber semi-automatic pistol, and fifteen rounds of ammunition,

27  at his residence in Tujunga, California.

28

144.   On or about February 10, 2010, defendant K. YERKANYAN, in a telephone conversation using coded language, told an unindicted co-conspirator that police officers had searched his house that day and found a firearm.

145.   On or about September 3, 2010, defendant ALOYAN possessed a Llama .22 caliber pistol and numerous rounds of ammunition.

Bank Fraud Targeting Victim P.J.C.

146.   On or about January 26, 2009, defendant DARBINYAN, in a telephone conversation using coded language, discussed with defendant ORTEGA using "check runners" to cash or deposit fraudulent checks associated with a bank account in the name of victim P.J.C.

147.   On or about January 26, 2009, defendant DARBINYAN, in a telephone conversation using coded language, told defendant ORTEGA to bring "check runners" to DARBINYAN's location.

148.   On or about January 26, 2009, defendant Rafael Roger Zendejas ("Zendejas") cashed check number 3439, made payable to "Rafael Zendejas" in the amount of $10, drawn on Bank of America account number xxxxx-42953, in the name of victim P.J.C.

149.   On or about January 26, 2009, defendant Joseph Mares ("Mares") deposited check number 3442, made payable to "Joseph Mares" in the amount of $15, drawn on Bank of America account number xxxxx-42953, in the name of victim P.J.C.

150.   On or about January 28, 2009, defendants DARBINYAN, ORTEGA, and Manuk Terzyan ("Terzyan"), in telephone conversations using coded language, discussed committing bank fraud on a bank account in the name of victim P.J.C.

151.   On or about January 28, 2009, defendant Julio Cesar Rivas ("Rivas"), in a telephone conversation using coded language, told defendant DARBINYAN that defendant Zendejas had entered a bank to cash a fraudulent check associated with a bank account in the name of victim P.J.C. and that the check amount was $5,900.

152.   On or about January 28, 2009, defendant Zendejas attempted to cash check number 3444, made payable to "Rafael Roger Zendejas" in the amount of $5,900, drawn on Bank of America account number xxxxx-42953, in the name of victim P.J.C.

153.   On or about January 28, 2009, defendant DARBINYAN, in a telephone conversation using coded language, discussed with defendant Rivas that police officers were about to arrest defendant Zendejas while he was attempting to cash a fraudulent check.

154.   On or about January 28, 2009, defendant DARBINYAN, in a telephone conversation using coded language, told defendant ORTEGA to call defendant Debra May-Lawson ("May-Lawson") to see if she had successfully cashed fraudulent checks associated with a bank account in the name of victim P.J.C.

155.   On or about January 28, 2009, defendant May-Lawson cashed check number 3438, made payable to "Debra Jane May Lawson" in the amount of $5,600, and check number 3443, made payable to "Debra Jane May-Lawson" in the amount of $5,600, both drawn on Bank of America account number xxxxx-42953, in the name of victim P.J.C.

Bank Fraud Targeting Victim G.F.

156.  On or about March 9, 2009, defendant TANGABEKYAN transferred $45,000 from Bank of America account number xxxxx-68791, a trust account in the name of victim G.F., to Bank of America account number xxxxx-40707, a checking account in the name of victim G.F.

157.  On or about March 16, 2009, defendant DARBINYAN, in a telephone conversation using coded language, discussed with defendant TANGABEKYAN giving defendant MORENO, a Mexican Mafia member, a fraudulent check as a gift, and DARBINYAN told TANGABEKYAN that they were planning on using the fraudulent checks they had that week.

158.  On or about March 16, 2009, defendant DARBINYAN told defendant MNATSAKANYAN to meet him so that DARBINYAN could introduce MNATSAKANYAN to defendant MORENO.

159.  On or about March 16, 2009, defendants DARBINYAN, TANGABEKYAN, MNATSAKANYAN, MORENO, and Samawi met together at Natalie's Peruvian Seafood restaurant in the Hollywood area of Los Angeles, California, to discuss, among other things, bank fraud.

160.  On or about March 16, 2009, defendant DARBINYAN, in a telephone conversation using coded language, told defendant TANGABEKYAN to prepare fraudulent checks for a bank account in the name of victim G.F. so that defendant MORENO could take them to Orange County, California, to deposit or cash them, and TANGABEKYAN asked DARBINYAN to find out what amount TANGABEKYAN should write on the fraudulent checks.

161.   On or about March 16, 2009, defendant DARBINYAN, in a telephone conversation using coded language, told defendants MORENO and Samawi that DARBINYAN would have a fraudulent check for a bank account in the name of victim G.F. deposited into Samawi's bank account and that the deposited amount would be approximately $26,300.

162.   On or about March 16, 2009, defendant DARBINYAN, in a telephone conversation using coded language, talked to defendant MORENO about getting MORENO expensive items.

163.   On or about March 16, 2009, defendant DARBINYAN, in a telephone conversation using coded language, told defendant TANGABEKYAN that they had to get defendant MORENO fraudulent checks as promised in order to insure they were not disgraced.

164.   On or about March 17, 2009, defendant DARBINYAN, in a telephone conversation using coded language, spoke to defendant MORENO about people messing up, and MORENO told DARBINYAN to break a bone, a kneecap, or a finger in such instances.

165.   On or about March 17, 2009, defendant TANGABEKYAN, in a telephone conversation using coded language, told defendant DARBINYAN that fraudulent checks he had prepared and that were associated with a bank account in the name of victim G.F. were ready.

166.   On or about March 17, 2009, defendants DARBINYAN, TANGABEKYAN, MORENO, Terzyan, and Vartan Avedissian ("Avedissian") met at AKA Euro Sports, in Studio City, California, to discuss, among other things, bank fraud.

167.   On or about March 17, 2009, defendant DARBINYAN, in a telephone conversation using coded language, discussed with

1  defendant MNATSAKANYAN account information for a bank account in

2  the name of victim G.F.

3      168.  On or about March 17, 2009, defendant Terzyan, in a

4  telephone conversation using coded language, told defendant

5  DARBINYAN that he was approaching a bank to deposit a fraudulent

6  check drawn on victim G.F.'s bank account into defendant Samawi's

7  bank account.

8      169.  On or about March 17, 2009, defendant Terzyan

9  deposited check number 1462, made payable to "Karen Hesham" in

10  the amount of $26,400, drawn on Bank of America account number

11  xxxxx-40707, in the name of victim G.F.

12      170.  On or about March 18, 2009, defendant DARBINYAN, in a

13  telephone conversation using coded language, told defendants

14  MORENO and Samawi to withdraw funds fraudulently deposited into

15  Samawi's bank account by purchasing cashier's checks in amounts

16  between $6,500 and $7,000.

17      171.  On or about March 18, 2009, defendant Samawi

18  purchased two cashier's checks, each in the amount of $6,500, and

19  withdrew additional cash from her Bank of America account,

20  bearing account number xxxxx-75143, using funds that had been

21  fraudulently deposited into her account from the account of

22  victim G.F.

23      172.  On or about March 18, 2009, defendants MORENO and

24  Samawi, in a telephone conversation using coded language, told

25  defendant DARBINYAN that they had gotten two $6,500 cashier's

26  checks and withdrawn $1,000 in cash, and DARBINYAN told them they

27  should take more money out of the bank account in cash.

28

173.   On or about March 18, 2009, defendant DARBINYAN, in telephone conversations using coded language, discussed with defendants TANGABEKYAN and MORENO fraudulently depositing additional money into defendant Samawi's bank account from victim G.F.'s bank account.

174.   On or about March 18, 2009, defendant DARBINYAN, in a telephone conversation using coded language, told defendant MORENO to write between $35,000 and $40,000 on a blank check drawn from victim G.F.'s bank account and to deposit the check.

175.   On or about March 18, 2009, defendants MORENO and Samawi deposited check number 1463, made payable to "Karen Hesham" in the amount of $38,000, drawn on Bank of America account number xxxxx-40707, in the name of victim G.F.

176.   On or about March 19, 2009, defendant DARBINYAN, in a telephone conversation using coded language, told defendant TANGABEKYAN that defendants MORENO and Samawi had deposited a fraudulent check drawn from victim G.F.'s bank account, and that the check amount was $38,000.

177.   On or about March 19, 2009, defendant DARBINYAN, in a telephone conversation using coded language, discussed with defendants TANGABEKYAN and MORENO splitting the proceeds of the bank fraud involving victim G.F. between themselves.

178.   On or about March 19, 2009, defendant Avedissian, in a telephone conversation using coded language, discussed with defendant DARBINYAN retrieving proceeds of the bank fraud involving victim G.F. from defendant MORENO.

179.   On or about March 19, 2009, defendant TANGABEKYAN transferred $40,000 from Bank of America account number xxxxx-

68791, a trust account in the name of victim G.F., to Bank of America account number xxxxx-40707, a checking account in the name of victim G.F.

Bank Fraud Targeting Victim Y.G.

180.   On or about March 30, 2009, defendant ORTEGA, in a telephone conversation using coded language, told defendants DARBINYAN and MNATSAKANYAN that ORTEGA had arrived at their previously agreed upon meeting place to deliver "check runners," defendants Mares and Steven Wilson ("Wilson").

181.   On or about March 30, 2009, defendant DARBINYAN, in a telephone conversation using coded language, told defendant Terzyan to drive defendants Mares and Wilson to different Bank of America bank branches to deposit checks from victim Y.G.'s bank account.

182.   On or about March 30, 2009, defendant Terzyan drove defendants Mares and Wilson to different Bank of America bank branches in the Los Angeles, California area to cash fraudulent checks from victim Y.G.'s bank account.

183.   On or about March 30, 2009, defendants DARBINYAN and Terzyan, in a telephone conversation using coded language, discussed fraudulent checks drawn from victim Y.G.'s bank account in the amounts of $4,500 and $5,000.

184.   On or about March 30, 2009, defendant Wilson cashed check number 304, made payable to "Steven A Wilson" in the amount of $4,500, drawn on Bank of America account number xxxxx-13899, in the name of victim Y.G.

185.   On or about March 30, 2009, defendant Mares cashed check number 305, made payable to "Joseph Mares" in the amount of

56

1   $5,300, drawn on Bank of America account number xxxxx-13899, in

2   the name of victim Y.G.

3       186.   On or about March 30, 2009, defendant Mares cashed

4   check number 306, made payable to "Joseph Mares" in the amount of

5   $5,000, drawn on Bank of America account number xxxxx-13899, in

6   the name of victim Y.G.

7       187.   On or about March 30, 2009, defendant DARBINYAN, in a

8   telephone conversation using coded language, told defendant

9   Terzyan to direct defendant Wilson, who was waiting for bank

10  employees to verify whether he was authorized to cash another

11  check from victim Y.G.'s bank account, to immediately leave the

12  bank.

13      188.   On or about March 30, 2009, defendant DARBINYAN, in a

14  telephone conversation using coded language, told defendant

15  ORTEGA to pick up defendants Mares and Wilson from defendant

16  Terzyan, and they discussed splitting the proceeds of the bank

17  fraud targeting victim Y.G.

18      <u>Bank Fraud Targeting Victims F.D. and M.D.</u>

19      189.   On or about April 14, 2009, defendant DARBINYAN, in a

20  telephone conversation using coded language, told defendant Hagop

21  Yamalyan ("Yamalyan") to go to a 7-11 Store to pick up fraudulent

22  checks drawn from the bank account of victims F.D. and M.D. from

23  defendant TANGABEKYAN and to deliver the fraudulent checks to

24  defendant Terzyan.

25      190.   On or about April 14, 2009, defendant TANGABEKYAN, in

26  a telephone conversation using coded language, told defendant

27  DARBINYAN that defendant Yamalyan had come over to pick up the

28

fraudulent checks associated with the bank account of victims
F.D. and M.D.

191. On or about April 14, 2009, defendant Terzyan, in a
telephone conversation using coded language, told defendant
DARBINYAN that he needed additional information to deposit a
fraudulent check drawn from the bank account of victims F.D. and
M.D. into a bank account under their control.

192. On or about April 14, 2009, defendant DARBINYAN, in a
telephone conversation using coded language, discussed with
defendant TANGABEKYAN providing defendant Terzyan with additional
information in order to deposit a fraudulent check drawn from the
bank account of victims F.D. and M.D.

193. On or about April 14, 2009, defendant Terzyan
deposited check number 2386, made payable to "RZ Diginet" in the
amount of $28,357, drawn on Bank of America account number XXXXX-
14509, in the name of victims F.D. and M.D.

194. On or about April 14, 2009, defendant DARBINYAN, in a
telephone conversation using coded language, discussed with
defendant FNU LNU, aka "Musho" ("Musho"), that DARBINYAN had
fraudulent checks in the amounts of approximately $28,300 and
$72,000 in his possession.

195. On or about April 14, 2009, defendant FNU LNU, aka
"David Petrosov" ("Petrosov"), deposited check number 2387, made
payable to "David Petrosov" in the amount of $74,350.09, drawn on
Bank of America account number XXXXX-14509, in the name of
victims F.D. and M.D.

196. On or about April 14, 2009, defendant DARBINYAN, in a
telephone conversation using coded language, told defendant L.

58

OGANDGANYAN to check on bank accounts under their control because DARBINYAN had just received a call saying that a fraudulent check from the bank account of victims F.D. and M.D. had been deposited and DARBINYAN wanted to confirm the deposit.

Bank Fraud Targeting Victim L.R.

197.   On or about April 15, 2009, defendant DARBINYAN, in a telephone conversation using coded language, told defendant L. OGANDGANYAN to impersonate an account holder and inquire into two bank accounts under their control, and L. OGANDGANYAN agreed to do so.

198.   On or about April 15, 2009, defendant MNATSAKANYAN, in a telephone conversation using coded language, told defendant DARBINYAN that MNATSAKANYAN was sending small amounts of money through a bank account to see if the money would go through before sending larger amounts of money through the account.

199.   On or about April 15, 2009, defendant DARBINYAN, in a telephone conversation using coded language, told defendant L. OGANDGANYAN that there would be small amounts of money coming through a bank account, and L. OGANDGANYAN informed DARBINYAN that those amounts had already arrived in the bank account.

200.   On or about April 15, 2009, defendant DARBINYAN, in a telephone conversation using coded language, discussed with defendant ORTEGA prior fraudulent checks he had given to ORTEGA and told ORTEGA to come by the following day to pick up and deposit a fraudulent check.

201.   On or about April 15, 2009, defendant DARBINYAN, in a telephone conversation using coded language, discussed with

59

defendant MNATSAKANYAN depositing a fraudulent check drawn from the bank account of victim L.R.

202.   On or about April 16, 2009, defendant MARKOSIAN, in a telephone conversation using coded language, discussed with defendant DARBINYAN depositing a fraudulent check drawn from the bank account of victim L.R.

203.   On or about April 16, 2009, defendant MNATSAKANYAN, in a telephone conversation using coded language, told defendant ORTEGA that he would meet ORTEGA in Hollywood in two hours to give him the fraudulent check.

204.   On or about April 16, 2009, defendant DARBINYAN, in a telephone conversation using coded language, asked defendant MARKOSIAN the amount of the fraudulent check, and MARKOSIAN said the check amount was $135,200.

205.   On or about April 17, 2009, a co-schemer deposited check number 1459, made payable to "Ruzanna Hakobyan" in the amount of $135,200, drawn on Citibank account number xxxx-7159, in the name of victim L.R.

206.   On or about April 17, 2009, defendant DARBINYAN, in a telephone conversation using coded language, discussed with defendant MARKOSIAN when the fraudulent deposit would appear in a bank account in the name of "Ruzanna Hakobyan," which was under their control.

207.   On or about April 17, 2009, defendant DARBINYAN, in a telephone conversation using coded language, gave defendant L. OGANDGANYAN the account number for the bank account in the name of "Ruzanna Hakobyan," and DARBINYAN asked L. OGANDGANYAN to monitor the account.

Bank Fraud and Access Device Fraud Targeting Customers of
99 Cents Only Stores

208.   On or about July 6, 2009, defendant DARBINYAN, in a
telephone conversation using coded language, discussed with
defendant TARVERDYAN their plan to install and later remove
skimming devices inside credit/debit card terminals at 99 Cents
Only Stores to obtain and use bank debit card numbers of store
customers.

209.   On or about July 6, 2009, defendants TARVERDYAN and
Andranik Bakhchadjian ("Bakhchadjian") entered a 99 Cents Only
Store in Whittier, California, to carry out the scheme to install
and remove skimming devices.

210.   On or about July 13, 2009, defendant DARBINYAN, in a
telephone conversation using coded language, told defendants
PETROSIAN and Garen Chouldjian ("Chouldjian") that a co-schemer
was going to deliver victim account information the following day
or Friday.

211.   On or about July 14, 2009, defendants TARVERDYAN and
Bakhchadjian went to three different 99 Cents Only Stores in
Riverside, California, to carry out the scheme to install and
remove skimming devices.

212.   On or about July 16, 2009, defendant DARBINYAN, in a
telephone conversation using coded language, told defendant
PETROSIAN that DARBINYAN had fraudulently obtained debit card
account numbers and needed four "runners" for the following day
to withdraw money using the fraudulently obtained debit card
account numbers.

213.   On or about July 16, 2009, defendant DARBINYAN, in a telephone conversation using coded language, told defendant Khachatur Arakelyan ("Arakelyan") that DARBINYAN needed four "runners" the following day to withdraw money using the fraudulently obtained debit card account numbers.

214.   On or about July 16, 2009, defendant TARVERDYAN, in a telephone conversation using coded language, asked defendant DARBINYAN if DARBINYAN would be using "runners" to withdraw money using fraudulently obtained debit card account numbers the following day, and DARBINYAN said yes.

215.   On or about July 16, 2009, defendant DARBINYAN, in a telephone conversation using coded language, told defendant Chouldjian that he needed four to five "runners" the following day to withdraw money and that DARBINYAN had approximately 400 fraudulently obtained account numbers, and Chouldjian said that the runners would withdraw the money from ATMs.

216.   On or about July 17, 2009, defendant DARBINYAN, in a telephone conversation using coded language, discussed with defendant TARVERDYAN having "runners" withdraw money that day.

217.   On or about July 17, 2009, defendant TARVERDYAN, in a telephone conversation using coded language, told defendant DARBINYAN that he had fraudulently obtained account numbers from Wells Fargo Bank, and TARVERDYAN asked DARBINYAN if he was ready to provide a second set of fraudulently obtained account numbers to the "runners."

218.   On or about July 17, 2009, defendants DARBINYAN and Arakelyan, in a telephone conversation using coded language,

discussed the status of their efforts to withdraw money using the fraudulently obtained account numbers.

219.   On or about July 17, 2009, defendants DARBINYAN and TARVERDYAN, in a telephone conversation using coded language, discussed having "runners" withdraw funds before and after midnight to avoid bank ATM withdrawal limits.

220.   On or about July 17, 2009, defendant Vardan Amirkhanyan ("Amirkhanyan") and other co-schemers known and unknown to the Grand Jury withdrew money from several bank accounts in the names of victims who had shopped at 99 Cents Only Stores, using various ATMs within the Central District of California.

221.   On or about July 18, 2009, defendant DARBINYAN, in a telephone conversation using coded language, discussed with defendant Rafael Parsadanyan ("Parsadanyan") how the "runners" had withdrawn funds before and after midnight to avoid bank ATM withdrawal limits, and Parsadanyan said there were some fraudulent debit cards left over.

222.   On or about July 18, 2009, defendant PETROSIAN, in a telephone conversation using coded language, told defendant DARBINYAN that the "runners" were all there and working that day.

223.   On or about July 18, 2009, defendant DARBINYAN, in a telephone conversation using coded language, discussed with defendant TARVERDYAN distributing proceeds from the fraudulent bank withdrawals, and DARBINYAN told TARVERDYAN that he was going to send defendant Parsadanyan to deliver approximately $30,000 to TARVERDYAN because DARBINYAN did not want to drive with that cash in his possession.

224.  On or about July 18, 2009, defendant Parsadanyan possessed approximately $30,000 in fraudulently obtained criminal proceeds inside a plastic bag.

225.  On or about July 18, 2009, defendant DARBINYAN, in a telephone conversation using coded language, discussed with defendant TARVERDYAN sending co-schemers to withdraw money using fraudulent debit cards.

226.  On or about July 18 and July 19, 2009, defendant Amirkhanyan and other co-schemers known and unknown to the Grand Jury withdrew money from several bank accounts in the names of victims who had shopped at 99 Cents Only Stores, using various ATMs within the Central District of California.

227.  On or about July 20, 2009, defendant TARVERDYAN and an unidentified co-schemer entered a 99 Cents Only Store in Riverside, California, to carry out the scheme to install and remove skimming devices.

228.  On or about July 20, 2009, defendant PETROSIAN, in a telephone conversation using coded language, discussed with defendant DARBINYAN what percentage from the fraudulently obtained money they were supposed to pay the "runners."

229.  On or about July 21, 2009, defendant DARBINYAN, in a telephone conversation using coded language, discussed installing skimming devices at 99 Cents Only Stores with defendant TARVERDYAN.

230.  On or about July 21, 2009, defendant TARVERDYAN, in a telephone conversation using coded language, told defendant DARBINYAN that employees of 99 Cents Only Stores may have

1  discovered some of the skimming devices they had installed at
2  debit/credit card terminals.

3      231.   On or about July 22, 2009, defendants Bakhchadjian
4  and Vartenie Ananian ("Ananian") entered a 99 Cents Only Store in
5  Riverside, California, to carry out the scheme to install and
6  remove skimming devices.

7      232.   On or about August 8, 2009, defendant DARBINYAN, in a
8  telephone conversation using coded language, discussed with
9  defendant TARVERDYAN installing skimming devices that day.

10      233.   On or about August 8, 2009, defendants Bakhchadjian
11  and Ananian, and other co-schemers known and unknown to the Grand
12  Jury, went to a 99 Cents Only Store in Ventura, California, to
13  carry out the scheme to install and remove skimming devices.

14      234.   On or about August 8, 2009, co-schemers known and
15  unknown to the Grand Jury went to a 99 Cents Only Store in North
16  Hollywood, California, to carry out the scheme to install and
17  remove skimming devices.

18      235.   On or about August 13, 2009, defendant DARBINYAN, in
19  a telephone conversation using coded language, told defendant
20  PEMBEJIAN that defendant Bakhchadjian would be installing
21  skimming devices soon.

22      236.   On or about August 13 and August 14, 2009, co-
23  schemers known and unknown to the Grand Jury went to 99 Cents
24  Only Stores in San Diego, California, to carry out the scheme to
25  install and remove skimming devices.

26      237.   On or about August 14, 2009, defendants Bakhchadjian
27  and Ananian went to 99 Cents Only Stores in Huntington Beach,

28

65

1  California, to carry out the scheme to install and remove

2  skimming devices.

3       238.  On or about August 19, August 20, and August 21,

4  2009, unidentified co-schemers withdrew money from several bank

5  accounts in the names of victims who had shopped at 99 Cents Only

6  Stores, using various ATMs within the Central District of

7  California.

8       239.  On or about August 24, 2009, defendants Bakhchadjian

9  and Ananian, and other co-schemers known and unknown to the Grand

10 Jury, attempted to retrieve a skimming device from a 99 Cents

11 Only Store in Huntington Beach, California.

12      240.  On or about August 27, 2009, defendant DARBINYAN, in

13 a telephone conversation using coded language, told defendant

14 Parsadanyan that he was on his way to San Diego, California, to

15 meet with defendant ORTEGA regarding the scheme to install and

16 remove skimming devices.

17      241.  On or about August 27, 2009, defendants ORTEGA and

18 Catrina Balderrama ("Balderrama"), and other co-schemers known

19 and unknown to the Grand Jury, went to at least two 99 Cents Only

20 Stores in San Diego, California, to carry out the scheme to

21 install and remove skimming devices.

22      242.  On or about August 28, 2009, defendant DARBINYAN, in

23 a telephone conversation using coded language, asked defendant

24 TARVERDYAN if TARVERDYAN could prepare counterfeit and

25 unauthorized access devices, and TARVERDYAN agreed to do so.

26      243.  On or about September 16, 2009, defendant DARBINYAN,

27 in a telephone conversation using coded language, asked defendant

28 Simon Antonyan ("Antonyan") how many unauthorized access devices

they were supposed to give to defendant ORTEGA for his work in the scheme to install and remove skimming devices at 99 Cents Only Stores, and Antonyan said they were supposed to give ORTEGA approximately 500 unauthorized access devices.

Bank Fraud Targeting Victim K.K.

244. On or about July 27, 2010, defendant SHAROPETROSIAN, in a telephone conversation using coded language, discussed with an unindicted co-schemer committing bank fraud on an account worth over $700,000, and SHAROPETROSIAN said he has been working with an incarcerated co-schemer to perpetrate bank fraud on various victim bank accounts.

245. On or about July 27, 2009, defendant SHAROPETROSIAN, in a telephone conversation using coded language, told an unindicted co-schemer that SHAROPETROSIAN had obtained bank account information for victim K.K., and SHAROPETROSIAN provided the co-schemer with victim K.K.'s social security number and told the co-schemer to get him victim K.K.'s address.

246. On or about August 13, 2009, an incarcerated co-schemer working with defendant SHAROPETROSIAN called a customer service representative for JP Morgan Chase Bank, pretended to be victim K.K., and obtained information about victim K.K.'s bank account, including the balance and recent check activity associated with the account.

247. On or about August 13, 2009, two unindicted co-schemers working with defendant SHAROPETROSIAN, in a telephone conversation using coded language, discussed having checks delivered to victim K.K.'s address so that they could intercept the checks and take money from victim K.K.'s bank account.

Bank Fraud Targeting Victim M.C.

248.   On or about July 28, 2009, an unindicted co-schemer, in a telephone conversation using coded language, provided defendant SHAROPETROSIAN with victim M.C.'s personal identifying information, including victim M.C.'s address, date of birth, and social security number, and gave SHAROPETROSIAN victim M.C.'s Bank of America account information.

249.   On or about July 28, 2009, defendant SHAROPETROSIAN, in a telephone conversation using coded language, told an unindicted co-schemer that SHAROPETROSIAN had checked on victim M.C.'s bank accounts and that one of victim M.C.'s bank accounts contained approximately $108,000.

250.   On or about July 29, 2009, defendant SHAROPETROSIAN, in a telephone conversation using coded language, told an unindicted co-schemer that other co-schemers would steal victims' checks from their houses.

251.   On or about August 3, 2009, defendant SHAROPETROSIAN, in a telephone conversation using coded language, told defendant MARKOSIAN that SHAROPETROSIAN would have co-schemers provide MARKOSIAN with fraudulent checks for victim M.C.'s bank account, and MARKOSIAN discussed depositing the fraudulent checks the following day.

252.   On or about August 3, 2009, defendant SHAROPETROSIAN, in a telephone conversation using coded language, told an unindicted co-schemer to tell another unindicted co-schemer working at Citibank to bring them victim bank accounts.

253.   On or about August 13, 2009, an incarcerated co-schemer working with defendant SHAROPETROSIAN called Bank of

America customer service and obtained information regarding victim M.C.'s account balances and recent check activity.

Bank Fraud Targeting Victim J.L.

254.  On or about August 6, 2009, an unindicted co-schemer, in a telephone conversation using coded language, told defendant SHAROPETROSIAN that she was working on forging the signature on a fraudulent check drawn from the bank account of victim J.L., and SHAROPETROSIAN said defendant MARKOSIAN would come to pick up the fraudulent check in about an hour.

255.  On or about August 6, 2009, defendant MARKOSIAN, in a telephone conversation using coded language, told defendant SHAROPETROSIAN that he was on his way to pick up the fraudulent check drawn from the bank account of victim J.L. and that the fraudulent check would be deposited that day.

256.  On or about August 6, 2009, an unindicted co-schemer, in a telephone conversation using coded language, told defendant SHAROPETROSIAN that she was able to forge the signature on the fraudulent check drawn from the bank account of victim J.L.

257.  On or about August 6, 2009, defendant SHAROPETROSIAN, in a telephone conversation using coded language, told an unindicted co-schemer to write out approximately $44,000 for the fraudulent check drawn from the bank account of victim J.L., and SHAROPETROSIAN discussed forging other fraudulent checks.

258.  On or about August 6, 2009, defendant MARKOSIAN, in a telephone conversation using coded language, told defendant SHAROPETROSIAN that the fraudulent check drawn from the bank account of victim J.L. was for $44,000, and MARKOSIAN discussed cashing other fraudulent checks.

259. On or about August 6, 2009, two unindicted co-schemers possessed check number 2117, made payable to "Gagik Karapetyan" in the amount of $44,730.17, drawn from Citibank account number xxxx-xxx-3182, in the name of victim J.L., that had been provided to them by defendants SHAROPETROSIAN and MARKOSIAN and another unindicted co-schemer.

260. On or about August 6, 2009, defendant MARKOSIAN, in a telephone conversation using coded language, told defendant SHAROPETROSIAN that the co-schemers who were going to cash the fraudulent check drawn from the bank account of victim J.L. had been stopped by police officers before depositing the fraudulent check.

261. On or about August 7, 2009, defendant MARKOSIAN, in a telephone conversation using coded language, told defendant SHAROPETROSIAN that the co-schemers who were supposed to deposit the fraudulent check drawn from the bank account of victim J.L. had put the fraudulent check in the glove compartment, but that police officers had found the fraudulent check.

Bank Fraud Targeting Victim N.A.

262. On or about August 19, 2009, defendant SHAROPETROSIAN, in a telephone conversation using coded language, discussed with defendant MARKOSIAN a bank account belonging to victim N.A., and MARKOSIAN said they should try to withdraw approximately $45,000 from that account.

263. On or about August 20, 2009, an unindicted co-schemer, in a telephone conversation using coded language, gave defendant SHAROPETROSIAN numerous bank account numbers for bank

accounts belonging to victim N.A. and said the bank accounts contained over $200,000.

264.   On or about August 26, 2009, an unindicted co-schemer, in a telephone conversation using coded language, provided defendant SHAROPETROSIAN with victim N.A.'s bank account numbers, address, social security number, mother's maiden name, and other personal identifying information, and SHAROPETROSIAN said he only needed checks for victim N.A.'s bank accounts to perpetrate the bank fraud.

265.   On or about August 27, 2009, an incarcerated co-schemer working with defendant SHAROPETROSIAN, in a telephone conversation using coded language, discussed with another unindicted co-schemer ordering checks associated with victim N.A.'s bank accounts.

266.   On or about August 30, 2009, defendant SHAROPETROSIAN, in a telephone conversation using coded language, provided an unindicted co-schemer with victim N.A.'s personal identifying information, and SHAROPETROSIAN instructed the co-schemer to call Bank of America customer service to impersonate victim N.A. and obtain account balance information for victim N.A.'s account.

Bank Fraud Targeting Victims K.W.K. and H.K.

267.   On or about August 20, 2009, defendant SHAROPETROSIAN, in a telephone conversation using coded language, obtained bank account information and personal identifying information, including names, an address, and social security numbers, for victims K.W.K. and H.K.

268.   On or about August 20, 2009, defendant SHAROPETROSIAN, in a telephone conversation using coded language, told defendant DARBINYAN that SHAROPETROSIAN wanted information concerning bank accounts with high-dollar balances, like in the $400,000 to $500,000 range, and that SHAROPETROSIAN had set up a good bank fraud scheme with another prison inmate.

269.   On or about August 20, 2009, defendant DARBINYAN, in a telephone conversation using coded language, told defendant SHAROPETROSIAN that DARBINYAN had account information for a Wells Fargo Bank victim with approximately $200,000 in his account, and SHAROPETROSIAN said he wanted victim bank accounts from Washington Bank, Citibank, and Bank of America, and that he was working with people who could obtain such victims' personal information.

Bank Fraud and Access Device Fraud Involving

Defendants BILEZIKCHYAN, K. YERKANYAN, and ALOYAN

270.   On or about November 15, 2009, defendant K. YERKANYAN, in a telephone conversation using coded language, discussed with an unindicted co-schemer receiving via the U.S. mail information regarding a bank account opened in the name of a bank fraud victim using the victim's personal identifying information, and K. YERKANYAN discussed obtaining a post office box to receive the bank account information.

271.   On or about November 16, 2009, defendant K. YERKANYAN, in a telephone conversation using coded language, discussed with an unindicted co-schemer obtaining personal identifying information for bank fraud victims.

272.   On or about November 16, 2009, defendant BILEZIKCHYAN, in a telephone conversation using coded language, discussed with an unindicted co-schemer receiving via U.S. mail information regarding a bank account opened in the name of a victim using the victim's personal identifying information, and they also discussed the credit score of a bank fraud victim.

273.   On or about November 21, 2009, defendant BILEZIKCHYAN, in a telephone conversation using coded language, discussed with an unindicted co-schemer their possession of personal identifying information for a bank fraud victim who was the mother of a police officer, and that they had obtained a post office box to receive mail regarding fraudulently opened bank accounts.

274.   On or about November 23, 2009, defendant BILEZIKCHYAN, in a telephone conversation using coded language, discussed with an unindicted co-schemer providing the co-schemer with personal identifying information for bank fraud victims.

275.   On or about November 25, 2009, defendant BILEZIKCHYAN, in a telephone conversation using coded language, discussed with an unindicted co-schemer obtaining a fake identification document to aid in fraudulently opening bank accounts.

276.   On or about January 8, 2010, an unindicted co-schemer, in a telephone conversation using coded language, told defendant BILEZIKCHYAN that the co-schemer wanted to fraudulently cash a cashier's check worth $10,000, and BILEZIKCHYAN told the co-schemer to give the cash to defendant K. YERKANYAN.

73

277. On or about January 8, 2010, defendant K. YERKANYAN, in a telephone conversation using coded language, spoke with defendant Edgar Yerkanyan ("E. Yerkanyan") about fraudulently cashing a cashier's check worth $10,000.

278. On or about March 10, 2010, defendants BILEZIKCHYAN and ALOYAN met with an unindicted co-schemer in Murrieta, California, to discuss committing bank fraud on high-value bank accounts, including a bank account in the name of victim S.T.

279. On or about March 10, 2010, defendant ALOYAN provided an unindicted co-schemer with Bank of America account information for a bank account in the name of victim S.T. containing approximately $190,371.

280. On or about March 10, 2010, defendant ALOYAN obtained credit reports for victim S.T. and provided the credit reports to an unindicted co-schemer.

Additional Bank Fraud Activity

281. On or about June 21, 2009, defendant TANGABEKYAN called the JP Morgan Chase Bank automated customer service number, entered account information for the bank account of victim R.M. to obtain the current balance for the account and recent account activity, and was informed that the balance for victim R.M.'s account was $369,626.37.

282. On or about June 22, 2009, defendant TANGABEKYAN called the JP Morgan Chase Bank automated customer service number, entered account information for the bank account of victims J.D. and M.D. to obtain the current balance for the account and recent account activity, and was informed that the

74

1  current balance for victims J.D.'s and M.D.'s account was

2  $328,362.86.

3      283.  On or about June 22, 2009, defendant TANGABEKYAN

4  called the JP Morgan Chase Bank automated customer service

5  number, entered account information for the bank account of

6  victim R.T. to obtain the current balance for the account and

7  recent account activity, and was informed that the current

8  balance for victim R.T.'s account was $217,301.69.

9      284.  On or about June 23, 2009, defendant TANGABEKYAN

10  called the JP Morgan Chase Bank customer service number, entered

11  account information for the bank account of victim R.M., spoke to

12  a customer service representative, and obtained balances for

13  various bank accounts of victim R.M.

14      285.  On or about July 8, 2009, defendant TANGABEKYAN, in a

15  telephone conversation using coded language, told defendant

16  DARBINYAN that TANGABEKYAN would bring fraudulent checks for two

17  bank accounts to DARBINYAN that day, and that the fraudulent

18  checks for another bank account would be ready the following day.

19      286.  On or about July 13, 2009, defendant DARBINYAN, in a

20  telephone conversation using coded language, told defendant

21  TANGABEKYAN that a fraudulent check had cleared, and DARBINYAN

22  asked TANGABEKYAN to write another fraudulent check for

23  approximately $75,000; TANGABEKYAN then responded that he would

24  do so with great pleasure.

25      287.  On or about July 16, 2009, defendant DARBINYAN, in a

26  telephone conversation using coded language, discussed with

27  defendant TANGABEKYAN fraudulent checks prepared by TANGABEKYAN.

28

288. On or about July 23, 2009, defendants SHAROPETROSIAN and AIRAPETIAN, in a telephone conversation using coded language, discussed finding "runners" to fraudulently cash and deposit checks.

289. On or about July 27, 2009, defendant SHAROPETROSIAN, in a telephone conversation using coded language, asked defendant AIRAPETIAN to deliver checks to an unindicted co-schemer so that she could forge the signatures.

290. On or about July 29, 2009, defendant SHAROPETROSIAN, in a telephone conversation using coded language, discussed with defendant AIRAPETIAN committing bank fraud and giving defendant MARKOSIAN twenty-five percent of the proceeds for cashing a fraudulent check.

291. On or about August 5, 2009, defendant DARBINYAN, in a telephone conversation using coded language, discussed with defendant TANGABEKYAN preparing fraudulent checks for victim accounts at Bank of America, Wells Fargo Bank, and Citibank.

292. On or about August 28, 2009, defendant SHAROPETROSIAN, in a telephone conversation using coded language, discussed with an unindicted co-schemer writing fraudulent checks for victim bank accounts.

293. On or about September 1, 2009, defendant SHAROPETROSIAN, in a telephone conversation using coded language, discussed with defendant AIRAPETIAN recruiting "runners" to withdraw money from banks, including Bank of America, using fraudulently obtained access devices.

294. On or about September 1, 2009, defendant AIRAPETIAN, in a telephone conversation using coded language, told defendant

SHAROPETROSIAN that, in general, the maximum amount they would be able to withdraw from Bank of America bank accounts they had fraudulently gained access to would be $500 per day.

295.   On or about September 1, 2009, defendant AIRAPETIAN, in a telephone conversation using coded language, told defendant SHAROPETROSIAN that he had contacted an employee of Citibank who would be able to provide them with bank customer information, and SHAROPETROSIAN and AIRAPETIAN discussed obtaining bank information for customers who were older in age and who had high-value accounts.

296.   On or about September 9, 2009, defendant TANGABEKYAN, in a telephone conversation using coded language, discussed with defendant DARBINYAN fraudulent checks and bank account information for victim bank accounts from Citibank and Wells Fargo Bank.

297.   On or about September 11, 2009, defendant AIRAPETIAN, in a telephone conversation using coded language, discussed with defendant SHAROPETROSIAN distributing unauthorized access devices to "runners" in order to fraudulently withdraw money from bank accounts.

298.   On or about September 30, 2009, defendant TARVERDYAN, in a telephone conversation using coded language, told defendant DARBINYAN that TARVERDYAN would write out some fraudulent checks and give them to DARBINYAN, and DARBINYAN said they cheated someone out of $300,000 that day.

299.   On or about October 10, 2009, defendant K. YERKANYAN, in a telephone conversation using coded language, asked defendant

1    DARBINYAN for fraudulent checks because K. YERKANYAN had victim

2    bank accounts at Wells Fargo Bank and Citibank that he could use.

3        300.   On or about October 13, 2009, defendant

4    SHAROPETROSIAN, in a telephone conversation using coded language,

5    asked defendant DARBINYAN if he had victim bank account

6    information, and DARBINYAN said he had available a victim bank

7    account from Wells Fargo Bank worth about $200,000.

8        301.   On or about December 1, 2009, defendant TANGABEKYAN,

9    in a telephone conversation using coded language, asked defendant

10   DARBINYAN to look up information regarding a fraudulent check

11   worth about $150,000 that TANGABEKYAN had written.

12   <u>Identity Theft and Access Device Fraud Using the Saticoy</u>

13   <u>Location</u>

14       302.   On or about January 16, 2010, defendant H. KARAYAN,

15   in a telephone conversation using coded language, discussed with

16   defendant TARVERDYAN the need to get their fraudulent business

17   going so that they could make some money.

18       303.   On or about January 21, 2010, defendant H. KARAYAN,

19   in a telephone conversation using coded language, discussed with

20   defendant TARVERDYAN that they had six individuals ready to work

21   on their financial fraud business and discussed the need to rent

22   office space.

23       304.   On or about January 22, 2010, defendant H. KARAYAN,

24   in a telephone conversation using coded language, discussed with

25   defendant A. KARAYAN that H. KARAYAN and defendant Gagik

26   Zhamkochyan ("Zhamkochyan") had found space for their financial

27   fraud business on Saticoy.

28

305.   On or about January 25, 2010, defendant Arsen Ayranjian ("Ayranjian") signed a two-year lease for space at 13847 Saticoy Street in North Hollywood, California ("Saticoy"), stating that the property would be used only for a food pickling company and related storage.

306.   On or about January 25, 2010, defendant A. KARAYAN issued a cashier's check for $7,750 to DRZ Partners to lease office space at Saticoy.

307.   On or about January 25, 2010, defendant H. KARAYAN, in a telephone conversation using coded language, discussed with defendant Zhamkochyan using the space at Saticoy for their financial fraud business, and H. KARAYAN instructed Zhamkochyan to contact defendants A. KARAYAN and Karapet Joey Karamusyan ("Karamusyan") regarding activities at Saticoy.

308.   On or about January 25, 2010, defendant H. KARAYAN, in a telephone conversation using coded language, discussed with defendant A. KARAYAN the lease for office space at Saticoy.

309.   On or about January 25, 2010, defendant H. KARAYAN, in a telephone conversation using coded language, discussed with defendant A. KARAYAN moving furniture into the office space at Saticoy, and H. KARAYAN told A. KARAYAN to instruct defendants Karamusyan and Ayranjian to obtain insurance for the financial fraud business at Saticoy.

310.   On or about January 25, 2010, defendant H. KARAYAN, in a telephone conversation using coded language, discussed with defendant Karamusyan individuals whom they could pay in exchange for use of their identities in fraudulent activity.

311.   On or about January 26, 2010, defendant H. KARAYAN, in a telephone conversation using coded language, discussed with defendant Zhamkochyan individuals whom they could pay in exchange for use of their identities in fraudulent activity.

312.   On or about January 26, 2010, defendant H. KARAYAN, in a telephone conversation using coded language, discussed with defendant TARVERDYAN moving into the office space at Saticoy, and H. KARAYAN said he would contact defendant Karamusyan.

313.   On or about January 27, 2010, defendant H. KARAYAN, in a telephone conversation using coded language, discussed with defendant Zhamkochyan moving into the office space at Saticoy and that defendants Karamusyan and Haroutioun Arthur Melkonian ("Melkonian") would also be there.

314.   On or about January 27, 2010, defendants H. KARAYAN, A. KARAYAN, TARVERDYAN, Zhamkochyan, Karamusyan, and Melkonian went to the office at Saticoy.

315.   On or about January 28, 2010, defendants H. KARAYAN and Zhamkochyan went to the office at Saticoy.

316.   On or about February 1, 2010, defendant TARVERDYAN, in a telephone conversation using coded language, asked defendant H. KARAYAN when they should go to the office at Saticoy and make some money.

317.   On or about February 3, 2010, defendant H. KARAYAN, in a telephone conversation using coded language, told defendant Zhamkochyan that defendants A. KARAYAN, TARVERDYAN, and Melkonian were at Saticoy.

318.   On or about February 3, 2010, defendant H. KARAYAN went to the office at Saticoy.

80

319.   On or about February 10, 2010, defendants H. KARAYAN, A. KARAYAN, TARVERDYAN, Zhamkochyan, Karamusyan, and Melkonian possessed pre-paid telephone cards, marked with their names, for their use in connection with the financial fraud business at Saticoy.

320.   On or about February 10, 2010, defendants H. KARAYAN, A. KARAYAN, TARVERDYAN, Zhamkochyan, Karamusyan, and Melkonian possessed rubber fingerprint covers to prevent their fingerprints from appearing on the documents and items inside Saticoy.

321.   On or about February 10, 2010, defendants H. KARAYAN, A. KARAYAN, TARVERDYAN, Zhamkochyan, Karamusyan, and Melkonian possessed a "reader-writer" device used to re-encode the magnetic strips on access devices, such as credit and debit cards, and possessed "skimming devices" used to collect means of identification, including account numbers, from gas station pumps.

322.   On or about February 10, 2010, defendant H. KARAYAN made false and misleading statements and representations to law enforcement and claimed that he had never been to Saticoy, did not lease or own office space at Saticoy, and did not operate a financial fraud business at Saticoy.

323.   On or about August 24, 2010, defendant Ayranjian made false and misleading statements and representations to law enforcement about his involvement with the operation of Saticoy and told law enforcement that when he signed the lease for the office space at Saticoy, he intended for that space to be used as an import-export business for canned foods.

Additional Acts of Identity Theft and Access Device Fraud

324.   On or about October 21, 2004, defendant DARBINYAN withdrew money from Bank of America bank accounts belonging to others, and possessed approximately $24,527 in proceeds from bank fraud.

325.   On or about October 21, 2004, defendant DARBINYAN possessed fifteen or more counterfeit and unauthorized access devices, that is, at least 150 debit card account numbers in the names of other people.

326.   On or about December 8, 2004, defendants H. TOROSYAN and SEROBYAN, and others, possessed a skimming device and an encoding device, that is, devices that can be used to create counterfeit or unauthorized access devices.

327.   On or about December 8, 2004, defendants H. TOROSYAN and SEROBYAN, and others, used and possessed fifteen or more counterfeit and unauthorized access devices.

328.   On or about August 24, 2007, defendant TOPADZHIKYAN possessed the means of identification of another person, specifically, the name, date of birth, social security number, and bank account numbers belonging to victim P.S., without the consent, knowledge, or authorization of victim P.S.

329.   On or about July 1, 2009, defendant DARBINYAN, in a telephone conversation using coded language, asked defendant MNATSAKANYAN to prepare a fraudulent access device for DARBINYAN, and MNATSAKANYAN said he could do so.

330.   On or about August 17, 2009, defendant DARBINYAN, in a telephone conversation using coded language, told defendant BILEZIKCHYAN that DARBINYAN had tried five fraudulent access

devices at a 7-11 Store, but they were defective so DARBINYAN was going to get more, and BILEZIKCHYAN said he needed some fraudulent access devices too.

331. On or about November 6, 2009, defendants H. TOROSYAN and TOPADZHIKYAN, and others unknown to the Grand Jury, went to a gas station in La Verne, California, to install a skimming device.

332. On or about November 6, 2009, defendants H. TOROSYAN, SEROBYAN, and TOPADZHIKYAN, and others unknown to the Grand Jury, installed, controlled, and possessed a skimming device, and possessed a gas station master key that could be used to install a skimming device.

333. On or about November 6, 2009, defendants H. TOROSYAN, SEROBYAN, and TOPADZHIKYAN, and others unknown to the Grand Jury, possessed credit reports for victims R.P. and D.L.

334. On or about May 25, 2010, defendant TOPADZHIKYAN possessed counterfeit access devices and the means of identification of other persons for the purpose of committing identity theft and access device fraud.

335. On or about May 25, 2010, defendant TOPADZHIKYAN possessed device-making equipment, such as a reader-writer encoder, an embosser, and a tipping machine, for the purpose of creating counterfeit access devices.

336. On or about September 3, 2010, defendant ALOYAN possessed approximately 47 access devices, including 23 credit card numbers and 24 bank account numbers, in the names of other people, without their consent, knowledge, or authorization.

337.   On or about September 3, 2010, defendant ALOYAN possessed five or more identification documents and false identification documents, and knowingly possessed means of identification for other people, without their consent, knowledge, or authorization.

338.   On or about September 3, 2010, defendant ALOYAN possessed checks and other bank account information in the names of other people, without their consent, knowledge, or authorization.

Conspiracy to Possess with Intent to Distribute Stolen Marijuana

339.   On or about August 5, 2009, defendant BILEZIKCHYAN, in a telephone conversation using coded language, discussed with defendant S. Torosyan the fact that defendant Arnold Moradians ("Moradians") sells large quantities of marijuana.

340.   On or about August 6, 2009, defendant BILEZIKCHYAN, in a telephone conversation using coded language, spoke with defendant Adam Davoodian ("Davoodian") and asked Davoodian if he had ever purchased marijuana from defendant Moradians, and Davoodian stated that he had just purchased $20,000 worth of marijuana from Moradians.

341.   On or about August 7, 2009, defendant BILEZIKCHYAN, in a telephone conversation using coded language, told defendant Moradians that BILEZIKCHYAN would bring some people to help Moradians package marijuana.

342.   On or about August 8, 2009, defendant BILEZIKCHYAN, in a telephone conversation using coded language, told defendant Artur Gabrelyan ("Gabrelyan") that defendant Moradians had two

84

million dollars worth of marijuana and needed help vacuuming and packaging the marijuana, and Gabrelyan agreed to meet with BILEZIKCHYAN and help out.

343. On or about August 8, 2009, defendant BILEZIKCHYAN, in a telephone conversation using coded language, told defendant Moradians that he had sent some guys to help Moradians package marijuana.

344. On or about August 9, 2009, defendant BILEZIKCHYAN, in a telephone conversation using coded language, told defendant O. TEROGANESYAN that BILEZIKCHYAN and defendants K. YERKANYAN and S. Torosyan wanted to bring narcotics to O. TEROGANESYAN's auto body shop, MR Auto Body Collision, the next day in order to package the narcotics, and O. TEROGANESYAN agreed.

345. On or about August 10, 2009, defendant BILEZIKCHYAN, in a telephone conversation using coded language, told defendant O. TEROGANESYAN that they needed a compressor hose to package the marijuana and asked O. TEROGANESYAN to cover the windows in his office so that they could package the marijuana there, and O. TEROGANESYAN said they could package the marijuana after the auto body shop workers left for the day.

346. On or about August 11, 2009, defendant BILEZIKCHYAN, in a telephone conversation using coded language, discussed with defendant O. TEROGANESYAN a plan to steal the marijuana that they had helped to package for defendant Moradians, and O. TEROGANESYAN agreed to make a copy of the keys for the U-Haul truck that contained the packaged marijuana so that they could steal the marijuana.

347. On or about August 11, 2009, defendant BILEZIKCHYAN, in a telephone conversation using coded language, spoke with defendant Sarkis Avedisian ("Avedisian") and asked Avedisian to hide marijuana on his property, and Avedisian agreed to do so.

348. On or about August 11, 2009, defendant BILEZIKCHYAN, in a telephone conversation using coded language, told defendant O. TEROGANESYAN that defendant K. YERKANYAN was on his way to assist O. TEROGANESYAN in stealing the U-Haul truck containing the packaged marijuana, and BILEZIKCHYAN told O. TEROGANESYAN to leave the U-Haul truck abandoned somewhere after they removed the marijuana; and the U-Haul truck was eventually left parked on Clifton Place in Glendale, California.

349. On or about August 11, 2009, defendant BILEZIKCHYAN, in a telephone conversation using coded language, told defendant Moradians that other individuals had stolen the packaged marijuana from the U-Haul truck, and BILEZIKCHYAN claimed he had nothing to do with the theft of the marijuana.

350. On or about August 11, 2009, defendants BILEZIKCHYAN, K. YERKANYAN, and Davoodian met with defendant Moradians and pretended that K. YERKANYAN and Davoodian were rival claimants to BILEZIKCHYAN and Moradians for the stolen marijuana.

351. On or about August 11, 2009, defendant BILEZIKCHYAN, in a telephone conversation using coded language, told defendant O. TEROGANESYAN that BILEZIKCHYAN was in possession of the marijuana they had stolen from defendant Moradians.

352. On or about August 11, 2009, defendant BILEZIKCHYAN, in a telephone conversation using coded language, told defendant Gabrelyan that BILEZIKCHYAN was in possession of approximately

86

1 207 pounds of marijuana, and that the marijuana was worth
2 $450,000.

3     353.  On or about August 15, 2009, defendant BILEZIKCHYAN,
4 in a telephone conversation using coded language, told an
5 unindicted co-conspirator that the marijuana BILEZIKCHYAN and his
6 co-conspirators had stolen from the U-Haul truck was worth
7 $450,000, that BILEZIKCHYAN and his co-conspirators had divided
8 up the money, and that BILEZIKCHYAN's share was $150,000.

9     <u>Conspiracy to Manufacture and Possess with Intent to</u>
10     <u>Distribute Marijuana</u>

11     354.  In or around January 2010, defendant Ayranjian took
12 care of marijuana plants being grown at the marijuana facilities
13 operated by defendant H. KARAYAN and others.

14     355.  On or about January 14, 2010, defendant H. KARAYAN,
15 in a telephone conversation using coded language, discussed with
16 defendant TARVERDYAN starting a marijuana grow consisting of
17 approximately 500 plants and finding workers to help cultivate
18 the marijuana plants.

19     356.  On or about January 15, 2010, defendant H. KARAYAN,
20 in a telephone conversation using coded language, discussed with
21 defendant A. KARAYAN purchasing plant fertilizer for growing
22 marijuana plants.

23     357.  On or about January 16, 2010, defendant H. KARAYAN,
24 in a telephone conversation using coded language, discussed with
25 defendant Zhirayr Karayan ("Z. Karayan") drying, packaging, and
26 labeling marijuana.

27     358.  On or about January 16, 2010, defendant H. KARAYAN,
28 in a telephone conversation using coded language, discussed with

defendant GAMBARYAN growing marijuana, and H. KARAYAN said he had moved marijuana plants into his house.

359.   On or about January 17, 2010, defendant H. KARAYAN, in a telephone conversation using coded language, told defendant Z. Karayan that Z. Karayan should instruct defendant Ayranjian to go to defendant A. KARAYAN's marijuana facility, water the plants, and make sure to vacuum carefully at the location.

360.   On or about January 21, 2010, defendant H. KARAYAN, in a telephone conversation using coded language, discussed with defendant GAMBARYAN looking for another marijuana grow location.

361.   On or about January 22, 2010, defendant H. KARAYAN, in a telephone conversation using coded language, discussed with defendant Z. Karayan obtaining larger locations to grow marijuana, including one location that already had 150 marijuana plants inside of it.

362.   On January 22, 2010, defendant H. KARAYAN, in a telephone conversation using coded language, discussed with defendant A. KARAYAN a person who had a warehouse of marijuana plants for sale for $25,000, and H. KARAYAN said it was good deal.

363.   On or about January 25, 2010, defendant H. KARAYAN, in a telephone conversation using coded language, discussed with defendant A. KARAYAN checking on the condition of their marijuana plants.

364.   On or about January 26, 2010, defendant H. KARAYAN, in a telephone conversation using coded language, discussed with defendants A. KARAYAN and Z. Karayan growing marijuana plants.

365.  On or about January 28, 2010, defendant K. YERKANYAN, in a telephone conversation using coded language, discussed with defendant H. KARAYAN one of H. KARAYAN's marijuana grows, and H. KARAYAN said he would start cutting the marijuana from the marijuana grow that upcoming Saturday or Sunday.

366.  On or about February 6, 2010, defendant H. KARAYAN, in a telephone conversation using coded language, told defendant K. YERKANYAN that H. KARAYAN was at work setting up a marijuana grow.

367.  On or about February 8, 2010, defendant H. KARAYAN, in a telephone conversation using coded language, told an unindicted co-conspirator that H. KARAYAN had high quality marijuana available at $1,100 to $1,200 dollars for 12 ounces.

368.  On or about February 8, 2010, defendant H. KARAYAN, in a telephone conversation using coded language, told an unindicted co-conspirator that H. KARAYAN would need 200 clone marijuana plants for one of his marijuana grow locations, and 200 marijuana clone plants for another marijuana grow location.

369.  On or about February 8, 2010, defendants H. KARAYAN and R. TEROGANESYAN, in a telephone conversation using coded language, discussed their marijuana grow operations, and R. TEROGANESYAN said he was expanding his marijuana grow.

370.  On or about February 8, 2010, defendant H. KARAYAN, in a telephone conversation using coded language, told defendant R. TEROGANESYAN that H. KARAYAN had three marijuana grow sites operating and was opening a fourth, and that each grow site consisted of at least 150 marijuana plants.

89

371.   On or about February 8, 2010, defendant R. TEROGANESYAN, in a telephone conversation using coded language, spoke with defendant H. KARAYAN and offered to take possession of some of H. KARAYAN's marijuana plants, and R. TEROGANESYAN said he could fit approximately 200 of H. KARAYAN's marijuana plants at R. TEROGANESYAN's marijuana grow location.

372.   On or about February 10, 2010, defendant H. KARAYAN possessed approximately 2.38 kilograms of marijuana, a firearm, namely, a Beretta model 96 .40 caliber semi-automatic pistol, and ammunition, at his residence at 18536 Brasilia Drive, in Northridge, California.

373.   On or about April 26, 2010, defendant GAMBARYAN brought a propane tank and bamboo stakes to a marijuana growing facility that defendants H. KARAYAN, A. KARAYAN, GAMBARYAN, Grigor Garibyan ("Garibyan"), Aram Khachatryan ("A. Khachatryan"), Z. Karayan, and Hovannes Igarian ("Igarian") were operating at 8239 Lankershim Boulevard, Unit D, in North Hollywood, California (the "marijuana growing facility").

374.   On or about April 26, 2010, defendants GAMBARYAN and Garibyan unloaded the propane tank and bamboo stakes into the marijuana growing facility.

375.   On or about April 26, 2010, defendant Igarian arrived at the marijuana growing facility in an SUV, met defendant GAMBARYAN, and the two shook hands and entered the marijuana growing facility.

376.   On or about April 26, 2010, defendant Igarian exited the marijuana growing facility, backed his SUV up to the door of

1 the marijuana growing facility, and opened the rear hatch of his

2 SUV.

3      377.  On or about April 26, 2010, defendant GAMBARYAN

4 brought a black plastic bag of small marijuana plants out of the

5 marijuana growing facility.

6      378.  On or about April 26, 2010, defendants GAMBARYAN and

7 Igarian loaded the bag of marijuana plants into Igarian's SUV.

8      379.  On or about April 26, 2010, defendants H. KARAYAN,

9 Garibyan, A. Khachatryan, and Z. Karayan met inside the marijuana

10 growing facility.

11      380.  On or about April 26, 2010, defendants GAMBARYAN, A.

12 Khachatryan, and Z. Karayan each possessed on his person a key to

13 the door of the marijuana growing facility.

14      381.  On or about April 26, 2010, defendants H. KARAYAN, A.

15 KARAYAN, GAMBARYAN, Garibyan, A. Khachatryan, Z. Karayan, and

16 Igarian, and others known and unknown to the Grand Jury,

17 possessed approximately 567 marijuana plants, as well as

18 equipment used to grow marijuana, including one-gallon and five-

19 gallon pots containing potting soil, high wattage overhead light

20 bulbs with reflector shades, air conditioning units, dehumidifier

21 units, fans, carbon filter systems, watering tubs, a submersible

22 pump, and a carbon dioxide generator attached to a propane tank,

23 all inside the marijuana growing facility.

24     <u>Additional Drug Trafficking Activities Engaged in by Members</u>

25     <u>of the Criminal Enterprise</u>

26      382.  On or about March 9, 2007, defendant BILEZIKCHYAN, in

27 a telephone conversation using coded language, spoke with a

28

Mexican Mafia member and discussed obtaining an ounce of drugs from the Mexican Mafia member for approximately $600.

383.   On or about March 26, 2007, defendant BILEZIKCHYAN, in a telephone conversation using coded language, told a Mexican Mafia member that BILEZIKCHYAN had a kilogram of drugs for him.

384.   On or about October 19, 2007, defendant K. YERKANYAN, in a telephone conversation using coded language, agreed to inquire with others regarding supplying drugs to a Mexican Mafia member.

385.   On or about December 5, 2007, defendant BILEZIKCHYAN, in a telephone conversation using coded language, spoke with a Mexican Mafia member and discussed obtaining methamphetamine from the Mexican Mafia member.

386.   On or about December 9, 2007, defendant BILEZIKCHYAN, in a telephone conversation using coded language, arranged with a Mexican Mafia member to pick up drugs from the Mexican Mafia member's home.

387.   On or about October 16, 2008, defendant HOVANISSIAN, in a telephone conversation using coded language, discussed with an unindicted co-conspirator smuggling drugs into the Los Angeles County Jail, where HOVANISSIAN was incarcerated and selling drugs within the jail.

388.   On or about November 2, 2008, defendant HOVANISSIAN and an unindicted co-conspirator, in a telephone conversation using coded language, discussed having the unindicted co-conspirator's girlfriend visit HOVANISSIAN in jail to deliver drugs to him.

92

389.   On or about November 3, 2008, defendant HOVANISSIAN and an unindicted co-conspirator, in a telephone conversation using coded language, discussed having the unindicted co-conspirator's girlfriend and another woman visit HOVANISSIAN in jail so that they could bring drugs to him as soon as possible.

390.   On or about November 6, 2008, defendant HOVANISSIAN, in a telephone conversation using coded language, told an unindicted co-conspirator that he was upset with a woman who delivered drugs to HOVANISSIAN in jail because the drug order had been messed up.

391.   On or about January 7, 2009, defendant HOVANISSIAN, in a telephone conversation using coded language, discussed with an unindicted co-conspirator smuggling fifteen grams of drugs to HOVANISSIAN in jail through other inmates.

392.   On or about June 27, 2009, defendant DARBINYAN, in a telephone conversation using coded language, told defendant ZAKARYAN that DARBINYAN had to send narcotics to friends inside prison.

393.   On or about July 12, 2009, defendant SHAROPETROSIAN, in a telephone conversation using coded language, asked defendant DARBINYAN to send him drugs in prison to distribute to others.

394.   On or about July 13, 2009, defendant DARBINYAN, in a telephone conversation using coded language, told defendant SHAROPETROSIAN that DARBINYAN was going to send SHAROPETROSIAN, who was incarcerated, marijuana and methamphetamine for distribution to other inmates.

395.   On or about July 14, 2009, defendant DARBINYAN, in a telephone conversation using coded language, told defendant

93

SHAROPETROSIAN that DARBINYAN had acquired marijuana for SHAROPETROSIAN.

396.  On or about October 19, 2009, defendant DARBINYAN, in a telephone conversation using coded language, asked defendant Ramirez for heroin because DARBINYAN wanted to send it to someone in prison.

397.  On or about October 29, 2009, defendant BILEZIKCHYAN, in a telephone conversation using coded language, asked defendant DARBINYAN to send narcotics to an unindicted co-conspirator in Miami, Florida, via overnight Federal Express.

398.  On or about October 29, 2009, defendant DARBINYAN, in a telephone conversation using coded language, asked defendant K. YERKANYAN to find someone to take a package containing narcotics to a Federal Express location, and DARBINYAN said that DARBINYAN and K. YERKANYAN should not go inside the Federal Express location to avoid showing their faces.

399.  On or about October 29, 2009, defendant DARBINYAN, in a telephone conversation using coded language, told an unindicted co-conspirator to put a fake name and address on the return label of the Federal Express package containing narcotics.

400.  On or about October 30, 2009, defendant DARBINYAN caused a Federal Express package containing approximately 216 grams of marijuana to be sent to Miami, Florida.

401.  On or about November 17, 2009, defendant K. YERKANYAN, in a telephone conversation using coded language, discussed with defendant GAMBARYAN drugs that were supposed to be sent into prison, and GAMBARYAN said that two grams were supposed

94

1 to be delivered into prison, but only one gram of drugs had
2 arrived at the prison.

3     402.   On or about November 21, 2009, defendant K.
4 YERKANYAN, in a telephone conversation using coded language, told
5 defendant FERMANYAN to bring him an unspecified quantity of
6 marijuana, and FERMANYAN agreed to do so.

7     403.   On or about February 8, 2010, defendant FERMANYAN, in
8 a telephone conversation using coded language, told defendant K.
9 YERKANYAN that FERMANYAN had lots of Oxycodone, and K. YERKANYAN
10 told FERMANYAN to bring him Oxycodone.

11     <u>Illegal Gambling Business</u>

12     404.   On or about December 28, 2009, defendants
13 BILEZIKCHYAN and H. KARAYAN, in a telephone conversation using
14 coded language, discussed paying the rent for a gambling location
15 at 3450 Cahuenga Boulevard, in Los Angeles, California.

16     405.   On or about January 14, 2010, defendant H. KARAYAN,
17 in a telephone conversation using coded language, spoke to an
18 unindicted co-conspirator about working as a waitress at an
19 upcoming poker tournament that he was organizing.

20     406.   On or about January 18, 2010, defendants H. KARAYAN
21 and R. TEROGANESYAN, in a telephone conversation using coded
22 language, discussed hiring three dealers and at least three
23 waitresses for a poker tournament they were organizing the next
24 evening, and R. TEROGANESYAN said that they should bring about
25 5,000 gambling chips and that there should be enough players for
26 three gambling tables.

27     407.   On or about January 18, 2010, defendant GAMBARYAN, in
28 a telephone conversation using coded language, told defendant H.

KARAYAN that he would contact a dealer about working at their poker tournament the next evening, and GAMBARYAN said he would be organizing another gambling game in two days.

408.   On or about January 18, 2010, defendant H. KARAYAN, in a telephone conversation using coded language, spoke to an unindicted co-conspirator about working as a dealer at the poker tournament the next evening, and H. KARAYAN told the dealer to contact other dealers and tell them to dress nicely because there would be high rollers at the poker tournament.

409.   On or about January 18, 2010, defendant H. KARAYAN, in a telephone conversation using coded language, spoke to an unindicted co-conspirator about working as a waitress at the poker tournament the next evening in which the first place prize would be $5,000, and H. KARAYAN said he would be hiring four waitresses for three gambling tables.

410.   On or about January 19, 2010, defendants H. KARAYAN and GAMBARYAN, in a telephone conversation using coded language, discussed meeting at the poker tournament that evening.

411.   On or about January 21, 2010, defendants H. KARAYAN and R. TEROGANESYAN, in a telephone conversation using coded language, discussed a gambler who owed them approximately $4,000 from the poker tournament they had organized two days before.

412.   On or about January 22, 2010, defendants H. KARAYAN and R. TEROGANESYAN, in a telephone conversation using coded language, discussed a gambling tournament they had organized that was currently taking place, and R. TEROGANESYAN said there was a lot of money on the table and that many people had arrived so he was going to open a second table.

413.   On or about January 23, 2010, defendant GAMBARYAN, in a telephone conversation using coded language, told defendant H. KARAYAN that he was organizing a gambling tournament that would take place in approximately one week, in which there would be $500 buy-ins, a first place prize of $10,000, and a minimum of four to five tables, and H. KARAYAN agreed to begin soliciting as many players as he could find for this tournament.

414.   On or about January 23, 2010, defendant R. TEROGANESYAN, in a telephone conversation using coded language, told defendant H. KARAYAN that the gambling tournament the night before had gone until 11:30 a.m. the next day.

415.   On or about January 25, 2010, defendants H. KARAYAN and R. TEROGANESYAN, in a telephone conversation using coded language, discussed what amounts to pay waitresses who worked at their poker tournament, and R. TEROGANESYAN said the next game would be the following day.

416.   On or about January 27, 2010, defendant R. TEROGANESYAN, in a telephone conversation using coded language, told defendant H. KARAYAN that the gambling tournament the night before had gone well and that many players owed them money, and R. TEROGANESYAN said this was business and he needed his money.

417.   On or about January 27, 2010, defendants H. KARAYAN and GAMBARYAN, and others known and unknown to the Grand Jury, possessed a poker table marked "Power Poker" with an Armenian crest in the center, thousands of gambling chips, and gambling pay-owe ledgers, listing amounts bet and owed, at 4055 Lankershim Boulevard, in Los Angeles, California.

418.   On or about February 2, 2010, defendant R. TEROGANESYAN, in a telephone conversation using coded language, mentioned a gambling player who would pay him between $10,000 and $15,000, and R. TEROGANESYAN discussed with defendant H. KARAYAN getting ready for a gambling game and hiring enough employees.

419.   On or about February 10, 2010, defendant H. KARAYAN, and others known and unknown to the Grand Jury, possessed two gambling tables, thousands of gambling chips, and other gambling paraphernalia, at 13847 Saticoy Street, in Los Angeles, California.

420.   On or about May 13, 2010, defendant GAMBARYAN, and others known and unknown to the Grand Jury, possessed a poker table, thousands of gambling chips, and gambling pay-owe sheets, at 13429 Friar Street, in Los Angeles, California.

<u>Additional Acts Related to the Criminal Enterprise</u>

421.   On or about January 9, 2007, defendant BILEZIKCHYAN, in a telephone conversation using coded language, agreed to provide a firearm to a Mexican Mafia member.

422.   On or about January 19, 2007, defendant HOVANISSIAN, in a telephone conversation using coded language, spoke with a Mexican Mafia member and discussed protection that the Mexican Mafia member would provide to HOVANISSIAN.

423.   On or about January 19, 2007, defendant BILEZIKCHYAN, in a telephone conversation using coded language, asked a Mexican Mafia member to help protect defendant HOVANISSIAN in jail.

424.   On or about January 29, 2007, defendant BILEZIKCHYAN, in a telephone conversation using coded language, discussed with a Mexican Mafia member how defendant DARBINYAN, who was

1  incarcerated, could send the Mexican Mafia member money collected
2  from other prison inmates.

3       425.   On or about March 26, 2007, defendant BILEZIKCHYAN,
4  in a telephone conversation using coded language, told a Mexican
5  Mafia member that defendant DARBINYAN had money collected from
6  prison inmates for the Mexican Mafia member.

7       426.   On or about April 19, 2007, defendant K. YERKANYAN,
8  in a telephone conversation using coded language, identified
9  himself to a Mexican Mafia member as an Armenian Power gang
10 member using the gang moniker "Guilty."

11      427.   On or about December 15, 2007, defendant
12 BILEZIKCHYAN, in a telephone conversation using coded language,
13 offered advice and assistance to a Mexican Mafia member who
14 recently had a significant amount of money seized by police, and
15 BILEZIKCHYAN told the Mexican Mafia member that BILEZIKCHYAN
16 would be there to support him.

17      428.   On or about November 5, 2008, defendant HOVANISSIAN,
18 in a telephone conversation using coded language, discussed with
19 defendant H. KARAYAN the status of other Armenian Power gang
20 members and associates who were in custody, and HOVANISSIAN and
21 H. KARAYAN discussed a prior shooting they had been charged with
22 in 2003.

23      429.   On or about March 8, 2009, defendant DARBINYAN, in a
24 telephone conversation using coded language, discussed with
25 defendant MORENO, a Mexican Mafia member, the fact that MORENO
26 had finally been let out of prison and that prison officials had
27 investigated MORENO for his involvement in disturbances that had
28 occurred inside prison.

430.  On or about April 25, 2009, defendant DARBINYAN, in a telephone conversation using coded language, complained to defendant SHAROPETROSIAN about police officers surveilling him, and DARBINYAN told SHAROPETROSIAN that he did not care if he went to jail for five or six years because he can do the time.

431.  On or about April 25, 2009, defendant DARBINYAN, in a telephone conversation using coded language, told defendant SHAROPETROSIAN that DARBINYAN is a validated associate of the Mexican Mafia.

432.  On or about June 27, 2009, defendant DARBINYAN, in a telephone conversation using coded language, discussed with defendant SHAROPETROSIAN two Mexican Mafia members who were father and son, and DARBINYAN referred to his close relationship with defendant MORENO, another Mexican Mafia member.

433.  On or about July 8, 2009, defendant DARBINYAN, in a telephone conversation using coded language, discussed with an unindicted co-conspirator that prison authorities had identified the unindicted co-conspirator as an Armenian Power gang member, and DARBINYAN said that prison authorities had done so due to the unindicted co-conspirator's association with DARBINYAN.

434.  On or about July 8, 2009, defendant DARBINYAN, in a telephone conversation using coded language, discussed with defendant SHAROPETROSIAN sending money to a Mexican Mafia associate for protection in prison.

435.  On or about July 17, 2009, defendant BILEZIKCHYAN, in a telephone conversation using coded language, told defendant DARBINYAN that BILEZIKCHYAN was going to visit a senior Mexican Mafia member and discuss money.

436.   On or about July 20, 2009, defendants SHAROPETROSIAN and AIRAPETIAN, in a telephone conversation using coded language, discussed whether AIRAPETIAN was interested in becoming a Thief-in-Law, and SHAROPETROSIAN said they did not have to become Thieves-in-Law to be financially strong.

437.   On or about August 19, 2009, defendant PETROSIAN, in a telephone conversation using coded language, asked defendant DARBINYAN if an unindicted co-conspirator's brother was a member of Armenian Power, and DARBINYAN said no way.

438.   On or about August 28, 2009, defendant DARBINYAN, in a telephone conversation using coded language, told an incarcerated unindicted co-conspirator that DARBINYAN had been validated by prison officials as an associate of the Mexican Mafia because DARBINYAN controlled the prison yards when DARBINYAN was incarcerated.

439.   On or about September 9, 2009, defendant BILEZIKCHYAN, in a telephone conversation using coded language, told defendant K. YERKANYAN that if an Armenian kidnapping victim goes to the police regarding his kidnapping by Mexican Mafia associates, all imprisoned Armenians would be in jeopardy, and BILEZIKCHYAN told K. YERKANYAN that they should call defendants DARBINYAN, H. KARAYAN, and O. TEROGANESYAN, and other Armenian Power leaders, to discuss the issue.

440.   On or about September 9, 2009, defendant BILEZIKCHYAN, in a telephone conversation using coded language, discussed with defendant DARBINYAN an incident in which an Armenian individual had been kidnapped by Mexican Mafia associates, and BILEZIKCHYAN said that all incarcerated Armenians

1 would be in danger if the Armenian kidnapping victim got the
2 police involved, and DARBINYAN agreed.

3    441.   On or about October 3, 2009, defendant DARBINYAN, in
4 a telephone conversation using coded language, told defendant
5 Antonyan that another high-level Armenian organized crime figure
6 had called DARBINYAN and told DARBINYAN that he respected
7 DARBINYAN as a Thief-in-Law.

8    442.   On or about October 10, 2009, defendant DARBINYAN, in
9 a telephone conversation using coded language, told defendant
10 ZAKARYAN that DARBINYAN was going to take $2,000 from an
11 unspecified victim and that DARBINYAN had to pay $500 each to
12 four incarcerated Mexican Mafia members.

13    443.   On or about October 13, 2009, defendant BILEZIKCHYAN,
14 in a telephone conversation using coded language, told defendant
15 DARBINYAN that the westside belonged to a senior Mexican Mafia
16 member and that the senior Mexican Mafia member was a friend of
17 Armenians.

18    444.   On or about October 22, 2009, defendant BILEZIKCHYAN,
19 in a telephone conversation using coded language, told defendant
20 DARBINYAN that he had spoken to a recently imprisoned Mexican
21 Mafia member who told BILEZIKCHYAN that law enforcement officers
22 were listening to their telephone conversations, and BILEZIKCHYAN
23 told DARBINYAN that they had to change their telephone numbers as
24 soon as possible.

25    445.   On or about December 3, 2009, defendant BILEZIKCHYAN,
26 in a telephone conversation using coded language, told defendant
27 K. YERKANYAN that BILEZIKCHYAN was going to have lunch with a
28 Mexican Mafia member and others to discuss recent arrests of

1  three Armenian Power gang members and associates, including

2  DARBINYAN.

3       446.   On or about January 27, 2010, defendants E.

4  KHACHATRYAN and GAMBARYAN, and other members and associates of

5  Armenian Power, possessed a roster identifying Armenian Power

6  gang members.

7       All in violation of Title 18, United States Code, Section

8  1962(d).

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COUNT TWO

[18 U.S.C. § 1201(c)]

A.   OBJECT OF THE CONSPIRACY

Beginning on a date unknown to the Grand Jury, but no later than on or about November 25, 2009, and continuing through on or about December 29, 2009, in Los Angeles County, within the Central District of California, and elsewhere, defendants PARAMAZ BILEZIKCHYAN, also known as ("aka") "Parik," aka "P," aka "Parnamas Bileziktsian," aka "Bleziktsian Paramas" ("BILEZIKCHYAN"), KARO YERKANYAN, aka "Guilty," aka "Gator," aka "Kane" ("K. YERKANYAN"), HAYK KARAYAN, aka "Hayko," aka "Whisper" ("H. KARAYAN"), ARAM PETROSIAN, aka "Tot," aka "Toto" ("PETROSIAN"), OGANES TEROGANESYAN, aka "Hovo," aka "Hovik," aka "Oganes Terognesyan" ("O. TEROGANESYAN"), and TIGRAN SARKISYAN, aka "Tiko" ("SARKISYAN"), and others known and unknown to the Grand Jury, conspired and agreed with each other to willfully and unlawfully seize, confine, inveigle, kidnap, abduct, and carry away victim G.A., and hold victim G.A. for ransom and reward and otherwise, and willfully used a means, facility, and instrumentality of interstate and foreign commerce in committing and in furtherance of the commission of such offense, in violation of Title 18, United States Code, Section 1201(a)(1).

B.   MEANS BY WHICH THE OBJECT OF THE CONSPIRACY WAS TO BE
     ACCOMPLISHED

The object of the conspiracy was to be accomplished, in substance, as follows:

1.   Defendants BILEZIKCHYAN, K. YERKANYAN, PETROSIAN, and O. TEROGANESYAN, SARKISYAN, and others known and unknown to the

Grand Jury, would devise a plan to seize, confine, inveigle, kidnap, abduct, and carry away victim G.A. from the Downtown district of Los Angeles, California.

2.    Defendants BILEZIKCHYAN, K. YERKANYAN, PETROSIAN, and SARKISYAN, and others known and unknown to the Grand Jury, would seize, confine, inveigle, kidnap, abduct, and carry away victim G.A. to MR Auto Body Collision, located in Los Angeles, California.

3.    Defendants BILEZIKCHYAN, K. YERKANYAN, PETROSIAN, and O. TEROGANESYAN, and others known and unknown to the Grand Jury, would threaten victim G.A. with death and bodily harm if victim G.A. did not pay and agree to pay a large sum of money for his release.

4.    Defendants BILEZIKCHYAN, K. YERKANYAN, H. KARAYAN, PETROSIAN, O. TEROGANESYAN, and SARKISYAN, and others known and unknown to the Grand Jury, would use multiple cellular telephones to communicate during the course of and in furtherance of the kidnapping of victim G.A.

C.   OVERT ACTS

In furtherance of the conspiracy and to accomplish the object of the conspiracy, defendants BILEZIKCHYAN, K. YERKANYAN, H. KARAYAN, PETROSIAN, O. TEROGANESYAN, and SARKISYAN, and others known and unknown to the Grand Jury, committed and caused to be committed various overt acts on or about the following dates, within the Central District of California, and elsewhere, including, but not limited to, the following:

1.    On or about November 25, 2009, defendant BILEZIKCHYAN, in a telephone conversation using coded language,

105

told defendant SARKISYAN to pick BILEZIKCHYAN up to drive him to the Downtown district of Los Angeles, California.

2.     On or about November 25, 2009, defendant BILEZIKCHYAN, in a telephone conversation using coded language, told defendant K. YERKANYAN that BILEZIKCHYAN was headed to downtown Los Angeles with defendant SARKISYAN to kidnap victim G.A., and BILEZIKCHYAN asked K. YERKANYAN to contact defendants H. KARAYAN and PETROSIAN to advise them to be prepared to assist in kidnapping victim G.A., and K. YERKANYAN agreed to do so.

3.     On or about November 25, 2009, defendant BILEZIKCHYAN, in a telephone conversation using coded language, told defendant K. YERKANYAN to talk to defendant PETROSIAN about where they should take victim G.A. after they seize him, and K. YERKANYAN said he would do so.

4.     On or about November 25, 2009, defendant BILEZIKCHYAN, in a telephone conversation using coded language, told defendant O. TEROGANESYAN that he would be at O. TEROGANESYAN's auto body shop, MR Auto Body Collision, in Los Angeles, California, in about an hour, and O. TEROGANESYAN told BILEZIKCHYAN he would be there for sure.

5.     On or about November 25, 2009, defendants BILEZIKCHYAN, K. YERKANYAN, PETROSIAN, and SARKISYAN, and others known and unknown to the Grand Jury, seized, confined, inveigled, kidnapped, abducted, and carried away victim G.A. to MR Auto Body Collision, an auto body shop owned by defendant O. TEROGANESYAN in Los Angeles, California.

106

6.    On or about November 25, 2009, defendants BILEZIKCHYAN and SARKISYAN carried out a ruse phone call designed to instill the fear of death in victim G.A.

7.    On or about November 25, 2009, defendants BILEZIKCHYAN, K. YERKANYAN, PETROSIAN, and SARKISYAN confronted victim G.A. while some of them were wearing masks with the intention of instilling the fear of death in victim G.A.

8.    On or about November 25, 2009, defendant K. YERKANYAN, in a telephone conversation using coded language, told defendant H. KARAYAN that he and others had taken victim G.A., who was with them, and H. KARAYAN offered to help.

9.    On or about November 25, 2009, defendant BILEZIKCHYAN told victim G.A. that victim G.A. had to pay BILEZIKCHYAN $100,000 to be released.

10.    On or about November 25, 2009, defendant BILEZIKCHYAN told victim G.A. that victim G.A. would need to pay BILEZIKCHYAN $400,000 to avoid future kidnappings.

11.    On or about November 25, 2009, defendants K. YERKANYAN, PETROSIAN, and others known and unknown to the Grand Jury, took victim G.A. away from defendant O. TEROGANESYAN's auto body shop to collect money that was being paid to secure victim G.A.'s release.

12.    On or about November 25, 2009, defendant PETROSIAN, in a telephone conversation using coded language, told defendant BILEZIKCHYAN that PETROSIAN was sitting outside victim G.A.'s building waiting for victim G.A. to bring money to him.

13.    On or about November 26, 2009, defendant BILEZIKCHYAN, in a telephone conversation using coded language, discussed with defendant K. YERKANYAN splitting $200,000 in proceeds from the kidnapping of victim G.A.

14.    On or about December 24, 2009, defendant H. KARAYAN, in a telephone conversation using coded language, told defendant BILEZIKCHYAN that victim G.A. had a lot of gold hidden, and BILEZIKCHYAN told H. KARAYAN to tell victim G.A. that Monday was the last day to pay the money owed in connection with the kidnapping.

COUNT THREE

[18 U.S.C. §§ 1201(a)(1), 2]

On or about November 25, 2009, in Los Angeles County, within the Central District of California, and elsewhere, defendants PARAMAZ BILEZIKCHYAN, also known as ("aka") "Parik," aka "P," aka "Parnamas Bileziktsian," aka "Bleziktsian Paramas," KARO YERKANYAN, aka "Guilty," aka "Gator," aka "Kane," HAYK KARAYAN, aka "Hayko," aka "Whisper," ARAM PETROSIAN, aka "Tot," aka "Toto," OGANES TEROGANESYAN, aka "Hovo," aka "Hovik," aka "Oganes Terognesyan," and TIGRAN SARKISYAN, aka "Tiko,"  and others known and unknown to the Grand Jury, willfully and unlawfully seized, confined, inveigled, kidnapped, abducted, and carried away victim G.A., and held victim G.A. for ransom and reward and otherwise, and used a means, facility, and instrumentality of interstate and foreign commerce in committing and in furtherance of the commission of such offense, and aided, abetted, counseled, commanded, induced, and procured the commission of such offense.

109

COUNT FOUR

[18 U.S.C. § 1951(a)]

A.  <u>OBJECT OF THE CONSPIRACY</u>

Beginning on a date unknown to the Grand Jury, but no later than on or about June 27, 2009, and continuing through in or around December 2009, in Los Angeles County, within the Central District of California, and elsewhere, defendants MHER DARBINYAN, also known as ("aka") "Mike," aka "Hollywood Mike," aka "Little Mike," aka "Capone," aka "Caps," aka "Maher" ("DARBINYAN"), ARMAN SHAROPETROSIAN, aka "Horse," aka "Dzi" ("SHAROPETROSIAN"), EMIL AIRAPETIAN, aka "Clever," aka "Emo" ("AIRAPETIAN"), and LUSINE OGANDGANYAN, aka "Lusine Ogandjanian," aka "Luso" ("L. OGANDGANYAN"), and others known and unknown to the Grand Jury, conspired and agreed with each other to knowingly obstruct, delay, and affect commerce and the movement of any article or commodity in commerce by extortion, and threatened physical violence to victim M.M. in furtherance of a plan and purpose to obstruct, delay, and affect commerce and the movement of any article or commodity in commerce by extortion, in violation of Title 18, United States Code, Section 1951(a).

B.  <u>MEANS BY WHICH THE OBJECT OF THE CONSPIRACY WAS TO BE</u>
<u>ACCOMPLISHED</u>

The object of the conspiracy was to be accomplished, in substance, as follows:

1.    Defendants DARBINYAN and SHAROPETROSIAN would devise a plan to extort money from victim M.M.

2.      Defendants DARBINYAN, SHAROPETROSIAN, AIRAPETIAN, and L. OGANDGANYAN would threaten victim M.M. with death and serious bodily harm to victim M.M. and victim M.M.'s family if victim M.M. did not pay a large sum of money to DARBINYAN, SHAROPETROSIAN, AIRAPETIAN, and L. OGANDGANYAN, and others known and unknown to the Grand Jury.

3.      Defendants DARBINYAN, SHAROPETROSIAN, AIRAPETIAN, and L. OGANDGANYAN would contact victim M.M. and instruct him to pay specific amounts of money via cash or wire transfers and specify the date, time, and location for the payment of the money.

C.    OVERT ACTS

In furtherance of the conspiracy and to accomplish the object of the conspiracy, defendants DARBINYAN, SHAROPETROSIAN, AIRAPETIAN, and L. OGANDGANYAN, and others known and unknown to the Grand Jury, committed and caused to be committed various overt acts on or about the following dates, within the Central District of California, and elsewhere, including, but not limited to, the following:

1.      On or about June 27, 2009, defendant SHAROPETROSIAN, in a telephone conversation using coded language, discussed with defendant DARBINYAN seizing and holding victim M.M. until victim M.M.'s father brought them money.

2.      On or about June 29, 2009, defendant SHAROPETROSIAN initiated a three-way call between defendant DARBINYAN and victim M.M. and threatened victim M.M. with bodily harm if he did not pay money to SHAROPETROSIAN and DARBINYAN.

111

3.     On or about June 30, 2009, defendant DARBINYAN, in a telephone conversation using coded language, told defendant SHAROPETROSIAN that DARBINYAN had met with victim M.M. and threatened him with physical violence if he did not pay money, and SHAROPETROSIAN said victim M.M. should pay $70,000 to defendant L. OGANDGANYAN and additional money to them.

4.     On or about July 3, 2009, defendant SHAROPETROSIAN, in a telephone conversation using coded language, told defendant DARBINYAN to threaten victim M.M. with physical harm if victim M.M. did not pay money to SHAROPETROSIAN and DARBINYAN.

5.     On or about July 4, 2009, defendant SHAROPETROSIAN, in a telephone conversation using coded language, told defendant DARBINYAN to inform victim M.M. that victim M.M. would be kidnapped for three months if he did not pay money to SHAROPETROSIAN.

6.     On or about July 4, 2009, defendant SHAROPETROSIAN initiated a three-way call with defendant DARBINYAN and victim M.M., and SHAROPETROSIAN and DARBINYAN told victim M.M. that they would kidnap victim M.M. if victim M.M. and his family did not pay money to SHAROPETROSIAN, DARBINYAN, and defendant L. OGANDGANYAN.

7.     On or about July 6, 2009, defendant SHAROPETROSIAN, in a telephone conversation using coded language, discussed with defendant DARBINYAN how much money they intended to obtain from victim M.M. that day using threats of physical harm.

8.     On or about July 6, 2009, defendant DARBINYAN, in a telephone conversation using coded language, told victim M.M.

112

that DARBINYAN would hurt victim M.M. if victim M.M. did not pay him money.

9.     On or about July 8, 2009, defendant DARBINYAN, in a telephone conversation using coded language, demanded money from victim M.M.

10.     On or about July 9, 2009, defendants DARBINYAN and SHAROPETROSIAN, in a telephone conversation using coded language, discussed how to obtain money from victim M.M., and SHAROPETROSIAN said that some of the money would go to defendant L. OGANDGANYAN.

11.     On or about August 30, 2009, defendant SHAROPETROSIAN, using coded language on the telephone, demanded money from victim M.M.

12.     On or about August 31, 2009, defendant SHAROPETROSIAN, in a telephone conversation using coded language, instructed victim M.M. to meet an unindicted co-conspirator to deliver money to her under threat of physical harm.

13.     On or about September 3, 2009, defendant SHAROPETROSIAN, in a telephone conversation using coded language, demanded $100,000 from victim M.M. under threat of physical harm.

14.     On or about September 4, 2009, defendant SHAROPETROSIAN, in a telephone conversation using coded language, told victim M.M. that victim M.M. would be killed.

15.     On or about September 11, 2009, defendants SHAROPETROSIAN and L. OGANDGANYAN, in a telephone conversation using coded language, spoke with victim M.M. and demanded money from victim M.M. under threat of physical harm.

16.   On or about October 16, 2009, in response to threats of violence and physical harm from defendants DARBINYAN, SHAROPETROSIAN, AIRAPETIAN, and L. OGANDGANYAN, and others, victim M.M. wired approximately $1,000 using Moneygram.

17.   On or about October 20, 2009, in response to threats of violence and physical harm from defendants DARBINYAN, SHAROPETROSIAN, AIRAPETIAN, and L. OGANDGANYAN, and others, victim M.M. wired approximately $1,500 using Moneygram.

18.   On or about October 28, 2009, defendant SHAROPETROSIAN, in a telephone conversation using coded language, instructed victim M.M. to make deposits into certain bank accounts and to use either Western Union or Moneygram to send money to SHAROPETROSIAN and his co-conspirators under threat of violence.

19.   On or about October 29, 2009, defendant AIRAPETIAN, in a telephone conversation using coded language, demanded money from victim M.M. and threatened victim M.M. with violence if victim M.M. did not pay the money.

20.   On or about October 29, 2009, defendant AIRAPETIAN, in a telephone conversation using coded language, arranged a meeting with victim M.M. for the purpose of obtaining money from victim M.M., and, later that day, obtained approximately $1,900 from victim M.M. under threat of physical harm.

21.   On or about October 29, 2009, defendant AIRAPETIAN, in a telephone conversation using coded language, demanded $10,000 from victim M.M. and threatened to disfigure victim M.M. if he did not pay.

114

22.   On or about October 30, 2009, defendant SHAROPETROSIAN, in a telephone conversation using coded language, instructed victim M.M. to make deposits into particular bank accounts under threat of physical harm.

23.   On or about October 30, 2009, in response to threats of violence and physical harm from defendants DARBINYAN, SHAROPETROSIAN, AIRAPETIAN, and L. OGANDGANYAN, and others, victim M.M. wired over $1,500 using Western Union.

24.   On or about October 31, 2009, defendant SHAROPETROSIAN, in a telephone conversation using coded language, demanded $2,000 from victim M.M.

26.   On or about November 1, 2009, defendant SHAROPETROSIAN, in a telephone conversation using coded language, demanded $10,000 from victim M.M.

27.   On or about November 2, 2009, defendant SHAROPETROSIAN, in a telephone conversation using coded language, demanded that victim M.M. take $1,000 to an unindicted co-conspirator that night.

28.   On or about November 2, 2009, victim M.M. paid $500 to an unindicted co-conspirator.

29.   On or about November 2, 2009, defendant SHAROPETROSIAN, in a telephone conversation using coded language, told victim M.M. that SHAROPETROSIAN would slaughter victim M.M. if victim M.M. did not deposit money as directed by SHAROPETROSIAN.

30.   On or about November 4, 2009, defendant SHAROPETROSIAN, in a telephone conversation using coded language,

demanded $2,500 in cash from victim M.M. and said he would send someone over to pick up the money from victim M.M.

31.   On or about November 4, 2009, an unindicted co-conspirator known to the Grand Jury picked up $2,000 from victim M.M.

32.   On or about November 5, 2009, defendant SHAROPETROSIAN, in a telephone conversation using coded language, asked victim M.M. when victim M.M. would be able to obtain money.

33.   On or about November 6, 2009, defendant SHAROPETROSIAN, in a telephone conversation using coded language, asked victim M.M. whether victim M.M. had sent the money demanded by SHAROPETROSIAN under threat of physical harm using Western Union or Moneygram.

34.   On or about November 12, 2009, defendant L. OGANDGANYAN, and others known and unknown to the Grand Jury, met with victim M.M. and demanded money from victim M.M.

35.   On or about November 19, 2009, defendant L. OGANDGANYAN, in a telephone conversation using coded language, told victim M.M. that victim M.M. had to pay her money under threat of physical harm.

36.   On or about November 21, 2009, defendant L. OGANDGANYAN, using coded language on the telephone, threatened to kill victim M.M.'s family if victim M.M. did not pay money to L. OGANDGANYAN.

COUNT FIVE

[18 U.S.C. §§ 1951(a), 2]

Beginning on a date unknown to the Grand Jury, but no later than on or about June 27, 2009, and continuing through in or around December 2009, in Los Angeles County, within the Central District of California, and elsewhere, defendants MHER DARBINYAN, also known as ("aka") "Mike," aka "Hollywood Mike," aka "Little Mike," aka "Capone," aka "Caps," aka "Maher," ARMAN SHAROPETROSIAN, aka "Horse," aka "Dzi," EMIL AIRAPETIAN, aka "Clever," aka "Emo," and LUSINE OGANDGANYAN, aka "Lusine Ogandjanian," aka "Luso," and others known and unknown to the Grand Jury, knowingly obstructed, delayed, and affected commerce and the movement of any article or commodity in commerce by extortion, and threatened physical violence to victim M.M. in furtherance of a plan to obstruct, delay, and affect commerce and the movement of any article or commodity in commerce by extortion, and aided, abetted, counseled, commanded, induced, and procured the commission of such offense.

117

COUNTS SIX THROUGH TWENTY-TWO

[18 U.S.C. § 1344]

A.   INTRODUCTORY ALLEGATIONS

1.   At all times pertinent to this Indictment, the deposits of Bank of America, Citibank, and JP Morgan Chase Bank were federally insured.

B.   THE FRAUDULENT SCHEME

2.   Beginning in or around July 2008, and continuing through on or about December 15, 2010, in Los Angeles and Orange Counties, within the Central District of California, and elsewhere, defendants MHER DARBINYAN, also known as ("aka") "Mike," aka "Hollywood Mike," aka "Little Mike," aka "Capone," aka "Caps," aka "Maher" ("DARBINYAN"), ARMAN TANGABEKYAN, aka "Spito," aka "Spitak," aka "Villager," aka "Thick Neck," aka "Armancho" ("TANGABEKYAN"), KAREN MARKOSIAN, aka "Kar," aka "Garen" ("MARKOSIAN"), VAHE MNATSAKANYAN, aka "V," aka "Vahik" ("MNATSAKANYAN"), ARMANDO MORENO, aka "Mando," aka "Monkey," aka "Blackie" ("MORENO"), LUSINE OGANDGANYAN, aka "Lusine Ogandjanian," aka "Luso" ("L. OGANDGANYAN"), GUSTAVO ORTEGA, aka "Bam Bam," aka "Bams," aka "Gus" ("ORTEGA"), HAGOP YAMALYAN, aka "Hago" ("YAMALYAN"), MANUK TERZYAN, aka "Max" ("TERZYAN"), KAREN HESHAM SAMAWI, aka "Karen Hesham" ("SAMAWI"), JULIO CESAR RIVAS, aka "July," aka "Biggie," aka "Big Boy" ("RIVAS"), VARTAN AVEDISSIAN, aka "Vardan," "aka "Voicebox" ("AVEDISSIAN"), JOSEPH MARES ("MARES"), DEBRA MAY-LAWSON, aka "Sugar" ("MAY-LAWSON"), RAFAEL ROGER ZENDEJAS ("ZENDEJAS"), STEVEN WILSON, aka "Stutters" ("WILSON"), FNU LNU, aka "Musho" ("MUSHO"), and FNU LNU, aka

"David Petrosov" ("PETROSOV"), together with others known and unknown to the Grand Jury, knowingly and with intent to defraud, devised, executed, and attempted to execute a scheme to defraud Bank of America, Citibank, JP Morgan Chase Bank, and other financial institutions as to material matters, and to obtain money and property from Bank of America, Citibank, JP Morgan Chase Bank, and other financial institutions by means of material false and fraudulent pretenses, representations, and promises, and the concealment of material facts.

3.   The fraudulent scheme operated, in substance, in the following manner:

a.   Defendants DARBINYAN, TANGABEKYAN, MARKOSIAN, MNATSAKANYAN, L. OGANDGANYAN, and YAMALYAN, and other co-schemers, obtained bank account information belonging to victim-account owners, including their names, personal identifying information, and victim-account values, without the victim-account owners' consent, knowledge, or authorization.

b.   Defendant DARBINYAN, TANGABEKYAN, MARKOSIAN, and L. OGANDGANYAN, and other co-schemers, transferred money from the victim-account owners' accounts and deposited it into other accounts controlled by the co-schemers, thereby depleting the victim-accounts.

c.   Defendants DARBINYAN, TANGABEKYAN, MARKOSIAN, MNATSAKANYAN, MORENO, L. OGANDGANYAN, ORTEGA, YAMALYAN, TERZYAN, SAMAWI, RIVAS, AVEDISSIAN, MARES, MAY-LAWSON, ZENDEJAS, WILSON, and PETROSOV, and other co-schemers, prepared, forged, and obtained fraudulent checks corresponding to the victim-accounts

1  without the victim-account owners' consent, knowledge, or

2  authorization.

3          d.  Defendants DARBINYAN, TANGABEKYAN, MARKOSIAN,

4  MNATSAKANYAN, MORENO, L. OGANDGANYAN, ORTEGA, YAMALYAN, TERZYAN,

5  SAMAWI, RIVAS, AVEDISSIAN, MARES, MAY-LAWSON, ZENDEJAS, WILSON,

6  and PETROSOV, and other co-schemers, cashed and deposited, and

7  attempted to cash and deposit, fraudulent checks drawn on the

8  victim-accounts without the victim-account owners' consent,

9  knowledge, or authorization.

10          e.  Defendants DARBINYAN, TERZYAN, ORTEGA, and RIVAS,

11 and other co-schemers, drove and transported other co-schemers

12 for purposes of cashing and depositing, and attempting to cash

13 and deposit, fraudulent checks for victim-accounts without the

14 victim-account owners' consent, knowledge, or authorization.

15          f.  Defendants DARBINYAN, TANGABEKYAN, MARKOSIAN,

16 MNATSAKANYAN, and L. OGANDGANYAN, and other co-schemers, tracked

17 the victim-accounts to determine if money had been successfully

18 drawn from the victim-accounts.

19          g.  Defendants DARBINYAN, TANGABEKYAN, MARKOSIAN,

20 MNATSAKANYAN, MORENO, L. OGANDGANYAN, ORTEGA, YAMALYAN, TERZYAN,

21 SAMAWI, RIVAS, AVEDISSIAN, MARES, MAY-LAWSON, ZENDEJAS, WILSON,

22 and PETROSOV, and other co-schemers, distributed proceeds from

23 the fraudulent bank fraud scheme amongst themselves.

24

25

26

27

28

                            120

C.   THE EXECUTION OF THE SCHEME

     4.     On or about the following dates, within the Central District of California, and elsewhere, defendants DARBINYAN, TANGABEKYAN, MARKOSIAN, MNATSAKANYAN, MORENO, L. OGANDGANYAN, ORTEGA, YAMALYAN, TERZYAN, SAMAWI, RIVAS, AVEDISSIAN, MARES, MAY-LAWSON, ZENDEJAS, WILSON, MUSHO, and PETROSOV, and others known and unknown to the Grand Jury, committed and willfully caused others to commit the following acts, each of which constituted an execution and attempted execution of the fraudulent scheme:

| COUNT | DATE | ACT |
|-------|------|-----|
| SIX | 1/26/09 | Cashing of check number 3439, made payable to "Rafael Zendejas" in the amount of $10, drawn on Bank of America account number xxxxx-42953, in the name of victim P.J.C. |
| SEVEN | 1/26/09 | Deposit of check number 3442, made payable to "Joseph Mares" in the amount of $15, drawn on Bank of America account number xxxxx-42953, in the name of victim P.J.C. |
| EIGHT | 1/28/09 | Cashing of check number 3438, made payable to "Debra Jane May Lawson" in the amount of $5,600, and check number 3443, made payable to "Debra Jane May-Lawson" in the amount of $5,600, both drawn on Bank of America account number xxxxx-42953, in the name of victim P.J.C. |
| NINE | 1/28/09 | Submission of check number 3444, made payable to "Rafael Roger Zendejas" in the amount of $5,900, drawn on Bank of America account number xxxxx-42953, in the name of victim P.J.C. |
| TEN | 3/9/09 | Transfer of $45,000 from Bank of America account number xxxxx-68791, a trust account in the name of victim G.F., to Bank of America account number xxxxx-40707, a checking account in the name of victim G.F. |

121

| ELEVEN | 3/17/09 | Deposit of check number 1462, made payable to "Karen Hesham" in the amount of $26,400, drawn on Bank of America account number xxxxx-40707, in the name of victim G.F. |
| TWELVE | 3/18/09 | Deposit of check number 1463, made payable to "Karen Hesham" in the amount of $38,000, drawn on Bank of America account number xxxxx-40707, in the name of victim G.F. |
| THIRTEEN | 3/19/09 | Transfer of $40,000 from Bank of America account number xxxxx-68791, a trust account in the name of victim G.F., to Bank of America account number xxxxx-40707, a checking account in the name of victim G.F. |
| FOURTEEN | 3/30/09 | Cashing of check number 304, made payable to "Steven A Wilson" in the amount of $4,500, drawn on Bank of America account number xxxxx-13899, in the name of victim Y.G. |
| FIFTEEN | 3/30/09 | Cashing of check number 305, made payable to "Joseph Mares" in the amount of $5,300, drawn on Bank of America account number xxxxx-13899, in the name of victim Y.G. |
| SIXTEEN | 3/30/09 | Cashing of check number 306, made payable to "Joseph Mares" in the amount of $5,000, drawn on Bank of America account number xxxxx-13899, in the name of victim Y.G. |
| SEVENTEEN | 4/14/09 | Deposit of check number 2386, made payable to "RZ Diginet" in the amount of $28,357.00, drawn on Bank of America account number XXXXX-14509, in the names of victims F.D. and M.D. |
| EIGHTEEN | 4/14/09 | Attempted cashing and deposit of check number 2387, made payable to "David Petrosov" in the amount of $74,350.09, drawn on Bank of America account number XXXXX-14509, in the names of victims F.D. and M.D. |
| NINETEEN | 4/16/09 | Deposit of check number 1459, made payable to "Ruzanna Hakobyan" in the amount of $135,200, drawn on Citibank account number xxxx-7159, in the name of victim L.R. |

122

| TWENTY | 6/21/09 | Acquisition of balance and recent account activity for JP Morgan Chase Bank account number xxxxx-81458, in the name of victim R.M. |
| TWENTY-ONE | 6/22/09 | Acquisition of balance and recent account activity for JP Morgan Chase Bank account number xxxxx-94403, in the name of victims J.D. and M.D. |
| TWENTY-TWO | 6/22/09 | Acquisition of balance and recent account activity for JP Morgan Chase Bank account number xxxxx-57257, in the name of victim R.T. |

123

COUNTS TWENTY-THREE THROUGH THIRTY-SEVEN

[18 U.S.C. §§ 1028A(a)(1), 2]

On or about the dates specified below, in Los Angeles and Orange Counties, within the Central District of California, and elsewhere, the defendants named below, while aiding and abetting each other, and together with others known and unknown to the Grand Jury, knowingly transferred, possessed, and used, and willfully caused to be transferred, possessed, and used, without lawful authority, a means of identification of another person, as specified below, during and in relation to Bank Fraud, a felony violation of Title 18, United States Code, Section 1344, as charged in Counts Six through Twenty-Two of this Indictment:

| COUNT | DATE | DEFENDANT(S) | MEANS OF IDENTIFICATION |
|-------|------|--------------|-------------------------|
| TWENTY-THREE | 1/26/09 | MHER DARBINYAN, aka "Mike," aka "Hollywood Mike," aka "Little Mike," aka "Capone," aka "Caps," aka "Maher" ("DARBINYAN"); GUSTAVO ORTEGA, aka "Bam Bam," aka "Bams," aka "Gus" ("ORTEGA"); JOSEPH MARES ("MARES") | Name, Account Number, and Signature of victim M.A. |
| TWENTY-FOUR | 1/26/09 | DARBINYAN; ORTEGA; RAFAEL ROGER ZENDEJAS ("ZENDEJAS") | Name, Account Number, and Signature of victim M.A. |

124

| COUNT | DATE | DEFENDANT(S) | MEANS OF IDENTIFICATION |
|---|---|---|---|
| TWENTY-FIVE | 1/28/09 | DARBINYAN;<br>ORTEGA;<br>MANUK TERZYAN,<br>aka "Max"<br>("TERZYAN");<br>JULIO CESAR RIVAS,<br>aka "July,"<br>aka "Biggie,"<br>aka "Big Boy";<br>ZENDEJAS | Name, Account Number, and Signature of victim M.A. |
| TWENTY-SIX | 1/28/09 | DARBINYAN;<br>ORTEGA;<br>TERZYAN;<br>DEBRA MAY-LAWSON,<br>aka "Sugar" | Name, Account Number, and Signature of victim M.A. |
| TWENTY-SEVEN | 3/17/09 | DARBINYAN;<br>ARMAN TANGABEKYAN,<br>aka "Spito,"<br>aka "Spitak,"<br>aka "Villager,"<br>aka "Thick Neck,"<br>aka "Armancho"<br>("TANGABEKYAN");<br>VAHE MNATSAKANYAN,<br>aka "V,"<br>aka "Vahik"<br>("MNATSAKANYAN");<br>ARMANDO MORENO,<br>aka "Mando,"<br>aka "Monkey,"<br>aka "Blackie"<br>("MORENO");<br>TERZYAN;<br>KAREN HESHAM<br>SAMAWI,<br>aka "Karen Hesham"<br>("SAMAWI");<br>VARTAN AVEDISSIAN,<br>aka "Vardan,"<br>"aka "Voicebox"<br>("AVEDISSIAN") | Name, Account Number, and Signature of victim G.F. |
| TWENTY-EIGHT | 3/18/09 | DARBINYAN;<br>TANGABEKYAN;<br>MNATSAKANYAN;<br>MORENO;<br>TERZYAN;<br>SAMAWI;<br>AVEDISSIAN | Name, Account Number, and Signature of victim G.F. |

125

| COUNT | DATE | DEFENDANT(S) | MEANS OF IDENTIFICATION |
|-------|------|--------------|--------------------------|
| TWENTY-NINE | 3/30/09 | DARBINYAN; ORTEGA; TERZYAN; MARES; STEVEN WILSON, aka "Stutters" ("WILSON") | Name, Account Number, and Signature of victim Y.G. |
| THIRTY | 3/30/09 | DARBINYAN; ORTEGA; TERZYAN; MARES; WILSON | Name, Account Number, and Signature of victim Y.G. |
| THIRTY-ONE | 3/30/09 | DARBINYAN; ORTEGA; TERZYAN; MARES; WILSON | Name, Account Number, and Signature of victim Y.G. |
| THIRTY-TWO | 4/14/09 | DARBINYAN; TANGABEKYAN; HAGOP YAMALYAN, aka "Hago" ("YAMALYAN"); TERZYAN | Names, Account Number, and Signatures of victims F.D. and M.D. |
| THIRTY-THREE | 4/14/09 | DARBINYAN; TANGABEKYAN; LUSINE OGANDGANYAN, aka "Lusine Ogandjanian," aka "Luso" ("L. OGANDGANYAN"); YAMALYAN; TERZYAN; FNU LNU, aka "David Petrosov" | Names, Account Number, and Signatures of victims F.D. and M.D. |
| THIRTY-FOUR | 4/16/09 | DARBINYAN; KAREN MARKOSIAN, aka "Kar," aka "Garen" ("MARKOSIAN"); MNATSAKANYAN; L. OGANDGANYAN; ORTEGA | Name, Account Number, and Signature of victim L.R. |

126

| COUNT | DATE | DEFENDANT(S) | MEANS OF IDENTIFICATION |
|---|---|---|---|
| THIRTY-FIVE | 6/22/09 | TANGABEKYAN | Account Number and Social Security Number of victim R.M. |
| THIRTY-SIX | 6/22/09 | TANGABEKYAN | Account Number and Social Security Number of victim J.D. |
| THIRTY-SEVEN | 6/22/09 | TANGABEKYAN | Account Number and Social Security Number of victim R.T. |

127

COUNTS THIRTY-EIGHT THROUGH SIXTY-EIGHT

[18 U.S.C. § 1344]

A.   INTRODUCTORY ALLEGATIONS

1.   At all times pertinent to this Indictment, the deposits of Bank of America, Guaranty Bank, Altura Credit Union, Ventura County Credit Union, Schools First Credit Union, and U.S. Bank were federally insured.

B.   THE FRAUDULENT SCHEME

2.   Beginning in or around July 2009, and continuing through in or around August 2009, in Los Angeles County, within the Central District of California, and elsewhere, defendants MHER DARBINYAN, also known as ("aka") "Mike," aka "Hollywood Mike," aka "Little Mike," aka "Capone," aka "Caps," aka "Maher" ("DARBINYAN"), ARAM PETROSIAN, aka "Tot," aka "Toto" ("PETROSIAN"), RAYMOND TARVERDYAN, aka "Rye," aka "Ray" ("TARVERDYAN"), GUSTAVO ORTEGA, aka "Bam Bam," aka "Bams," "Gus" ("ORTEGA"), RAFAEL PARSADANYAN, aka "Raffi," aka "Raffo" ("PARSADANYAN"), SIMON ANTONYAN, aka "Simo," aka "Sim" ("ANTONYAN"), GAREN CHOULDJIAN, aka "Misak" ("CHOULDJIAN"), ANDRANIK BAKHCHADJIAN, aka "Ando," aka "Andranik Bakhcadjian" ("BAKHCHADJIAN"), VARTENIE ANANIAN ("ANANIAN"), KHACHATUR ARAKELYAN, aka "Khecho" ("ARAKELYAN"), CATRINA BALDERRAMA ("BALDERRAMA"), and VARDAN AMIRKHANYAN ("AMIRKHANYAN"), together with others known and unknown to the Grand Jury, knowingly and with intent to defraud, devised, executed, and attempted to execute a scheme to defraud Bank of America, Guaranty Bank, Altura Credit Union, Ventura County Credit Union, Schools First

128

1  Credit Union, U.S. Bank, and other financial institutions as to

2  material matters, and to obtain money and property from Bank of

3  America, Guaranty Bank, Altura Credit Union, Ventura County

4  Credit Union, Schools First Credit Union, U.S. Bank, and other

5  financial institutions by means of material false and fraudulent

6  pretenses, representations, and promises, and the concealment of

7  material facts.

8          3.    The fraudulent scheme operated, in substance, in the

9  following manner:

10                 a.  Defendants DARBINYAN and ANTONYAN, and others

11  known and unknown to the Grand Jury, obtained skimming devices

12  and distributed them to other co-schemers, including defendants

13  TARVERDYAN, ORTEGA, BAKHCHADJIAN, ANANIAN, and BALDERRAMA.

14                 b.  Defendants TARVERDYAN, ORTEGA, BAKHCHADJIAN,

15  ANANIAN, and BALDERRAMA, and others known and unknown to the

16  Grand Jury, installed the skimming devices at 99 Cents Only

17  Stores throughout Southern California, including within the

18  Central District of California.

19                 c.  After the skimming devices had gathered account

20  numbers and access codes belonging to victim-account owners,

21  defendants TARVERDYAN, ORTEGA, BAKHCHADJIAN, ANANIAN, BALDERRAMA,

22  and others known and unknown to the Grand Jury, retrieved the

23  skimming devices from the 99 Cents Only Stores.

24                 d.  Defendants DARBINYAN, TARVERDYAN, PARSADANYAN, and

25  ANTONYAN, and others known and unknown to the Grand Jury,

26  distributed the victim-account numbers, fraudulently obtained

27  using the skimming devices, to other co-schemers in order to

28

129

1   withdraw money from the victim-account owners' bank accounts
2   without the victim-account owners' consent, knowledge, or
3   authorization.

4            e.   Defendants PETROSIAN, PARSADANYAN, CHOULDJIAN, and
5   ARAKELYAN, and others known and unknown to the Grand Jury,
6   coordinated groups of "runners" and provided the runners with
7   fraudulent debit cards so that the runners could withdraw money
8   from the victim-account owners' bank accounts without the victim-
9   account owners' consent, knowledge, or authorization.

10           f.   Defendant AMIRKHANYAN and others known and unknown
11  to the Grand Jury withdrew money from the victim-account owners'
12  bank accounts without the victim-account owners' consent,
13  knowledge, or authorization.

14           g.   Defendants distributed proceeds from the unlawful
15  scheme among themselves.

16  C.   THE EXECUTION OF THE SCHEME
17           4.   On or about the following dates, within the Central
18  District of California, and elsewhere, defendants DARBINYAN,
19  PETROSIAN, TARVERDYAN, ORTEGA, PARSADANYAN, ANTONYAN, CHOULDJIAN,
20  BAKHCHADJIAN, ANANIAN, ARAKELYAN, BALDERRAMA, and AMIRKHANYAN,
21  and others known and unknown to the Grand Jury, committed and
22  willfully caused others to commit the following acts, each of
23  which constituted an execution and attempted execution of the
24  fraudulent scheme:
25  ///
26  ///
27  ///
28
                              130

| COUNT | DATE | ACT |
|---|---|---|
| THIRTY-EIGHT | 7/17/09 | Withdrawal of $300 from Altura Credit Union account number xxxxxx-4193, in the name of victim J.D. |
| THIRTY-NINE | 7/17/09 | Withdrawal of $300 from Altura Credit Union account number xxxxxx-4353, in the name of victim S.G. |
| FORTY | 7/17/09 | Withdrawal of $100 from Bank of America account number xxxxxx-2441, in the name of victim M.L. |
| FORTY-ONE | 7/17/09 | Withdrawal of $500 from Guaranty Bank account number xxxxxx-8903, in the name of victim M.J. |
| FORTY-TWO | 7/17/09 | Withdrawal of $500 from Guaranty Bank account number xxxxxx-9996, in the name of victim R.R. |
| FORTY-THREE | 7/17/09 | Withdrawal of $500 from Guaranty Bank account number xxxxxx-7309, in the name of victim B.T. |
| FORTY-FOUR | 7/18/09 | Withdrawal of $300 from Altura Credit Union account number xxxxxx-4193, in the name of victim J.D. |
| FORTY-FIVE | 7/18/09 | Withdrawal of $200 from Altura Credit Union account number xxxxxx-4353, in the name of victim S.G. |
| FORTY-SIX | 7/18/09 | Withdrawal of $300 from Bank of America account number xxxxxx-4118, in the name of victim H.B. |
| FORTY-SEVEN | 7/18/09 | Withdrawal of $500 from Bank of America account number xxxxxx-4118, in the name of victim H.B. |
| FORTY-EIGHT | 7/18/09 | Withdrawal of $500 from Bank of America account number xxxxxx-2441, in the name of victim M.L. |
| FORTY-NINE | 7/18/09 | Withdrawal of $500 from U.S. Bank account number xxxxxx-7284, in the name of victim L.D. |
| FIFTY | 7/18/09 | Withdrawal of $300 from Guaranty Bank account number xxxxxx-8903, in the name of victim M.J. |

| FIFTY-ONE | 7/18/09 | Withdrawal of $200 from Guaranty Bank account number xxxxxx-8903, in the name of victim M.J. |
| FIFTY-TWO | 7/18/09 | Withdrawal of $300 from Guaranty Bank account number xxxxxx-9996, in the name of victim R.R. |
| FIFTY-THREE | 7/18/09 | Withdrawal of $500 from Guaranty Bank account number xxxxxx-7309, in the name of victim B.T. |
| FIFTY-FOUR | 7/18/09 | Withdrawal of $500 from Schools First Credit Union account number xxxx-6700, in the name of victim J.A. |
| FIFTY-FIVE | 7/18/09 | Withdrawal of $300 from Schools First Credit Union account number xxxx-8730, in the name of victim B.V. |
| FIFTY-SIX | 7/19/09 | Withdrawal of $300 from Altura Credit Union account number xxxxxx-2862, in the name of victim H.B. |
| FIFTY-SEVEN | 7/19/09 | Withdrawal of $300 from Altura Credit Union account number xxxxxx-4193, in the name of victim J.D. |
| FIFTY-EIGHT | 7/19/09 | Withdrawal of $200 from Bank of America account number xxxxxx-9309, in the name of victim M.B. |
| FIFTY-NINE | 7/19/09 | Withdrawal of $300 from Bank of America account number xxxxxx-9309, in the name of victim M.B. |
| SIXTY | 7/19/09 | Withdrawal of $500 from Guaranty Bank account number xxxxxx-8903, in the name of victim M.J. |
| SIXTY-ONE | 7/19/09 | Withdrawal of $500 from Guaranty Bank account number xxxxxx-6213, in the name of victim Y.O. |
| SIXTY-TWO | 7/19/09 | Withdrawal of $300 from Guaranty Bank account number xxxxxx-9996, in the name of victim R.R. |
| SIXTY-THREE | 7/20/09 | Withdrawal of $300 from Altura Credit Union account number xxxxxx-4353, in the name of victim S.G. |
| SIXTY-FOUR | 7/20/09 | Withdrawal of $500 from Bank of America account number xxxxxx-9309, in the name of victim M.B. |

| SIXTY-FIVE | 7/20/09 | Withdrawal of $500 from Guaranty Bank account number xxxxxx-6213, in the name of victim Y.O. |
| SIXTY-SIX | 7/23/09 | Withdrawal of $500 from U.S. Bank account number xxxxxx-719326, in the name of victim M.J.K.. |
| SIXTY-SEVEN | 8/19/09 | Withdrawal of $500 from Ventura County Credit Union account number xxxxxx-7848, in the name of victim J.L. |
| SIXTY-EIGHT | 8/20/09 | Withdrawal of $500 from Ventura County Credit Union account number xxxxxx-5581, in the name of victim A.M. |

COUNT SIXTY-NINE

[18 U.S.C. § 1029(b)(2)]

A.   <u>OBJECTS OF THE CONSPIRACY</u>

From at least in or around July 2009, until in or around August 2009, in Los Angeles, Orange, Riverside, and Ventura Counties, within the Central District of California, and elsewhere, defendants MHER DARBINYAN, also known as ("aka") "Mike," aka "Hollywood Mike," aka "Little Mike," aka "Capone," aka "Caps," aka "Maher" ("DARBINYAN"), ARAM PETROSIAN, aka "Tot," aka "Toto" ("PETROSIAN"), RAYMOND TARVERDYAN, aka "Rye," aka "Ray" ("TARVERDYAN"), GUSTAVO ORTEGA, aka "Bam Bam," aka "Bams," "Gus" ("ORTEGA"), RAFAEL PARSADANYAN, aka "Raffi," aka "Raffo" ("PARSADANYAN"), SIMON ANTONYAN, aka "Simo," aka "Sim" ("ANTONYAN"), GAREN CHOULDJIAN, aka "Misak" ("CHOULDJIAN"), ANDRANIK BAKHCHADJIAN, aka "Ando," aka "Andranik Bakhcadjian," ("BAKHCHADJIAN"), VARTENIE ANANIAN ("ANANIAN"), KHACHATUR ARAKELYAN, aka "Khecho" ("ARAKELYAN"), CATRINA BALDERRAMA ("BALDERRAMA"), and VARDAN AMIRKHANYAN ("AMIRKHANYAN"), together with others known and unknown to the Grand Jury, conspired and agreed with each other to commit the following offenses under Title 18, United States Code, Section 1029(a), affecting interstate and foreign commerce:

1.   To knowingly and with intent to defraud produce, use, and traffic in one or more counterfeit access devices, in violation of Title 18, United States Code, Section 1029(a)(1);

2.   To knowingly and with intent to defraud possess fifteen or more counterfeit or unauthorized access devices at the

134

1  same time, in violation of Title 18, United States Code, Section

2  1029(a)(3); and

3      3.   To knowingly and with intent to defraud have custody

4  and control of, and possess, device-making equipment, in

5  violation of Title 18, United States Code, Section 1029(a)(4).

6  B.  <u>MEANS BY WHICH THE OBJECTS OF THE CONSPIRACY WERE TO BE</u>

7      <u>ACCOMPLISHED</u>

8      The objects of the conspiracy were to be accomplished, in

9  substance, as follows:

10     1.   Defendants DARBINYAN and ANTONYAN, and other co-

11 conspirators known and unknown to the Grand Jury, would obtain

12 skimming devices and distribute them to other co-conspirators,

13 including defendants TARVERDYAN, ORTEGA, BAKHCHADJIAN, ANANIAN,

14 and BALDERRAMA.

15     2.   Defendants TARVERDYAN, ORTEGA, BAKHCHADJIAN, ANANIAN,

16 and BALDERRAMA, and other co-conspirators known and unknown to

17 the Grand Jury, would install the skimming devices at 99 Cents

18 Only Stores throughout Southern California, including within the

19 Central District of California.

20     3.   After the skimming devices had gathered account

21 numbers and access codes belonging to victim-account owners,

22 defendants TARVERDYAN, ORTEGA, BAKHCHADJIAN, ANANIAN, and

23 BALDERRAMA, and other co-conspirators known and unknown to the

24 Grand Jury, would retrieve the skimming devices from the 99 Cents

25 Only Stores.

26     4.   Defendants DARBINYAN, TARVERDYAN, PARSADANYAN, and

27 ANTONYAN, and other co-conspirators known and unknown to the

28

Grand Jury, would distribute the victim-account numbers, fraudulently obtained using the skimming devices, to other co-conspirators in order to withdraw money from the victim-account owners' bank accounts without the victim-account owners' consent, knowledge, or authorization.

5.    Defendants PETROSIAN, PARSADANYAN, CHOULDJIAN, and ARAKELYAN, and other co-conspirators known and unknown to the Grand Jury, would coordinate groups of "runners" and provide the runners with fraudulent debit cards so that the runners could withdraw money from the victim-account owners' bank accounts without the victim-account owners' consent, knowledge, or authorization.

6.    Defendant AMIRKHANYAN, and other co-conspirators known and unknown to the Grand Jury, would withdraw money from the victim-account owners' bank accounts without the victim-account owners' consent, knowledge, or authorization.

7.    Defendants DARBINYAN, PETROSIAN, TARVERDYAN, ORTEGA, PARSADANYAN, ANTONYAN, CHOULDJIAN, BAKHCHADJIAN, ANANIAN, ARAKELYAN, BALDERRAMA, and AMIRKHANYAN, and other co-conspirators known and unknown to the Grand Jury, would distribute proceeds from the unlawful scheme among themselves.

C.    OVERT ACTS

In furtherance of the conspiracy and to accomplish its objects, defendants DARBINYAN, PETROSIAN, TARVERDYAN, ORTEGA, PARSADANYAN, ANTONYAN, CHOULDJIAN, BAKHCHADJIAN, ANANIAN, ARAKELYAN, BALDERRAMA, and AMIRKHANYAN, and others known and unknown to the Grand Jury, committed and caused to be committed

various overt acts on or about the following dates, within the Central District of California, and elsewhere, including, but not limited to, the following:

    1.    On or about July 6, 2009, defendant DARBINYAN, in a telephone conversation using coded language, discussed with defendant TARVERDYAN their plan to install skimming devices at 99 Cents Only Stores.

    2.    On or about July 6, 2009, defendants TARVERDYAN and BAKHCHADJIAN entered a 99 Cents Only Store in Whittier, California, to install a skimming device.

    3.    On or about July 13, 2009, defendant DARBINYAN, in a telephone conversation using coded language, told defendants PETROSIAN and CHOULDJIAN that a co-conspirator was going to deliver victim-account information the following day or Friday.

    4.    On or about July 14, 2009, defendants TARVERDYAN and BAKHCHADJIAN retrieved skimming devices from three different 99 Cents Only Stores in Riverside, California.

    5.    On or about July 16, 2009, defendant DARBINYAN, in a telephone conversation using coded language, told defendant PETROSIAN that DARBINYAN had fraudulently obtained debit card account numbers and needed four "runners" the following day to withdraw money using the fraudulently obtained debit card account numbers.

    6.    On or about July 16, 2009, defendant DARBINYAN, in a telephone conversation using coded language, told defendant ARAKELYAN that DARBINYAN needed four "runners" the following day to withdraw money using the fraudulently obtained debit card

account numbers.

7.   On or about July 16, 2009, defendant TARVERDYAN, in a telephone conversation using coded language, asked defendant DARBINYAN if DARBINYAN would be using "runners" to withdraw money using the fraudulently obtained debit card account numbers the following day, and DARBINYAN responded affirmatively.

8.   On or about July 16, 2009, defendant DARBINYAN, in a telephone conversation using coded language, told defendant CHOULDJIAN that DARBINYAN needed four to five "runners" the following day to withdraw money and that he had approximately 400 fraudulently obtained account numbers, and CHOULDJIAN said that the runners would withdraw the money from ATMs.

9.   On or about July 17, 2009, defendant DARBINYAN, in a telephone conversation using coded language, discussed with defendant TARVERDYAN having "runners" withdraw money that day.

10.   On or about July 17, 2009, defendant TARVERDYAN, in a telephone conversation using coded language, told defendant DARBINYAN that he had fraudulently obtained account numbers from Wells Fargo Bank, and TARVERDYAN asked DARBINYAN if he was ready for a second set of fraudulently obtained account numbers to provide to the "runners."

11.   On or about July 17, 2009, defendants DARBINYAN and ARAKELYAN, in a telephone conversation using coded language, discussed the status of their efforts to withdraw money using the fraudulently obtained account numbers.

12.   On or about July 17, 2009, defendants DARBINYAN and TARVERDYAN, in a telephone conversation using coded language,

138

1   discussed having "runners" withdraw funds before and after
2   midnight to avoid bank ATM withdrawal limits.
3        13.   On or about July 17, 2009, defendant AMIRKHANYAN
4   withdrew approximately $500 from a Guaranty Bank account in the
5   name of victim B.T.
6        14.   On or about July 18, 2009, defendants DARBINYAN and
7   PARSADANYAN, in a telephone conversation using coded language,
8   discussed how the "runners" had withdrawn funds before and after
9   midnight to avoid bank ATM withdrawal limits, and PARSADANYAN
10  said there were some fraudulent debit cards left over.
11       15.   On or about July 18, 2009, defendant PETROSIAN, in a
12  telephone conversation using coded language, told defendant
13  DARBINYAN that the "runners" were all there and working that day.
14       16.   On or about July 18, 2009, defendant CHOULDJIAN, in a
15  telephone conversation using coded language, told defendant
16  DARBINYAN that the "runners" had withdrawn approximately $14,500,
17  and that there were still more fraudulently obtained account
18  numbers to be used.
19       17.   On or about July 18, 2009, defendant DARBINYAN, in a
20  telephone conversation using coded language, discussed with
21  defendant TARVERDYAN distributing proceeds from the fraudulent
22  bank withdrawals, and DARBINYAN told TARVERDYAN that he was going
23  to send PARSADANYAN to deliver approximately $30,000 to
24  TARVERDYAN because DARBINYAN did not want to drive with it.
25       18.   On or about July 18, 2009, defendant PARSADANYAN
26  possessed approximately $30,000 in criminal proceeds inside a
27  shoe box.
28

19.   On or about July 18, 2009, defendant DARBINYAN, in a telephone conversation using coded language, discussed with defendant TARVERDYAN sending co-conspirators to withdraw money using fraudulent debit cards.

20.   On or about July 18, 2009, defendant AMIRKHANYAN withdrew approximately $300 from a Guaranty Bank account in the name of victim R.R.

21.   On or about July 20, 2009, defendant TARVERDYAN and an unidentified co-conspirator entered a 99 Cents Only Store in Riverside, California, to examine a debit/credit card keypad.

22.   On or about July 20, 2009, defendants DARBINYAN and PETROSIAN, in a telephone conversation using coded language, discussed what percentage of the fraudulently obtained money should be paid to the "runners."

23.   On or about July 21, 2009, defendants DARBINYAN and TARVERDYAN, in a telephone conversation using coded language, discussed installing skimming devices at 99 Cents Only Stores.

24.   On or about July 21, 2009, defendant TARVERDYAN, in a telephone conversation using coded language, told defendant DARBINYAN that employees of 99 Cents Only Stores may have discovered some of the skimming devices that they had installed at debit/credit card terminals.

25.   On or about July 22, 2009, defendants BAKHCHADJIAN and ANANIAN entered a 99 Cents Only Store in Riverside, California, to examine a debit/credit card keypad.

26.   On or about August 8, 2009, defendants DARBINYAN and PARSADANYAN, in a telephone conversation using coded language,

1    discussed installing skimming devices.

2        27.    On or about August 8, 2009, defendants DARBINYAN and

3    TARVERDYAN, in a telephone conversation using coded language,

4    discussed installing skimming devices that day.

5        28.    On or about August 8, 2009, defendants BAKHCHADJIAN

6    and ANANIAN, and other unindicted co-conspirators, installed a

7    skimming device at a 99 Cents Only Store in Ventura, California.

8        29.    On or about August 8, 2009, unindicted co-

9    conspirators installed a skimming device at a 99 Cents Only Store

10   in North Hollywood, California.

11       30.    On or about August 9, 2009, defendants DARBINYAN and

12   PARSADANYAN, in a telephone conversation using coded language,

13   discussed the installation of skimming devices at 99 Cents Only

14   Stores the day before, and PARSADANYAN said that fraudulently

15   obtained account numbers should arrive soon.

16       31.    On or about August 9, 2009, defendant DARBINYAN, in a

17   telephone conversation using coded language, told defendant

18   CHOULDJIAN that the fraudulently obtained account numbers were

19   ready, and both defendants discussed getting "runners."

20       32.    On or about August 13, 2009, defendant DARBINYAN, in

21   a telephone conversation using coded language, told defendant

22   Artur Pembejian that defendant BAKHCHADJIAN would be installing

23   skimming devices soon.

24       33.    On or about August 14, 2009, defendants BAKHCHADJIAN

25   and ANANIAN installed skimming devices at two 99 Cents Only

26   Stores in Huntington Beach, California.

27

28

34.   On or about August 14, 2009, defendant ANTONYAN, in a telephone conversation using coded language, told defendant DARBINYAN that ANTONYAN was in the San Diego, California area with others, and that they had skimming devices.

35.   On or about August 13 and August 14, 2009, unindicted co-conspirators installed skimming devices at 99 Cents Only Stores in San Diego, California.

36.   On or about August 14, 2009, defendant ANTONYAN, in a telephone conversation using coded language, told defendant DARBINYAN that they had successfully installed skimming devices at 99 Cents Only Stores in San Diego, California.

37.   On or about August 24, 2009, defendant ANTONYAN, in a telephone conversation using coded language, told defendant DARBINYAN that ANTONYAN and other unindicted co-conspirators would soon be picking up skimming devices from 99 Cents Only Stores.

38.   On or about August 24, 2009, defendants BAKHCHADJIAN and ANANIAN, and other unindicted co-conspirators, attempted to retrieve a skimming device from a 99 Cents Only Store in Huntington Beach, California.

39.   On or about August 24, 2009, defendants BAKHCHADJIAN and ANANIAN possessed skimming devices, each containing approximately 524 and 348 victim records, respectively.

40.   On or about August 26, 2009, defendant DARBINYAN, in a telephone conversation using coded language, discussed with defendant ANTONYAN picking up a skimming device from ANTONYAN.

41.   On or about August 27, 2009, defendant DARBINYAN, in a telephone conversation using coded language, told defendant PARSADANYAN that he was on his way to San Diego, California, to meet with defendant ORTEGA.

42.   On or about August 27, 2009, defendants ORTEGA and BALDERRAMA, and other unindicted co-conspirators, retrieved skimming devices from two 99 Cents Only Stores in San Diego, California.

43.   On or about August 27, 2009, defendants DARBINYAN and PARSADANYAN, in a telephone conversation using coded language, discussed proceeds from the skimming device scheme targeting 99 Cents Only Stores.

COUNT SEVENTY

[18 U.S.C. §§ 1029(a)(4), 2]

On or about August 24, 2009, in Los Angeles County, within the Central District of California, and elsewhere, defendants ANDRANIK BAKHCHADJIAN, also known as ("aka") "Ando," aka "Andranik Bakhcadjian," and VARTENIE ANANIAN, together with others known and unknown to the Grand Jury, knowingly and with intent to defraud had custody and control of, possessed, and aided and abetted the custody, control, and possession of, device-making equipment, as defined in Title 18, United States Code, Section 1029(e)(6), namely, a credit and debit card skimming device, with said custody, control, and possession affecting interstate and foreign commerce.

144

COUNTS SEVENTY-ONE THROUGH NINETY-FIVE

[18 U.S.C. §§ 1028A(a)(1), 2]

On or about the dates specified below, in Los Angeles, Orange, Riverside, and Ventura Counties, within the Central District of California, and elsewhere, the defendants named below, while aiding and abetting each other, and together with others known and unknown to the Grand Jury, knowingly transferred, possessed, and used, and willfully caused to be transferred, possessed, and used, without lawful authority, a means of identification of another person, as specified below, during and in relation to: (1) Bank Fraud, a felony violation of Title 18, United States Code, Section 1344, as charged in Counts Thirty-Eight through Sixty-Eight of this Indictment; and (2) Access Device Fraud, a felony violation of Title 18, United States Code, Section 1029, as charged in Counts Sixty-Nine and Seventy of this Indictment:

145

| COUNT | DATE | DEFENDANT(S) | MEANS OF IDENTIFICATION |
|---|---|---|---|
| SEVENTY-ONE | 7/17/09 | MHER DARBINYAN, also known as ("aka") "Mike," aka "Hollywood Mike," aka "Little Mike," aka "Capone," aka "Caps," aka "Maher" ("DARBINYAN"); ARAM PETROSIAN, aka "Tot," aka "Toto" ("PETROSIAN"); RAYMOND TARVERDYAN, aka "Rye," aka "Ray" ("TARVERDYAN"); GUSTAVO ORTEGA, aka "Bam Bam," aka "Bams," aka "Gus" ("ORTEGA"); RAFAEL PARSADANYAN, aka "Raffi," aka "Raffo" ("PARSADANYAN"); SIMON ANTONYAN, aka "Simo," aka "Sim" ("ANTONYAN"); GAREN CHOULDJIAN, aka "Misak" ("CHOULDJIAN"); ANDRANIK BAKHCHADJIAN, aka "Ando" aka "Andranik Bakhcadjian" ("BAKHCHADJIAN"); VARTENIE ANANIAN ("ANANIAN"); KHACHATUR ARAKELYAN, aka "Khecho" ("ARAKELYAN") | Account Number, Altura Credit Union account number xxxxxx-4193, and Personal Identification Number ("PIN") of victim J.D. |

146

| COUNT | DATE | DEFENDANT(S) | MEANS OF IDENTIFICATION |
|---|---|---|---|
| SEVENTY-TWO | 7/17/09 | DARBINYAN;<br>PETROSIAN;<br>TARVERDYAN;<br>ORTEGA;<br>PARSADANYAN;<br>ANTONYAN;<br>CHOULDJIAN;<br>BAKHCHADJIAN;<br>ANANIAN;<br>ARAKELYAN | Account Number,<br>Altura Credit Union<br>account number<br>xxxxxx-4353, and<br>PIN of victim S.G. |
| SEVENTY-THREE | 7/17/09 | DARBINYAN;<br>PETROSIAN;<br>TARVERDYAN;<br>ORTEGA;<br>PARSADANYAN;<br>ANTONYAN;<br>CHOULDJIAN;<br>BAKHCHADJIAN;<br>ANANIAN;<br>ARAKELYAN | Account Number,<br>Guaranty Bank<br>account number<br>xxxxxx-8903, and<br>PIN of victim M.J. |
| SEVENTY-FOUR | 7/17/09 | DARBINYAN;<br>PETROSIAN;<br>TARVERDYAN;<br>ORTEGA;<br>PARSADANYAN;<br>ANTONYAN;<br>CHOULDJIAN;<br>BAKHCHADJIAN;<br>ANANIAN;<br>ARAKELYAN | Account Number,<br>Guaranty Bank<br>account number<br>xxxxxx-9996, and<br>PIN of victim R.R. |
| SEVENTY-FIVE | 7/17/09 | DARBINYAN;<br>PETROSIAN;<br>TARVERDYAN;<br>ORTEGA;<br>PARSADANYAN;<br>ANTONYAN;<br>CHOULDJIAN;<br>BAKHCHADJIAN;<br>ANANIAN;<br>ARAKELYAN;<br>VARDAN AMIRKHANYAN<br>("AMIRKHANYAN") | Account Number,<br>Guaranty Bank<br>account number<br>xxxxxx-7309, and<br>PIN of victim B.T. |

147

| COUNT | DATE | DEFENDANT(S) | MEANS OF IDENTIFICATION |
|-------|------|--------------|-------------------------|
| SEVENTY-SIX | 7/18/09 | DARBINYAN; PETROSIAN; TARVERDYAN; ORTEGA; PARSADANYAN; ANTONYAN; CHOULDJIAN; BAKHCHADJIAN; ANANIAN; ARAKELYAN | Account Number, Bank of America account number xxxxxx-4118, and PIN of victim H.B. |
| SEVENTY-SEVEN | 7/18/09 | DARBINYAN; PETROSIAN; TARVERDYAN; ORTEGA; PARSADANYAN; ANTONYAN; CHOULDJIAN; BAKHCHADJIAN; ANANIAN; ARAKELYAN | Account Number, Altura Credit Union account number xxxxxx-4193, and PIN of victim J.D. |
| SEVENTY-EIGHT | 7/18/09 | DARBINYAN; PETROSIAN; TARVERDYAN; ORTEGA; PARSADANYAN; ANTONYAN; CHOULDJIAN; BAKHCHADJIAN; ANANIAN; ARAKELYAN | Account Number, U.S. Bank account number xxxxxx-7284, and PIN of victim L.D. |
| SEVENTY-NINE | 7/18/09 | DARBINYAN; PETROSIAN; TARVERDYAN; ORTEGA; PARSADANYAN; ANTONYAN; CHOULDJIAN; BAKHCHADJIAN; ANANIAN; ARAKELYAN | Account Number, Altura Credit Union account number xxxxxx-4353, and PIN of victim S.G. |

| COUNT | DATE | DEFENDANT(S) | MEANS OF IDENTIFICATION |
|---|---|---|---|
| EIGHTY | 7/18/09 | DARBINYAN;<br>PETROSIAN;<br>TARVERDYAN;<br>ORTEGA;<br>PARSADANYAN;<br>ANTONYAN;<br>CHOULDJIAN;<br>BAKHCHADJIAN;<br>ANANIAN;<br>ARAKELYAN | Account Number,<br>Guaranty Bank account<br>number xxxxxx-8903, and<br>PIN of victim M.J. |
| EIGHTY-ONE | 7/18/09 | DARBINYAN;<br>PETROSIAN;<br>TARVERDYAN;<br>ORTEGA;<br>PARSADANYAN;<br>ANTONYAN;<br>CHOULDJIAN;<br>BAKHCHADJIAN;<br>ANANIAN;<br>ARAKELYAN | Account Number,<br>Bank of America account<br>number xxxxxx-4441, and<br>PIN of victim M.L. |
| EIGHTY-TWO | 7/18/09 | DARBINYAN;<br>PETROSIAN;<br>TARVERDYAN;<br>ORTEGA;<br>PARSADANYAN;<br>ANTONYAN;<br>CHOULDJIAN;<br>BAKHCHADJIAN;<br>ANANIAN;<br>ARAKELYAN;<br>AMIRKHANYAN | Account Number,<br>Guaranty Bank account<br>number xxxxxx-9996, and<br>PIN of victim R.R. |
| EIGHTY-THREE | 7/18/09 | DARBINYAN;<br>PETROSIAN;<br>TARVERDYAN;<br>ORTEGA;<br>PARSADANYAN;<br>ANTONYAN;<br>CHOULDJIAN;<br>BAKHCHADJIAN;<br>ANANIAN;<br>ARAKELYAN | Account Number,<br>Guaranty Bank account<br>number xxxxxx-7309, and<br>PIN of victim B.T. |

| COUNT | DATE | DEFENDANT(S) | MEANS OF IDENTIFICATION |
|-------|------|--------------|-------------------------|
| EIGHTY-FOUR | 7/18/09 | DARBINYAN;<br>PETROSIAN;<br>TARVERDYAN;<br>ORTEGA;<br>PARSADANYAN;<br>ANTONYAN;<br>CHOULDJIAN;<br>BAKHCHADJIAN;<br>ANANIAN;<br>ARAKELYAN | Account Number,<br>Schools First Credit<br>Union account number<br>xxxx-6700, and<br>PIN of victim J.A. |
| EIGHTY-FIVE | 7/18/09 | DARBINYAN;<br>PETROSIAN;<br>TARVERDYAN;<br>ORTEGA;<br>PARSADANYAN;<br>ANTONYAN;<br>CHOULDJIAN;<br>BAKHCHADJIAN;<br>ANANIAN;<br>ARAKELYAN | Account Number,<br>Schools First Credit<br>Union account number<br>xxxx-8730, and<br>PIN of victim B.V. |
| EIGHTY-SIX | 7/19/09 | DARBINYAN;<br>PETROSIAN;<br>TARVERDYAN;<br>ORTEGA;<br>PARSADANYAN;<br>ANTONYAN;<br>CHOULDJIAN;<br>BAKHCHADJIAN;<br>ANANIAN;<br>ARAKELYAN | Account Number,<br>Bank of America account<br>number xxxxxx-9309, and<br>PIN of victim M.B. |
| EIGHTY-SEVEN | 7/19/09 | DARBINYAN;<br>PETROSIAN;<br>TARVERDYAN;<br>ORTEGA;<br>PARSADANYAN;<br>ANTONYAN;<br>CHOULDJIAN;<br>BAKHCHADJIAN;<br>ANANIAN;<br>ARAKELYAN | Account Number,<br>Guaranty Bank account<br>number xxxxxx-8903, and<br>PIN of victim M.J. |

| COUNT | DATE | DEFENDANT(S) | MEANS OF IDENTIFICATION |
|---|---|---|---|
| EIGHTY-EIGHT | 7/19/09 | DARBINYAN; PETROSIAN; TARVERDYAN; ORTEGA; PARSADANYAN; ANTONYAN; CHOULDJIAN; BAKHCHADJIAN; ANANIAN; ARAKELYAN | Account Number, Guaranty Bank account number xxxxxx-6213, and PIN of victim Y.O. |
| EIGHTY-NINE | 7/19/09 | DARBINYAN; PETROSIAN; TARVERDYAN; ORTEGA; PARSADANYAN; ANTONYAN; CHOULDJIAN; BAKHCHADJIAN; ANANIAN; ARAKELYAN | Account Number, Guaranty Bank account number xxxxxx-9996, and PIN of victim R.R. |
| NINETY | 7/20/09 | DARBINYAN; PETROSIAN; TARVERDYAN; ORTEGA; PARSADANYAN; ANTONYAN; CHOULDJIAN; BAKHCHADJIAN; ANANIAN; ARAKELYAN | Account Number, Bank of America account number xxxxxx-9309, and PIN of victim M.B. |
| NINETY-ONE | 7/20/09 | DARBINYAN; PETROSIAN; TARVERDYAN; ORTEGA; PARSADANYAN; ANTONYAN; CHOULDJIAN; BAKHCHADJIAN; ANANIAN; ARAKELYAN | Account Number, Altura Credit Union account number xxxxxx-4353, and PIN of victim S.G. |

| COUNT | DATE | DEFENDANT(S) | MEANS OF IDENTIFICATION |
|-------|------|--------------|-------------------------|
| NINETY-TWO | 7/20/09 | DARBINYAN;<br>PETROSIAN;<br>TARVERDYAN;<br>ORTEGA;<br>PARSADANYAN;<br>ANTONYAN;<br>CHOULDJIAN;<br>BAKHCHADJIAN;<br>ANANIAN;<br>ARAKELYAN | Account Number,<br>Guaranty Bank account<br>number xxxxxx-6213, and<br>PIN of victim Y.O. |
| NINETY-THREE | 7/23/09 | DARBINYAN;<br>PETROSIAN;<br>TARVERDYAN;<br>ORTEGA;<br>PARSADANYAN;<br>ANTONYAN;<br>CHOULDJIAN;<br>BAKHCHADJIAN;<br>ANANIAN;<br>ARAKELYAN | Account Number,<br>U.S. Bank account<br>number xxxxxx-719326,<br>and PIN of victim<br>M.J.K. |
| NINETY-FOUR | 8/19/09 | DARBINYAN;<br>PETROSIAN;<br>TARVERDYAN;<br>ORTEGA;<br>PARSADANYAN;<br>ANTONYAN;<br>CHOULDJIAN;<br>BAKHCHADJIAN;<br>ANANIAN;<br>ARAKELYAN | Account Number,<br>Ventura County Credit<br>Union account number<br>xxxxxx-7848, and<br>PIN of victim J.L. |
| NINETY-FIVE | 8/20/09 | DARBINYAN;<br>PETROSIAN;<br>TARVERDYAN;<br>ORTEGA;<br>PARSADANYAN;<br>ANTONYAN;<br>CHOULDJIAN;<br>BAKHCHADJIAN;<br>ANANIAN;<br>ARAKELYAN | Account Number,<br>Ventura County Credit<br>Union account number<br>xxxxxx-5581, and<br>PIN of victim A.M. |

COUNTS NINETY-SIX THROUGH NINETY-EIGHT

[18 U.S.C. § 1344]

A.    INTRODUCTORY ALLEGATIONS

1.    At all times pertinent to this Indictment, the deposits of HSBC Bank and Bank of America were federally insured.

B.    THE FRAUDULENT SCHEME

2.    Beginning on a date unknown to the Grand Jury, but no later than in or around November 2009, and continuing through in or around June 2010, in Los Angeles County, within the Central District of California, and elsewhere, defendants PARAMAZ BILEZIKCHYAN, also known as ("aka") "Parik," aka "P," aka "Parnamas Bileziktsian," aka "Blezisktsian Paramas" ("BILEZIKCHYAN"), KARO YERKANYAN, aka "Guilty," aka "Gator," aka "Kane" ("K. YERKANYAN"), and ANDRANIK ALOYAN, aka "Andy," aka "Ando" ("ALOYAN"), together with others known and unknown to the Grand Jury, knowingly and with intent to defraud, devised, executed, and attempted to execute a scheme to defraud HSBC Bank, Bank of America, and other financial institutions as to material matters, and to obtain money and property from HSBC Bank, Bank of America, and other financial institutions by means of material false and fraudulent pretenses, representations, and promises, and the concealment of material facts.

3.    The fraudulent scheme operated, in substance, in the following manner:

a.   Defendants BILEZIKCHYAN, K. YERKANYAN, and ALOYAN, and other co-schemers, obtained personal identifying information belonging to third-party individuals, including their names,

153

addresses, social security numbers, dates of birth, and other personal identifying information, without the individuals' knowledge, consent, or authorization.

b. Defendants BILEZIKCHYAN, K. YERKANYAN, and ALOYAN, and other co-schemers, obtained bank account information belonging to third-party individuals, including their account names, the names of account owners, the account owners' personal identifying information, and account values, without these individuals' knowledge, consent, or authorization.

c. Defendants BILEZIKCHYAN, K. YERKANYAN, and ALOYAN, and other co-schemers, provided the third-party personal identifying information and third-party bank account information to other co-schemers to obtain money, open fraudulent bank accounts, obtain bank loans, and obtain lines of credit, without the knowledge, consent, or authorization of these third-party individuals.

C. THE EXECUTION OF THE SCHEME

4. On or about the following dates, within the Central District of California, and elsewhere, defendants BILEZIKCHYAN, K. YERKANYAN, and ALOYAN, and others known and unknown to the Grand Jury, committed and willfully caused others to commit the following acts, each of which constituted an execution and attempted execution of the fraudulent scheme:

///

///

///

154

| COUNT | DATE | ACT |
|---|---|---|
| NINETY-SIX | 11/11/09 | Applied for bank account with HSBC Bank in the name of victim E.J. using personal identifying information for victim E.J. |
| NINETY-SEVEN | 11/21/09 | Possessed personal identifying information belonging to victim J.S. |
| NINETY-EIGHT | 3/10/10 | Distributed bank account information belonging to victim S.T. and Bank of America account number xxxxx-61642 |

155

COUNTS NINETY-NINE THROUGH ONE HUNDRED AND ONE

[18 U.S.C. §§ 1028A(a)(1), 2]

On or about the dates specified below, in Los Angeles and Orange Counties, within the Central District of California, and elsewhere, the defendants named below, while aiding and abetting each other, and together with others known and unknown to the Grand Jury, knowingly transferred, possessed, and used, and willfully caused to be transferred, possessed, and used, without lawful authority, a means of identification of another person, as specified below, during and in relation to Bank Fraud, a felony violation of Title 18, United States Code, Section 1344, as charged in Counts Ninety-Six through Ninety-Eight of this Indictment:

| COUNT | DATE | DEFENDANT(S) | MEANS OF IDENTIFICATION |
|-------|------|--------------|-------------------------|
| NINETY-NINE | 11/11/09 | PARAMAZ BILEZIKCHYAN, aka "Parik," aka "P," aka "Parnamas Bileziktsian," aka "Bleziktsian Paramas" ("BILEZIKCHYAN"); KARO YERKANYAN, aka "Guilty," aka "Gator," aka "Kane" ("YERKANYAN") | Name, Social Security Number, and Date of Birth of victim E.J. |
| ONE HUNDRED | 11/21/09 | BILEZIKCHYAN; YERKANYAN | Name, Social Security Number, and Date of Birth of victim J.S. |
| ONE HUNDRED AND ONE | 3/10/10 | BILEZIKCHYAN; ANDRANIK ALOYAN, aka "Andy," aka "Ando" | Name, Bank Account Number, and Date of Birth of victim S.T. |

156

COUNT ONE HUNDRED AND TWO

[18 U.S.C. § 1028(a)(7)]

On or about November 21, 2009, in Los Angeles and Riverside Counties, within the Central District of California, and elsewhere, defendants PARAMAZ BILEZIKCHYAN, also known as ("aka") "Parik," aka "P," aka "Parnamas Bileziktsian," aka "Bleziktsian Paramas," and KARO YERKANYAN, aka "Guilty," aka "Gator," aka "Kane," together with others known and unknown to the Grand Jury, knowingly transferred, possessed, and used, without lawful authority, a means of identification of another person, as defined in Title 18, United States Code, Section 1028(d)(7), with the intent to commit, to aid and abet, and in connection with, unlawful activity constituting a violation of Federal law and a felony under any applicable State and local law, including, but not limited to, Bank Fraud, in violation of Title 18, United States Code, Section 1344, and Access Device Fraud, in violation of Title 18, United States Code, Section 1029, with said transfer, possession, and use affecting interstate and foreign commerce.

157

COUNT ONE HUNDRED AND THREE

[18 U.S.C. § 371]

A.   OBJECTS OF THE CONSPIRACY

Beginning on a date unknown to the Grand Jury, and continuing to on or about January 26, 2011, in Los Angeles County, within the Central District of California, and elsewhere, defendants HAYK KARAYAN, also known as ("aka") "Hayko," aka "Whisper" ("H. KARAYAN"), ARMAN KARAYAN ("A. KARAYAN"), RAYMOND TARVERDYAN, aka "Rye," aka "Ray" ("TARVERDYAN"), GAGIK ZHAMKOCHYAN, aka "Manic," aka "Panther," aka "Gago," aka "Gag" ("ZHAMKOCHYAN"), KARAPET JOEY KARAMUSYAN, aka "Karo" ("KARAMUSYAN"), HAROUTIOUN ARTHUR MELKONIAN, aka "Art," aka "Art from Montebello" ("MELKONIAN"), and ARSEN AYRANJIAN ("AYRANJIAN"), together with others known and unknown to the Grand Jury, conspired and agreed with each other to commit the following offenses against the United States:

1.     To knowingly possess with intent to use and transfer unlawfully five or more identification documents and false identification documents, in and affecting interstate and foreign commerce, in violation of Title 18, United States Code, Section 1028(a)(3);

2.     To knowingly transfer, possess, and use without lawful authority a means of identification of another person with the intent to commit, to aid and abet, and in connection with, unlawful activity constituting a violation of Federal law and applicable State and local law, in and affecting interstate and

158

foreign commerce, in violation of Title 18, United States Code, Section 1028(a)(7);

3.  To commit aggravated identity theft, in violation of Title 18, United States Code, Section 1028A(a)(1);

4.  To knowingly and with intent to defraud possess fifteen or more counterfeit and unauthorized access devices, in violation of Title 18, United States Code, Section 1029(a)(3); and

5.  To knowingly and with the intent to defraud produce, traffic in, have custody and control of, and possess device-making equipment, in violation of Title 18, United States Code, Section 1029(a)(4).

B.  MEANS BY WHICH THE OBJECTS OF THE CONSPIRACY WERE TO BE ACCOMPLISHED

The objects of the conspiracy were to be accomplished, in substance, as follows:

1.  Defendants H. KARAYAN, A. KARAYAN, TARVERDYAN, ZHAMKOCHYAN, KARAMUSYAN, and MELKONIAN would identify individuals whose identities could be utilized for fraudulent purposes.

2.  Defendants H. KARAYAN, A. KARAYAN, and AYRANJIAN would rent an office space in which to possess fraudulent identification documents and means of identification.

3.  Defendants H. KARAYAN, A. KARAYAN, TARVERDYAN, ZHAMKOCHYAN, KARAMUSYAN, and MELKONIAN would possess various means of identification of other persons, fraudulent access devices, and device-making equipment for use in committing identity theft and access device fraud.

4.   Defendants H. KARAYAN and AYRANJIAN, when questioned by law enforcement about their activities at the rented office space, would lie to law enforcement about the true nature of their business in order to conceal and further the conspiracy to commit identity theft and access device fraud.

C.   OVERT ACTS

In furtherance of the conspiracy and to accomplish the objects of the conspiracy, defendants H. KARAYAN, A. KARAYAN, TARVERDYAN, ZHAMKOCHYAN, KARAMUSYAN, MELKONIAN, and AYRANJIAN, and others known and unknown to the Grand Jury, committed and caused to be committed various overt acts on or about the following dates, within the Central District of California, and elsewhere, including, but not limited to, the following:

1.   On or about January 16, 2010, defendants H. KARAYAN and TARVERDYAN, in a telephone conversation using coded language, discussed the need to get their fraudulent operation started so that they could make some money.

2.   On or about January 21, 2010, defendants H. KARAYAN and TARVERDYAN, in a telephone conversation using coded language, discussed how they had six individuals ready to work on their fraudulent business and discussed the need to rent office space.

3.   On or about January 22, 2010, defendant H. KARAYAN, in a telephone conversation using coded language, told an unindicted co-conspirator that defendants TARVERDYAN, KARAMUSYAN, and MELKONIAN had put in money for their business.

4.   On or about January 22, 2010, defendants H. KARAYAN and A. KARAYAN, in a telephone conversation using coded language,

160

1  discussed how H. KARAYAN and defendant ZHAMKOCHYAN had found a
2  location for their fraudulent business.

3       5.    On or about January 25, 2010, defendant AYRANJIAN
4  signed a two-year lease for space at 13847 Saticoy Street in
5  North Hollywood, California ("Saticoy"), stating that the
6  property would be used only for a food pickling company and
7  related storage.

8       6.    On or about January 25, 2010, defendant A. KARAYAN
9  issued a cashier's check for $7,750 to DRZ Partners to lease
10  office space at Saticoy.

11       7.    On or about January 25, 2010, defendants H. KARAYAN
12  and ZHAMKOCHYAN, in a telephone conversation using coded
13  language, discussed how they would use the space at Saticoy for
14  their fraudulent business, and H. KARAYAN instructed ZHAMKOCHYAN
15  to contact defendants A. KARAYAN and KARAMUSYAN regarding
16  activities at Saticoy.

17       8.    On or about January 25, 2010, defendants H. KARAYAN
18  and A. KARAYAN, in a telephone conversation using coded language,
19  discussed the lease for the office space at Saticoy.

20       9.    On or about January 25, 2010, defendant H. KARAYAN,
21  in a telephone conversation using coded language, discussed with
22  defendant A. KARAYAN moving furniture into the office space at
23  Saticoy and told A. KARAYAN to instruct defendants KARAMUSYAN and
24  AYRANJIAN to obtain insurance for the fraudulent business at
25  Saticoy.

26       10.   On or about January 25, 2010, defendants H. KARAYAN
27  and KARAMUSYAN, in a telephone conversation using coded language,

28

discussed individuals whom they could pay in exchange for use of their identities in fraudulent activity.

11.   On or about January 26, 2010, defendants H. KARAYAN and ZHAMKOCHYAN, in a telephone conversation using coded language, discussed individuals whom they could pay in exchange for use of their identities in fraudulent activity.

12.   On or about January 26, 2010, defendants H. KARAYAN and TARVERDYAN, in a telephone conversation using coded language, discussed moving into the office space at Saticoy, and H. KARAYAN said he would contact defendant KARAMUSYAN.

13.   On or about January 27, 2010, defendants H. KARAYAN and ZHAMKOCHYAN, in a telephone conversation using coded language, discussed moving into the office space at Saticoy and that defendants KARAMUSYAN and MELKONIAN would also be there.

14.   On or about January 27, 2010, defendants H. KARAYAN, A. KARAYAN, TARVERDYAN, ZHAMKOCHYAN, KARAMUSYAN, and MELKONIAN went to the office at Saticoy.

15.   On or about January 28, 2010, defendants H. KARAYAN and ZHAMKOCHYAN went to the office at Saticoy.

16.   On or about February 1, 2010, defendant TARVERDYAN, in a telephone conversation using coded language, asked defendant H. KARAYAN when they should go to the office at Saticoy and make some money.

17.   On or about February 2, 2010, defendant H. KARAYAN, in a telephone conversation using coded language, told defendant ZHAMKOCHYAN that defendants A. KARAYAN, TARVERDYAN, and MELKONIAN were at Saticoy.

162

18.   On or about February 3, 2010, defendant H. KARAYAN went to the office at Saticoy.

19.   On or about February 10, 2010, defendants H. KARAYAN, A. KARAYAN, TARVERDYAN, ZHAMKOCHYAN, KARAMUSYAN, and MELKONIAN possessed pre-paid telephone cards, marked with their names, for their use in connection with the fraudulent business at Saticoy.

20.   On or about February 10, 2010, defendants H. KARAYAN, A. KARAYAN, TARVERDYAN, ZHAMKOCHYAN, KARAMUSYAN, and MELKONIAN possessed rubber fingerprint covers to prevent their fingerprints from appearing on the documents and items inside Saticoy.

21.   On or about February 10, 2010, defendants H. KARAYAN, A. KARAYAN, TARVERDYAN, ZHAMKOCHYAN, KARAMUSYAN, and MELKONIAN possessed a "reader-writer" device used to re-encode the magnetic strip of access devices, such as credit and debit cards, and possessed a "skimming device" used to collect means of identification, including account numbers, from gas station pumps.

22.   On or about February 10, 2010, defendant H. KARAYAN made false and misleading statements and representations to law enforcement and claimed that he had never been to Saticoy, did not lease or own space at Saticoy, and did not operate a financial fraud business at Saticoy.

23.   On or about August 24, 2010, defendant AYRANJIAN made false and misleading statements and representations to law enforcement about his involvement with the operation of Saticoy and told law enforcement that when he signed the lease for the

163

office space at Saticoy, he intended for that space to be used as
an import-export business for canned foods.

COUNT ONE HUNDRED AND FOUR

[18 U.S.C. § 1028(a)(3)]

On or about February 10, 2010, in Los Angeles County, within the Central District of California, and elsewhere, defendants HAYK KARAYAN, also known as ("aka") "Hayko," aka "Whisper," ARMAN KARAYAN, RAYMOND TARVERDYAN, aka "Rye," aka "Ray," GAGIK ZHAMKOCHYAN, aka "Manic," aka "Panther," aka "Gago," aka "Gag," KARAPET JOEY KARAMUSYAN, aka "Karo," and HAROUTIOUN ARTHUR MELKONIAN, aka "Art," aka "Art from Montebello," knowingly possessed with intent to unlawfully use and transfer five or more identification documents and false identification documents, all of which were issued and appeared to have been issued by and under the authority of the State of California and the United States, including California Drivers Licenses, Social Security Cards, and Employment Authorization Cards, with said possession and transfer affecting interstate and foreign commerce.

165

COUNT ONE HUNDRED AND FIVE

[18 U.S.C. § 1029(a)(3)]

On or about February 10, 2010, in Los Angeles County, within the Central District of California, and elsewhere, defendants HAYK KARAYAN, also known as ("aka") "Hayko," aka "Whisper," ARMAN KARAYAN, RAYMOND TARVERDYAN, aka "Rye," aka "Ray," GAGIK ZHAMKOCHYAN, aka "Manic," aka "Panther," aka "Gago," aka "Gag," KARAPET JOEY KARAMUSYAN, aka "Karo," and HAROUTIOUN ARTHUR MELKONIAN, aka "Art," aka "Art from Montebello," knowingly and with intent to defraud possessed fifteen or more unauthorized and counterfeit access devices, as defined in Title 18, United States Code, Sections 1029(e)(1), (2), and (3), with said possession affecting interstate and foreign commerce.

166

COUNT ONE HUNDRED AND SIX

[18 U.S.C. §§ 1029(a)(4), 2]

On or about February 10, 2010, in Los Angeles County, within the Central District of California, and elsewhere, defendants HAYK KARAYAN, also known as ("aka") "Hayko," aka "Whisper," ARMAN KARAYAN, RAYMOND TARVERDYAN, aka "Rye," aka "Ray," GAGIK ZHAMKOCHYAN, aka "Manic," aka "Panther," aka "Gago," aka "Gag," KARAPET JOEY KARAMUSYAN, aka "Karo," and HAROUTIOUN ARTHUR MELKONIAN, aka "Art," aka "Art from Montebello," while aiding and abetting each other, and together with others known and unknown to the Grand Jury, knowingly and with intent to defraud had custody and control of and possessed, and willfully caused others to have custody and control of and possess, device-making equipment, as defined in Title 18, United States Code, Section 1029(e)(6), with said custody, control, and possession affecting interstate and foreign commerce.

COUNTS ONE HUNDRED AND SEVEN THROUGH ONE HUNDRED AND TEN

[18 U.S.C. §§ 1028A(a)(1), 2]

On or about February 10, 2010, in Los Angeles County, within the Central District of California, and elsewhere, defendants HAYK KARAYAN, also known as ("aka") "Hayko," aka "Whisper," ARMAN KARAYAN, RAYMOND TARVERDYAN, aka "Rye," aka "Ray," GAGIK ZHAMKOCHYAN, aka "Manic," aka "Panther," aka "Gago," aka "Gag," KARAPET JOEY KARAMUSYAN, aka "Karo," and HAROUTIOUN ARTHUR MELKONIAN, aka "Art," aka "Art from Montebello," while aiding and abetting each other, and together with others known and unknown to the Grand Jury, knowingly transferred, possessed, and used, and willfully caused to be transferred, possessed, and used, without lawful authority, a means of identification of another person, as specified below, during and in relation to: (1) Identity Theft, a felony violation of Title 18, United States Code, Section 1028(a)(3), as charged in Count One Hundred and Four of this Indictment; and (2) Access Device Fraud, a felony violation of Title 18, United States Code, Section 1029(a), as charged in Counts One Hundred and Five and One Hundred and Six of this Indictment:

///

///

///

168

| COUNT | MEANS OF IDENTIFICATION |
|---|---|
| ONE HUNDRED AND SEVEN | Name, Social Security Number, Date of Birth, Bank Account Numbers, and Driver's License Number belonging to victim M.S. |
| ONE HUNDRED AND EIGHT | Name, Social Security Number, Date of Birth, and Bank Account Numbers belonging to victim D.C. |
| ONE HUNDRED AND NINE | Name, Social Security Number, Date of Birth, Bank Account Numbers, and Driver's License Number belonging to victim C.B. |
| ONE HUNDRED AND TEN | Name, Social Security Number, Date of Birth, and Bank Account Numbers belonging to victim S.F. |

COUNT ONE HUNDRED AND ELEVEN

[18 U.S.C. § 1028(a)(7)]

On or about February 10, 2010, in Los Angeles County, within the Central District of California, and elsewhere, defendants HAYK KARAYAN, also known as ("aka") "Hayko," aka "Whisper," ARMAN KARAYAN, RAYMOND TARVERDYAN, aka "Rye," aka "Ray," GAGIK ZHAMKOCHYAN, aka "Manic," aka "Panther," aka "Gago," aka "Gag," KARAPET JOEY KARAMUSYAN, aka "Karo," and HAROUTIOUN ARTHUR MELKONIAN, aka "Art," aka "Art from Montebello," together with others known and unknown to the Grand Jury, knowingly transferred, possessed, and used, without lawful authority, a means of identification of another person, as defined in Title 18, United States Code, Section 1028(d)(7), and as specified below, with the intent to commit, to aid and abet, and in connection with, unlawful activity constituting a violation of Federal law and a felony under any applicable State and local law, including, but not limited to, Access Device Fraud, in violation of Title 18, United States Code, Section 1029(a), and False Personation of Another, in violation of California Penal Code Section 530.5, with said transfer, possession, and use affecting interstate and foreign commerce:

///

///

///

170

| MEANS OF IDENTIFICATION |
|---|
| Name, Social Security Number, Date of Birth, Bank Account Numbers, and Driver's License Number belonging to victim M.S. |
| Name, Social Security Number, Date of Birth, and Bank Account Numbers belonging to victim D.C. |
| Name, Social Security Number, Date of Birth, Bank Account Numbers, and Driver's License Number belonging to victim C.B. |
| Name, Social Security Number, Date of Birth, and Bank Account Numbers belonging to victim S.F. |

171

## COUNT ONE HUNDRED AND TWELVE

### [18 U.S.C. § 1001(a)(2)]

On or about February 10, 2010, in Los Angeles County, within the Central District of California, in a matter within the jurisdiction of the Federal Bureau of Investigation, defendant HAYK KARAYAN, also known as ("aka") "Hayko," aka "Whisper" ("H. KARAYAN"), knowingly and willfully made a false material statement and representation, in that defendant H. KARAYAN told an agent with the Federal Bureau of Investigation that he did not recall visiting the location at 13847 Saticoy Street in North Hollywood, California, and that he did not work out of the location at 13847 Saticoy Street in North Hollywood, California, when, in truth and in fact, as defendant H. KARAYAN then and there well knew, defendant H. KARAYAN had been to 13847 Saticoy Street in North Hollywood, California, several times and was operating a fraudulent business at that location.

COUNT ONE HUNDRED AND THIRTEEN

[18 U.S.C. § 371]

A.   <u>INTRODUCTORY ALLEGATIONS</u>

At all times relevant to this Indictment:

1.   PMC Bancorp was licensed by the State of California as a Finance Lender and operated as a mortgage lending business, within the meaning of Title 18, United States Code, Section 20(10).

2.   Defendant NAIRA ASTGHIK TEROUNIAN was a real estate broker licensed in the State of California.

B.   <u>OBJECT OF THE CONSPIRACY</u>

Beginning on a date unknown to the Grand Jury, and continuing to on or about January 26, 2011, in Los Angeles County, within the Central District of California, and elsewhere, defendants MHER DARBINYAN, also known as ("aka") "Mike," aka "Hollywood Mike," aka "Little Mike," aka "Capone," aka "Caps," aka "Maher" ("DARBINYAN"), KARO YERKANYAN, aka "Guilty," aka "Gator," aka "Kane" ("K. YERKANYAN"), EDGAR YERKANYAN, aka "Edo" ("E. YERKANYAN"), KARINE MKRTCHYAN ("MKRTCHYAN"), and NAIRA ASTGHIK TEROUNIAN ("TEROUNIAN"), together with others known and unknown to the Grand Jury, conspired and agreed with each other to knowingly and intentionally commit the following offense against the United States:  False Statements on a Loan Application, in violation of Title 18, United States Code, Section 1014.

///

///

173

C.   MEANS BY WHICH THE OBJECT OF THE CONSPIRACY WAS TO BE
ACCOMPLISHED

The object of the conspiracy was to be accomplished, in substance, as follows:

1.   Defendant DARBINYAN would look for an individual to take title of a house where DARBINYAN lived with defendant MKRTCHYAN, located at 27033 Fairway Lane in Valencia, California ("the Fairway residence"), even though DARBINYAN and MKRTCHYAN intended to reside at the property after it was sold.

2.   Defendant TEROUNIAN, a real estate agent and loan broker, would advise defendant DARBINYAN about how he should select the person to assume title of the Fairway residence and assist defendants DARBINYAN, K. YERKANYAN, and E. YERKANYAN in obtaining the necessary approvals and loans to transfer title of the property from DARBINYAN to K. YERKANYAN.

3.   Defendant K. YERKANYAN would agree to pose as a buyer for the Fairway residence, even though K. YERKANYAN did not intend to occupy the Fairway residence.

4.   Defendant E. YERKANYAN would assist defendants DARBINYAN and K. YERKANYAN in facilitating the sale of the Fairway residence to K. YERKANYAN.

5.   Defendant MKRTCHYAN would obtain the money for defendant K. YERKANYAN's downpayment on the Fairway residence.

6.   Defendant K. YERKANYAN would make false statements on a loan application about his income, employment, and intent to occupy the Fairway residence in order to secure the loan with which to purchase the Fairway residence.

174

7.    Defendants DARBINYAN and MKRTCHYAN would continue to live in the Fairway residence after it was sold to defendant K. YERKANYAN.

C.   OVERT ACTS

In furtherance of the conspiracy and to accomplish the object of the conspiracy, defendants DARBINYAN, K. YERKANYAN, E. YERKANYAN, MKRTCHYAN, and TEROUNIAN, and others known and unknown to the Grand Jury, committed and caused to be committed various overt acts on or about the following dates, within the Central District of California, and elsewhere, including, but not limited to, the following:

1.    On or about September 28, 2009, defendants K. YERKANYAN and TEROUNIAN signed a Uniform Residential Loan Application containing false statements.

2.    On or about September 29, 2009, defendant MKRTCHYAN, using coded language on the telephone, asked defendant DARBINYAN if the loan was going to be approved, notified DARBINYAN that defendant TEROUNIAN could not reach defendant E. YERKANYAN, and asked DARBINYAN how they should proceed.

3.    On or about September 30, 2009, defendant DARBINYAN spoke with an unindicted co-conspirator on the telephone and told the unindicted co-conspirator, using coded language, that DARBINYAN wanted to find someone to assume title of his house for a few months, refinance it, and then put the house in the name of his wife, defendant MKRTCHYAN.

4.    On or about October 3, 2009, defendant DARBINYAN spoke with an unindicted co-conspirator on the telephone about

175

1  using defendant TEROUNIAN to assist him in finding someone to

2  assume title of his house.

3       5.    On or about October 6, 2009, defendants DARBINYAN and

4  E. YERKANYAN spoke by telephone and agreed, using coded language,

5  that the Fairway residence should be put in defendant K.

6  YERKANYAN's name and that E. YERKANYAN would talk to defendant

7  TEROUNIAN to facilitate the transfer of title for the Fairway

8  residence.

9       6.    On or about October 13, 2009, defendant DARBINYAN

10  told defendant E. YERKANYAN, in a telephone conversation using

11  coded language, to get copies of defendant K. YERKANYAN's social

12  security and driver's license cards and that DARBINYAN would

13  compensate K. YERKANYAN.

14       7.    On or about October 13, 2009, defendants DARBINYAN

15  and TEROUNIAN discussed on the telephone how to transfer title of

16  the Fairway residence to defendant K. YERKANYAN.

17       8.    On or about October 13, 2009, defendant TEROUNIAN

18  advised defendant DARBINYAN, in a telephone conversation using

19  coded language, not to use a real estate agent as the buyer

20  because the scheme was fraudulent and they could get in a lot of

21  trouble.

22       9.    On or about October 13, 2009, defendant TEROUNIAN

23  told defendant DARBINYAN, in a telephone conversation using coded

24  language, that she was working on the loan for defendant K.

25  YERKANYAN and that she was trying to get approval from the bank.

26       10.   On or about October 13, 2009, defendant TEROUNIAN, in

27  a telephone conversation using coded language, told defendant

28

1  DARBINYAN that DARBINYAN could get in a lot of trouble if their

2  scheme was discovered.

3      11.   On or about October 27, 2009, defendant TEROUNIAN

4  asked defendant DARBINYAN to have defendant E. YERKANYAN email

5  defendant K. YERKANYAN's bank statements to TEROUNIAN so that

6  TEROUNIAN could alter the bank statements.

7      12.   On or about December 14, 2009, defendant K. YERKANYAN

8  signed a note promising to pay $248,000 to PMC Bancorp, a

9  mortgage lending company.

10     13.   On or about December 14, 2009, defendant K. YERKANYAN

11  signed an Occupancy Statement, certifying under penalty of Title

12  18, United States Code, Section 1014, and other federal laws,

13  that he would occupy the Fairway residence as his principal

14  residence as required by, and in compliance with the terms of the

15  Deed of Trust/Mortgage/Security Instrument relating to the

16  Fairway residence.

17     14.   On or about December 14, 2009, defendants K.

18  YERKANYAN and TEROUNIAN signed a Uniform Residential Loan

19  Application containing false statements about K. YERKANYAN's

20  employment, income, and intent to occupy the Fairway residence.

21     15.   On or about December 21, 2009, defendant MKRTCHYAN

22  purchased a cashier's check for $70,000 for defendant K.

23  YERKANYAN to use as the downpayment to complete the purported

24  purchase of the Fairway residence.

25

26

27

28

COUNT ONE HUNDRED AND FOURTEEN

[18 U.S.C. §§ 1014, 2]

On or about December 14, 2009, in Los Angeles County, within the Central District of California, and elsewhere, defendants MHER DARBINYAN, also known as ("aka") "Mike," aka "Hollywood Mike," aka "Little Mike," aka "Capone," aka "Caps," aka "Maher," KARO YERKANYAN, aka "Guilty," aka "Gator," aka "Kane," EDGAR YERKANYAN, aka "Edo," KARINE MKRTCHYAN, and NAIRA ASTGHIK TEROUNIAN knowingly made, willfully caused to be made, and aided and abetted the making of false statements to PMC Bancorp, a mortgage lending business, namely, the execution and submission of a Uniform Residential Loan Application to PMC Bancorp for $248,000 to purchase 27033 Fairway Lane, Valencia, California, 91381, falsely stating K. YERKANYAN's employment, income, assets, bank accounts, and intent to occupy said property, for the purpose of influencing the actions of the mortgage lending business.

178

COUNT ONE HUNDRED AND FIFTEEN

[21 U.S.C. § 846]

A.   OBJECT OF THE CONSPIRACY

Beginning on a date unknown to the Grand Jury, and continuing to on or about August 15, 2009, in Los Angeles County, within the Central District of California, and elsewhere, defendants PARAMAZ BILEZIKCHYAN, also known as ("aka") "Parik," aka "P," aka "Parnamas Bileziktsian," aka "Bleziktsian Paramas" ("BILEZIKCHYAN"), KARO YERKANYAN, aka "Guilty," aka "Gator," aka "Kane" ("K. YERKANYAN"), SUREN TOROSYAN, aka "Suro," aka "Sunny" ("S. TOROSYAN"), OGANES TEROGANESYAN, aka "Hovo," aka "Hovik," aka "Oganes Terognesyan" ("O. TEROGANESYAN"), ARTUR GABRELYAN, aka "Rubo," aka "Art" ("GABRELYAN"), ADAM DAVOODIAN, aka "Aram" ("DAVOODIAN"), and SARKIS AVEDISIAN, aka "Sako" ("AVEDISIAN"), and others known and unknown to the Grand Jury, conspired and agreed with each other to knowingly and intentionally possess with intent to distribute at least 100 kilograms of marijuana, namely, approximately 273 pounds of marijuana, a schedule I controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1), (b)(1)(C).

B.   MEANS BY WHICH THE OBJECT OF THE CONSPIRACY WAS TO BE ACCOMPLISHED

The object of the conspiracy was to be accomplished, in substance, as follows:

1.      Defendants BILEZIKCHYAN, K. YERKANYAN, S. TOROSYAN, O. TEROGANESYAN, GABRELYAN, and DAVOODIAN would develop a plan to pretend to enter a marijuana partnership with defendant Arnold

Moradians, aka "Arno" ("Moradians"), in order to steal a load of marijuana from Moradians and sell it for their own benefit.

2.   Defendants BILEZIKCHYAN, K. YERKANYAN, and O. TEROGANESYAN would obtain keys for a truck which contained the marijuana belonging to Moradians, and take the truck from its place of storage.

3.   Defendants BILEZIKCHYAN, K. YERKANYAN, S. TOROSYAN, and GABRELYAN would divide, package, and store the marijuana stolen from Moradians.

4.   Defendant AVEDISIAN would agree to allow the stolen marijuana to be stored for a time on his property.

5.   Defendants BILEZIKCHYAN, O. TEROGANESYAN, and GABRELYAN would negotiate the sale of the stolen marijuana.

C.   OVERT ACTS

In furtherance of the conspiracy and to accomplish the object of the conspiracy, defendants BILEZIKCHYAN, K. YERKANYAN, S. TOROSYAN, O. TEROGANESYAN, GABRELYAN, DAVOODIAN, and AVEDISIAN, and others known and unknown to the Grand Jury, committed and caused to be committed various overt acts on or about the following dates, within the Central District of California, and elsewhere, including, but not limited to, the following:

1.   On or about August 5, 2009, defendant BILEZIKCHYAN, in a telephone conversation using coded language, discussed with defendant S. TOROSYAN the fact that Moradians sells large quantities of marijuana.

2.     On or about August 6, 2009, defendant BILEZIKCHYAN, in a telephone conversation using coded language, spoke with defendant DAVOODIAN and asked DAVOODIAN if he had ever purchased marijuana from defendant Moradians, and DAVOODIAN stated that he had just purchased $20,000 worth of marijuana from Moradians.

3.     On or about August 7, 2009, defendant BILEZIKCHYAN, in a telephone conversation using coded language, told Moradians that BILEZIKCHYAN would bring some people to help Moradians package his marijuana.

4.     On or about August 8, 2009, defendant GABRELYAN agreed to meet defendant BILEZIKCHYAN to help package Moradians' marijuana.

5.     On or about August 8, 2009, defendant BILEZIKCHYAN, in a telephone conversation using coded language, told Moradians that he had sent some guys to help Moradians package his marijuana.

6.     On or about August 9, 2009, defendant BILEZIKCHYAN, in a telephone conversation using coded language, told defendant O. TEROGANESYAN that BILEZIKCHYAN and defendants K. YERKANYAN and S. TOROSYAN wanted to bring narcotics to O. TEROGANESYAN's auto body shop the next day in order to package the narcotics, and O. TEROGANESYAN informed BILEZIKCHYAN that he could do so.

7.     On or about August 10, 2009, defendant BILEZIKCHYAN, in a telephone conversation using coded language, told defendant O. TEROGANESYAN that they needed a compressor hose to package the marijuana and asked O. TEROGANESYAN to cover the windows in his office so that they could package the marijuana there, and O.

181

TEROGANESYAN said they could package the marijuana at his business after the auto body shop workers left for the day.

8.    On or about August 11, 2009, defendant BILEZIKCHYAN, in a telephone conversation using coded language, discussed with defendant O. TEROGANESYAN stealing the marijuana that they had helped to package for Moradians.

9.    On or about August 11, 2009, defendant O. TEROGANESYAN, in a telephone conversation using coded language, spoke with defendant BILEZIKCHYAN and agreed to make a copy of the keys for the truck that contained the packaged marijuana belonging to Moradians.

10.    On or about August 11, 2009, defendant O. TEROGANESYAN made or had made spare keys for the truck containing the marijuana belonging to Moradians.

11.    On or about August 11, 2009, defendant BILEZIKCHYAN, in a telephone conversation using coded language, told defendant O. TEROGANESYAN that defendant K. YERKANYAN was on his way to assist O. TEROGANESYAN in stealing the truck containing the packaged marijuana, and BILEZIKCHYAN told O. TEROGANESYAN to leave the truck abandoned somewhere after they removed the marijuana; and the truck was eventually left parked on Clifton Place in Glendale, California.

12.    On or about August 11, 2009, defendant K. YERKANYAN drove away the truck which contained the marijuana.

13.    On or about August 11, 2009, defendant AVEDISIAN agreed to hide the stolen marijuana on his property.

14.   On or about August 11, 2009, defendants BILEZIKCHYAN, K. YERKANYAN, and DAVOODIAN met with Moradians and pretended that K. YERKANYAN and DAVOODIAN were rival claimants to BILEZIKCHYAN and Moradians for the stolen marijuana.

15.   On or about August 11, 2009, defendant TOROSYAN provided a location for dividing and packaging the stolen marijuana at his property.

16.   On or about August 11, 2009, defendant BILEZIKCHYAN, in a telephone conversation using coded language, told defendant GABRELYAN that BILEZIKCHYAN was in possession of approximately 207 pounds of marijuana, and that the marijuana was worth $450,000.

17.   On or about August 11, 2009, defendant GABRELYAN took samples of the stolen marijuana to offer for sale.

18.   On or about August 15, 2009, defendant BILEZIKCHYAN, in a telephone conversation using coded language, told an unindicted co-conspirator that the marijuana BILEZIKCHYAN and his co-conspirators had stolen from the truck was worth $450,000, that BILEZIKCHYAN and his co-conspirators divided up the money, and that BILEZIKCHYAN's share was $150,000.

COUNT ONE HUNDRED AND SIXTEEN

[21 U.S.C. §§ 841(a)(1), (b)(1)(C)]

On or about August 11, 2009, in Los Angeles County, within the Central District of California, and elsewhere, defendants PARAMAZ BILEZIKCHYAN, also known as ("aka") "Parik," aka "P," aka "Parnamas Bileziktsian," aka "Bleziktsian Paramas," KARO YERKANYAN, aka "Guilty," aka "Gator," aka "Kane," SUREN TOROSYAN, aka "Suro," aka "Sunny," OGANES TEROGANESYAN, aka "Hovo," aka "Hovik," aka "Oganes Terognesyan," ARTUR GABRELYAN, aka "Rubo," aka "Art," ADAM DAVOODIAN, aka "Aram," and SARKIS AVEDISIAN, aka "Sako," knowingly and intentionally possessed with intent to distribute at least 100 kilograms of marijuana, namely, approximately 273 pounds of marijuana, a schedule I controlled substance.

1          COUNT ONE HUNDRED AND SEVENTEEN

2          [21 U.S.C. §§ 841(a)(1), (b)(1)(C)]

3          On or about August 11, 2009, in Los Angeles County, within

4    the Central District of California, and elsewhere, defendant

5    ARNOLD MORADIANS, also known as "Arno," knowingly and

6    intentionally possessed with intent to distribute marijuana, a

7    schedule I controlled substance.

COUNT ONE HUNDRED AND EIGHTEEN

[21 U.S.C. § 846]

A.   <u>OBJECTS OF THE CONSPIRACY</u>

Beginning on a date unknown to the Grand Jury, and continuing to on or about January 26, 2011, in Los Angeles County, within the Central District of California, and elsewhere, defendants HAYK KARAYAN, also known as ("aka") "Hayko," aka "Whisper" ("H. KARAYAN"), ROMAN TEROGANESYAN, aka "Lil Boy," aka "Rome," aka "Roman Teroganesian," aka "Arthur Teroganesian" ("R. TEROGANESYAN"), ARMAN KARAYAN ("A. KARAYAN"), JACK GAMBARYAN, aka "Zhak Gambarian," aka "Speedy" ("GAMBARYAN"), GRIGOR GARIBYAN, aka "Gokor" ("GARIBYAN"), ARAM KHACHATRYAN ("A. KHACHATRYAN"), ZHIRAYR KARAYAN, aka "Zhiro," aka "Jerry" ("Z. KARAYAN"), ARSEN AYRANJIAN ("AYRANJIAN"), and HOVANNES IGARIAN, aka "Hovo" ("IGARIAN"), and others known and unknown to the Grand Jury, conspired and agreed with each other to knowingly and intentionally manufacture, and possess with intent to distribute, at least 1,000 marijuana plants, a schedule I controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1), (b)(1)(A)(vii).

B.   <u>MEANS BY WHICH THE OBJECTS OF THE CONSPIRACY WERE TO BE ACCOMPLISHED</u>

The objects of the conspiracy were to be accomplished, in substance, as follows:

1.   Defendants H. KARAYAN, A. KARAYAN, and Z. KARAYAN would establish and maintain several marijuana growing sites in or around January 2010.

186

2.    Defendant A. KARAYAN would maintain a marijuana growing site at his residence at 12451 Daryl Avenue, in Granada Hills, California.

3.    Defendant H. KARAYAN would maintain a marijuana growing site at his residence at 18536 Brasilia Drive, in Porter Ranch, California.

4.    Defendants H. KARAYAN, GAMBARYAN, GARIBYAN, A. KHACHATRYAN, Z. KARAYAN, and IGARIAN would obtain an additional location to be used to grow marijuana plants.

5.    Defendants H. KARAYAN, GAMBARYAN, GARIBYAN, A. KHACHATRYAN, Z. KARAYAN, and IGARIAN would construct and equip a facility that would enable them to grow large numbers of marijuana plants.

6.    Defendants H. KARAYAN, GAMBARYAN, GARIBYAN, A. KHACHATRYAN, Z. KARAYAN, and IGARIAN would grow a large number of marijuana plants at the marijuana growing facility they constructed.

7.    Defendants R. TEROGANESYAN and AYRANJIAN would assist defendant H. KARAYAN in maintaining and expanding his marijuana growing sites.

C.    OVERT ACTS

In furtherance of the conspiracy and to accomplish the objects of the conspiracy, defendants H. KARAYAN, R. TEROGANESYAN, A. KARAYAN, GAMBARYAN, GARIBYAN, A. KHACHATRYAN, Z. KARAYAN, AYRANJIAN, and IGARIAN, and others known and unknown to the Grand Jury, committed and caused to be committed various overt acts on or about the following dates, within the Central

187

District of California, and elsewhere, including, but not limited to, the following:

1.     In or around January 2010, defendant AYRANJIAN cared for marijuana plants being grown at the marijuana facilities operated by AYRANJIAN's co-conspirators.

2.     On or about January 15, 2010, defendants H. KARAYAN and A. KARAYAN, in a telephone conversation using coded language, discussed purchasing plant fertilizer for growing marijuana plants.

3.     On or about January 16, 2010, defendant H. KARAYAN, in a telephone conversation using coded language, discussed with defendant Z. KARAYAN drying, packaging, and labeling marijuana.

4.     On or about January 17, 2010, defendant H. KARAYAN told defendant Z. KARAYAN, using coded language on the telephone, that Z. KARAYAN should instruct defendant AYRANJIAN to go to defendant A. KARAYAN's marijuana facility, water the plants, and make sure to vacuum carefully at the location.

5.     On or about January 21, 2010, defendant H. KARAYAN, in a telephone conversation using coded language, discussed with defendant GAMBARYAN looking for another marijuana grow location.

6.     On or about January 26, 2010, defendant H. KARAYAN, in a telephone conversation using coded language, discussed with defendants A. KARAYAN and Z. KARAYAN growing marijuana plants.

7.     On or about February 8, 2010, defendants H. KARAYAN and R. TEROGANESYAN, in a telephone conversation using coded language, discussed their marijuana grow operations, and R. TEROGANESYAN said he was expanding his marijuana grow.

8.     On or about February 8, 2010, defendant H. KARAYAN, in a telephone conversation using coded language, told defendant R. TEROGANESYAN that H. KARAYAN had three marijuana grow sites operating and was opening a fourth, and that each grow site had at least 150 marijuana plants.

9.     On or about February 8, 2010, defendant R. TEROGANESYAN, in a telephone conversation using coded language, spoke with defendant H. KARAYAN, offered to hold some of H. KARAYAN's marijuana plants, and said he could fit approximately 200 of H. KARAYAN's marijuana plants at his marijuana grow location.

10.    On or about February 10, 2010, defendant A. KARAYAN maintained a marijuana growing site at his residence at 12451 Daryl Avenue, in Granada Hills, California.

11.    On or about February 10, 2010, defendant H. KARAYAN possessed approximately 2.38 kilograms of cultivated marijuana, a firearm, namely, a Beretta model 96 .40 caliber semi-automatic pistol, and ammunition, at his residence at 18536 Brasilia Drive, in Northridge, California.

12.    On or about April 26, 2010, defendant GAMBARYAN brought a propane tank and bamboo stakes to a marijuana growing facility that defendants H. KARAYAN, A. KARAYAN, GAMBARYAN, GARIBYAN, A. KHACHATRYAN, Z. KARAYAN, and IGARIAN were operating at 8239 Lankershim Boulevard, Unit D, in North Hollywood, California (the "marijuana growing facility").

13. On or about April 26, 2010, defendants GAMBARYAN and GARIBYAN unloaded the propane tank and bamboo stakes into the marijuana growing facility.

14. On or about April 26, 2010, defendant IGARIAN arrived at the marijuana growing facility in an SUV, met defendant GAMBARYAN, and the two shook hands and entered the marijuana growing facility.

15. On or about April 26, 2010, defendant IGARIAN exited the marijuana growing facility, backed his SUV up to the door of the marijuana growing facility, and opened the rear hatch of his SUV.

16. On or about April 26, 2010, defendant GAMBARYAN brought a black plastic bag of small marijuana plants out of the marijuana growing facility.

17. On or about April 26, 2010, defendants GAMBARYAN and IGARIAN loaded the bag of marijuana plants into IGARIAN's SUV.

18. On or about April 26, 2010, defendants H. KARAYAN, GARIBYAN, A. KHACHATRYAN, and Z. KARAYAN met inside the marijuana growing facility.

19. On or about April 26, 2010, defendants GAMBARYAN, A. KHACHATRYAN, and Z. KARAYAN each possessed on his person a key to the door of the marijuana growing facility.

20. On or about April 26, 2010, defendants H. KARAYAN, A. KARAYAN, GAMBARYAN, GARIBYAN, A. KHACHATRYAN, Z. KARAYAN, and IGARIAN possessed approximately 567 marijuana plants, as well as equipment used to grow marijuana, including one-gallon and five-gallon pots containing potting soil, high wattage overhead light

bulbs with reflector shades, air conditioning units, dehumidifier units, fans, carbon filter systems, watering tubs, a submersible pump, and a carbon dioxide generator attached to a propane tank, all inside the marijuana growing facility.

COUNT ONE HUNDRED AND NINETEEN

[21 U.S.C. §§ 841(a)(1), (b)(1)(B)(vii)]

On or about April 26, 2010, in Los Angeles County, within the Central District of California, and elsewhere, defendants HAYK KARAYAN, also known as ("aka") "Hayko," aka "Whisper," ARMAN KARAYAN, JACK GAMBARYAN, aka "Zhak Gambarian," aka "Speedy," GRIGOR GARIBYAN, aka "Gokor," ARAM KHACHATRYAN, ZHIRAYR KARAYAN, aka "Zhiro," aka "Jerry," ARSEN AYRANJIAN, and HOVANNES IGARIAN, aka "Hovo," knowingly and intentionally manufactured and possessed with the intent to distribute at least 100 marijuana plants, that is, approximately 567 marijuana plants, a schedule I controlled substance.

COUNT ONE HUNDRED AND TWENTY

[18 U.S.C. § 1029(a)(3)]

On or about September 3, 2010, in Los Angeles County, within the Central District of California, and elsewhere, defendant ANDRANIK ALOYAN, also known as ("aka") "Andy," aka "Ando," knowingly and with intent to defraud possessed fifteen or more unauthorized access devices, as defined in Title 18, United States Code, Sections 1029(e)(1) and (3), namely, approximately 346 credit card account numbers and bank account numbers in the names of other persons, with said possession affecting interstate and foreign commerce.

COUNTS ONE HUNDRED AND TWENTY-ONE THROUGH ONE HUNDRED

AND TWENTY-THREE

[18 U.S.C. § 1028A(a)(1)]

On or about September 3, 2010, in Los Angeles County, within the Central District of California, and elsewhere, defendant ANDRANIK ALOYAN, also known as ("aka") "Andy," aka "Ando," together with others known and unknown to the Grand Jury, knowingly transferred, possessed, and used, without lawful authority, a means of identification of another person, as specified below, during and in relation to Access Device Fraud, a felony violation of Title 18, United States Code, Section 1029(a)(3), as charged in Count One Hundred and Twenty of this Indictment:

| COUNT | MEANS OF IDENTIFICATION |
|---|---|
| ONE HUNDRED AND TWENTY-ONE | Name and Account Number belonging to victim R.D. |
| ONE HUNDRED AND TWENTY-TWO | Name and Account Number belonging to victim A.M.R. |
| ONE HUNDRED AND TWENTY-THREE | Name and Account Number belonging to victim V.N. |

194

COUNT ONE HUNDRED AND TWENTY-FOUR

[18 U.S.C. §§ 1028(a)(7), 2]

On or about September 3, 2010, in Los Angeles County, within the Central District of California, and elsewhere, defendant ANDRANIK BAKHCHADJIAN, also known as ("aka") "Ando," aka "Andranik Bakhcadjian," together with others known and unknown to the Grand Jury, knowingly transferred, possessed, and used, without lawful authority, a means of identification of another person, as defined in Title 18, United States Code, Section 1028(d)(7), with the intent to commit, to aid and abet, and in connection with, unlawful activity constituting a violation of Federal law and a felony under any applicable State and local law, including, but not limited to, Bank Fraud, in violation of Title 18, United States Code, Section 1344, and Access Device Fraud, in violation of Title 18, United States Code, Section 1029, with said transfer, possession, and use affecting interstate and foreign commerce.

COUNT ONE HUNDRED AND TWENTY-FIVE

[18 U.S.C. §§ 1955, 2]

Beginning on a date unknown to the Grand Jury, but no later than on or about December 28, 2009, and continuing through on or about January 26, 2011, in Los Angeles County, within the Central District of California, and elsewhere, defendants PARAMAZ BILEZIKCHYAN, also known as ("aka") "Parik," aka "P," aka "Parnamas Bileziktsian," aka "Bleziktsian Paramas," HAYK KARAYAN, aka "Hayko," aka "Whisper," ROMAN TEROGANESYAN, aka "Lil Boy," aka "Rome," aka "Roman Teroganesian," aka "Arthur Teroganesian," and JACK GAMBARYAN, aka "Zhak Gambarian," aka "Speedy," while aiding and abetting each other, and together with others known and unknown to the Grand Jury, knowingly conducted, financed, managed, supervised, directed, and owned, and willfully caused to be conducted, financed, managed, supervised, directed, and owned, all or part of an illegal gambling business, in violation of the laws of the State of California and the Municipal Code for the City of Los Angeles.

COUNT ONE HUNDRED AND TWENTY-SIX

[18 U.S.C. § 922(g)(1)]

On or about August 20, 2009, in Los Angeles County, within the Central District of California, defendant HARUT TOROSYAN, also known as ("aka") "Menace," aka "Harout Torosyan" ("H. TOROSYAN"), knowingly possessed a firearm, namely, a Springfield Armory model XD .45 caliber handgun, bearing serial number US690631, and ammunition, namely, two rounds of Remington .45 caliber ammunition, and one round of Winchester .45 caliber ammunition, in and affecting interstate and foreign commerce.

Such possession occurred after defendant H. TOROSYAN had been convicted of at least one of the following felony crimes, each punishable by a term of imprisonment exceeding one year:

(1)    Manufacture, Sale, or Possession of a Dangerous Weapon, in violation of California Penal Code Section 12020(a)(1), in the Superior Court of the State of California, County of Los Angeles, case number GA05306301, on or about June 11, 2003;

(2)    Taking Identity of Another Person, in violation of Arizona Revised Statutes Section 13-2008, in the Superior Court of the State of Arizona for Maricopa County, case number CR 2006-030210, on or about February 16, 2007.

COUNT ONE HUNDRED AND TWENTY-SEVEN

[18 U.S.C. § 922(g)(1)]

On or about November 23, 2009, in Los Angeles County, within the Central District of California, defendant MIGUEL AGUSTIN RAMIREZ, also known as ("aka") "Mugsy," aka "Mugs" ("RAMIREZ"), knowingly possessed firearms, namely, a Smith & Wesson model 638-2 .38 caliber revolver, bearing serial number CCH2705, a Star model 30M 9 millimeter caliber semi-automatic pistol, bearing serial number 1885728, and an Intratec model Tec-22 .22 caliber semi-automatic pistol, bearing serial number 36039; and ammunition, namely, eleven rounds of Federal .22 caliber ammunition, in and affecting interstate and foreign commerce.

Such possession occurred after defendant RAMIREZ had been convicted of at least one of the following felony crimes, each punishable by a term of imprisonment exceeding one year:

(1)     Possession of a Controlled Substance, in violation of California Health and Safety Code Section 11350(A), in the Superior Court of the State of California, County of Los Angeles, case number BA094160, on or about April 28, 1994;

(2)     Felon in Possession of a Firearm, in violation of California Penal Code Section 12021(A)(1), in the Superior Court of the State of California, County of Los Angeles, case number BA099431, on or about September 27, 1994;

(3)     Transportation or Sale of a Controlled Substance, in violation of California Health and Safety Code Section 11352(A), in the Superior Court of the State of California, County of Los Angeles, case number BA29192303, on or about December 15, 2006;

198

(4)   Transportation of a Controlled Substance, in violation of California Health and Safety Code Section 11379, in the Superior Court of the State of California, County of Los Angeles, case number BA29192303, on or about December 15, 2006;

(5)   Use of a Fake Compartment to Transport a Controlled Substance, in violation of California Health and Safety Code Section 11366.8(A), in the Superior Court of the State of California, County of Los Angeles, case number BA29192302, on or about December 15, 2006;

(6)   Felon in Possession of a Firearm, in violation of California Penal Code Section 12021(A)(1), in the Superior Court of the State of California, County of Los Angeles, case number BA29192303, on or about December 15, 2006.

COUNT ONE HUNDRED AND TWENTY-EIGHT

[18 U.S.C. §§ 922(g)(1), 2]

On or about November 24, 2009, in Los Angeles County, within the Central District of California, defendants MHER DARBINYAN, also known as ("aka") "Mike," aka "Hollywood Mike," aka "Little Mike," aka "Capone," aka "Caps," aka "Maher" ("DARBINYAN"), and SOUREN SEROBYAN, aka "Suro" ("SEROBYAN"), knowingly possessed firearms, namely, a Smith & Wesson model 638-2 .38 caliber revolver, bearing serial number CCH2705, a Star model 30M 9 millimeter caliber semi-automatic pistol, bearing serial number 1885728, and an Intratec model Tec-22 .22 caliber semi-automatic pistol, bearing serial number 36039; and ammunition, namely, eleven rounds of Federal .22 caliber ammunition, in and affecting interstate and foreign commerce.

Such possession occurred after defendant DARBINYAN had been convicted of at least one of the following felony crimes, each punishable by a term of imprisonment exceeding one year:

(1)   Robbery, in violation of California Penal Code Section 211, in the Superior Court of the State of California, County of Los Angeles, case number LA027917, on or about July 21, 1998;

(2)   Three Counts of Theft by a Forged or Invalid Credit Card with a Prior Felony Conviction, in violation of California Penal Code Section 484G(A), in the Superior Court of the State of California, County of Los Angeles, case number SA054286, on or about March 18, 2005.

///

200

Such possession occurred after defendant SEROBYAN had been convicted of a felony punishable by a term of imprisonment exceeding one year, namely:  Three Counts of Taking the Identity of Another, in violation of Arizona Penal Code Section 13-2008A, in the Superior Court of the State of Arizona for Maricopa County, case number CR2006030210001SE, on or about October 6, 2006.

At the above time and place, defendant GEVORK KASABYAN, aka "Kash," aided, abetted, counseled, commanded, induced, and procured the commission of the offense alleged above.

201

COUNT ONE HUNDRED AND TWENTY-NINE

[18 U.S.C. §§ 922(g)(1), 2]

On or about December 1, 2009, in Los Angeles County, within the Central District of California, defendant MHER DARBINYAN, also known as ("aka") "Mike," aka "Hollywood Mike," aka "Little Mike," aka "Capone," aka "Caps," aka "Maher" ("DARBINYAN"), knowingly possessed a firearm, namely, an Omega Arms model Omega III 30-06 caliber bolt action rifle, bearing serial number 549, in and affecting interstate and foreign commerce.

Such possession occurred after defendant DARBINYAN had been convicted of at least one of the following felony crimes, each punishable by a term of imprisonment exceeding one year:

(1)    Robbery, in violation of California Penal Code Section 211, in the Superior Court of the State of California, County of Los Angeles, case number LA027917, on or about July 21, 1998;

(2)    Three Counts of Theft by a Forged or Invalid Credit Card with a Prior Felony Conviction, in violation of California Penal Code Section 484G(A), in the Superior Court of the State of California, County of Los Angeles, case number SA054286, on or about March 18, 2005.

At the above time and place, defendant ARTUR PEMBEJIAN, aka "Cham," aided, abetted, counseled, commanded, induced, and procured the commission of the offense alleged above.

COUNT ONE HUNDRED AND THIRTY

[18 U.S.C. § 922(g)(1)]

On or about December 30, 2009, in Los Angeles County, within the Central District of California, defendants PARAMAZ BILEZIKCHYAN, also known as ("aka") "Parik," aka "P," aka "Parnamas Bileziktsian," aka "Bleziktsian Paramas" ("BILEZIKCHYAN"), and RAFAEL GONZALEZ-MUNOZ JR., aka "Cisco," aka "the Drink" ("GONZALEZ-MUNOZ JR."), knowingly possessed ammunition, namely, 35 rounds of Federal .45 caliber ammunition, in and affecting interstate and foreign commerce.

Such possession occurred after defendant BILEZIKCHYAN had been convicted of at least one of the following felony crimes, punishable by a term of imprisonment exceeding one year:

(1)    Two Counts of Robbery with Use of a Firearm, in violation of California Penal Code Section 211, in the Superior Court of the State of California, County of San Diego, case number SD102276, on or about September 2, 1994;

(2)    First Degree Burglary with Use of a Firearm, in violation of California Penal Code Section 459, in the Superior Court of the State of California, County of San Diego, case number SD102276 (Count 3), on or about September 2, 1994;

(3)    False Imprisonment with Use of a Firearm, in violation of California Penal Code Sections 236, 237, in the Superior Court of the State of California, County of San Diego, case number SD102276 (Count 4), on or about September 2, 1994;

(4)    Robbery with Use of a Firearm, in violation of California Penal Code Section 211, in the Superior Court of the

203

State of California, County of Riverside, case number ICR18906, on or about March 28, 1995;

(5)   Assault with Firearm on a Person, in violation of California Penal Code Section 245(a)(2), in the Superior Court of the State of California, County of Riverside, case number ICR18906, on or about March 28, 1995.

Such possession occurred after defendant GONZALEZ-MUNOZ JR. had been convicted of at least one of the following felony crimes, punishable by a term of imprisonment exceeding one year:

(1)   Conspiracy to Possess with Intent to Distribute a Controlled Substance, in violation of 21 U.S.C. §§ 846, 841(a)(1), in the United States District Court for the Southern District of New York, case number 90-CR-0015-RPP-11, on or about March 7, 1990;

(2)   Possession of a Controlled Substance for Sale, in violation of California Health and Safety Code Section 11378, in the Superior Court of the State of California, County of Los Angeles, case number XEAKA04736101, on or about May 23, 2002;

(3)   Assault with a Dangerous Weapon in Aid of Racketeering, in violation of 18 U.S.C. § 1959(a)(3), in the United States District Court for the Central District of California, case number CR 02-938-DOC, on or about February 7, 2005.

204

COUNT ONE HUNDRED AND THIRTY-ONE

[18 U.S.C. § 1001(a)(2)]

On or about December 30, 2009, in Los Angeles County, within the Central District of California, in a matter within the jurisdiction of the Federal Bureau of Investigation, defendant MARAT SHAKHRAMANYAN ("SHAKHRAMANYAN") knowingly and willfully made a false material statement and representation, in that defendant SHAKHRAMANYAN told an officer with the Glendale Police Department that a plastic bag containing a high-capacity gun magazine and 35 rounds of .45 caliber ammunition, which the officer had just found in defendant SHAKHRAMANYAN's car, might have been forgotten and left in the car by one of defendant SHAKHRAMANYAN's friends who had driven the car, when, in truth and in fact, as defendant SHAKHRAMANYAN then and there well knew, defendant SHAKHRAMANYAN had been told to pick up the gun magazine and had been given directions as to where to obtain it by Paramaz Bilezikchyan, also known as ("aka") "Parik," aka "P," aka "Parnamas Bileziktsian," aka "Bleziktsian Paramas," to whom the gun magazine belonged.

COUNT ONE HUNDRED AND THIRTY-TWO

[18 U.S.C. § 922(g)(1)]

On or about January 19, 2010, in Los Angeles County, within the Central District of California, defendants EDGAR KHACHATRYAN, also known as ("aka") "Gunner", aka "Lil Gunner," aka "Edo" ("E. KHACHATRYAN"), and GRACHIA NALBANDYAN, aka "Raider," aka "Puffy," aka "Crazy" ("NALBANDYAN"), knowingly possessed firearms, namely, a Sig Sauer P220 .45 caliber semi-automatic handgun, bearing serial number G286010, and a Maadi Helwan 9 millimeter caliber handgun, bearing serial number 1128786; and ammunition, namely, six rounds of Remington .45 caliber ammunition, one round of Speer .45 caliber ammunition, one round of Pro-Load .45 caliber ammunition, four rounds of Winchester 9 millimeter caliber ammunition, and three rounds of Speer 9 millimeter caliber ammunition, in and affecting interstate and foreign commerce.

Such possession occurred after defendant E. KHACHATRYAN had been convicted of a felony punishable by a term of imprisonment exceeding one year, namely:  Carrying a Loaded Firearm in Public, in violation of California Penal Code Section 12031(A)(1), in the Superior Court of the State of California, County of Los Angeles, case number GA068124, or about February 6, 2007.

Such possession occurred after defendant NALBANDYAN had been convicted of a felony punishable by a term of imprisonment exceeding one year, namely:  Vandalism with a Gang Allegation, in violation of California Penal Code Section 594(A), in the

206

Superior Court of the State of California, County of Los Angeles, case number GA070988-01, on or about October 31, 2007.

COUNT ONE HUNDRED AND THIRTY-THREE

[18 U.S.C. § 922(g)(1)]

On or about February 10, 2010, in Los Angeles County, within the Central District of California, defendant KARO YERKANYAN, also known as ("aka") "Guilty," aka "Gator," aka "Kane" ("K. YERKANYAN"), knowingly possessed a firearm, namely, a Beretta model 92FS 9 millimeter caliber semi-automatic pistol, bearing serial number BER402785Z, and ammunition, namely, six rounds of Winchester 9 millimeter caliber ammunition, two rounds of Royal Ordnance Factory - Blackpole 9 millimeter caliber ammunition, two rounds of Federal 9 millimeter caliber ammunition, one round of Wolf 9 millimeter caliber ammunition, one round of Royal Ordnance Factory - Hirwaun 9 millimeter caliber ammunition, one round of Hirtenberger Patronen 9 millimeter caliber ammunition, one round of COR-BON 9 millimeter caliber ammunition, and one round of 9 millimeter caliber ammunition marked "NPA," in and affecting interstate and foreign commerce.

Such possession occurred after defendant K. YERKANYAN had been convicted of a felony punishable by a term of imprisonment exceeding one year, namely: Driving with a Blood Alcohol Level above .08% Causing Bodily Injury, in violation of California Vehicle Code Section 23153(B), in the Superior Court of the State of California, County of Los Angeles, case number LAVLA04165601, on or about February 10, 2003.

COUNT ONE HUNDRED AND THIRTY-FOUR

[18 U.S.C. § 922(g)(1)]

On or about February 10, 2010, in Los Angeles County, within the Central District of California, defendant HAYK KARAYAN, also known as ("aka") "Hayko," aka "Whisper" ("H. KARAYAN"), knowingly possessed a firearm, namely, a Beretta model 96 .40 caliber semi-automatic pistol, with an obliterated serial number, and ammunition, namely, thirteen rounds of Federal .40 caliber ammunition, and one round of Remington .40 caliber ammunition, in and affecting interstate and foreign commerce.

Such possession occurred after defendant H. KARAYAN had been convicted of a felony punishable by a term of imprisonment exceeding one year, namely:  Assault with a Firearm on a Person, in violation of California Penal Code Section 245(a), in the Superior Court of the State of California, County of Los Angeles, case number GA053647, on or about May 13, 2005.

COUNT ONE HUNDRED AND THIRTY-FIVE

[18 U.S.C. § 922(g)(1)]

On or about September 3, 2010, in Los Angeles County, within the Central District of California, defendant ANDRANIK ALOYAN, also known as ("aka") "Andy," aka "Ando" ("ALOYAN"), knowingly possessed a firearm, namely, a Llama .22 caliber pistol, bearing serial number 658698, in and affecting interstate and foreign commerce.

Such possession occurred after defendant ALOYAN had been convicted of a felony punishable by a term of imprisonment exceeding one year, namely:  Possession of a Pistol with a Removed Serial Number, in violation of California Penal Code Section 12031, in the Superior Court of the State of California, County of Los Angeles, Case Number LA064010, on or about February 22, 2010.

COUNT ONE HUNDRED AND THIRTY-SIX

[18 U.S.C. § 922(g)(1)]

On or about September 3, 2010, in Los Angeles County, within the Central District of California, defendant ANDRANIK BAKHCHADJIAN, also known as ("aka") "Ando," aka "Andranik Bakhcadjian" ("BAKHCHADJIAN"), knowingly possessed a firearm, namely, a Llama .45 caliber pistol, bearing serial number B95369, in and affecting interstate and foreign commerce.

Such possession occurred after defendant BAKHCHADJIAN had been convicted of at least one of the following felony crimes, punishable by a term of imprisonment exceeding one year:

(1)   Forgery/Access Card Theft, in violation of California Penal Code Section 484f, in the Superior Court of the State of California, County of Los Angeles, Case Number PA04795701, on or about August 24, 2005;

(2)   Theft of Access Cards, in violation of California Penal Code Section 484e, in the Superior Court of the State of California, County of Los Angeles, Case Number PA04795701, on or about August 24, 2005;

(3)   Vehicular Manslaughter, in violation of California Penal Code Section 192, in the Superior Court of the State of California, County of Los Angeles, Case Number PA04795701, on or about August 24, 2005;

(4)   Receiving Stolen Property, in violation of California Penal Code Section 496, in the Superior Court of the State of California, County of Los Angeles, Case Number LA06039101, on or about January 22, 2009;

1    (5)  Receiving Stolen Property, in violation of California

2 Penal Code Section 496, in the Superior Court of the State of

3 California, County of Los Angeles, Case Number LA06001, on or

4 about January 22, 2009.

212

## COUNT ONE HUNDRED AND THIRTY-SEVEN

[18 U.S.C. § 922(g)(1)]

On or about February 16, 2011, in Los Angeles County, within the Central District of California, defendant EMIL AIRAPETIAN, also known as ("aka") "Clever," aka "Emo" ("AIRAPETIAN"), knowingly possessed firearms, namely, a Walther, model PPK, .380 Auto caliber, semi-automatic pistol, bearing serial number A000877, and a Zbrojovka Praga, 7.65 mm (.32 Auto) caliber, semi-automatic pistol, bearing serial number 10888, in and affecting interstate and foreign commerce.

Such possession occurred after defendant AIRAPETIAN had been convicted of a felony punishable by a term of imprisonment exceeding one year, namely: Assault with a Deadly Weapon not a Firearm, in violation of California Penal Code Section 245(a)(1), in the Superior Court of the State of California, County of Los Angeles, case number GA033565-01, on or about September 16, 1999.

COUNT ONE HUNDRED AND THIRTY-EIGHT

[18 U.S.C. § 922(g)(1)]

On or about February 16, 2011, in Los Angeles County, within the Central District of California, defendant ARAM PETROSIAN, also known as ("aka") "Tot," aka "Toto" ("PETROSIAN"), knowingly possessed ammunition, namely, forty-four rounds of 9mm caliber PMC ammunition, in and affecting interstate and foreign commerce.

Such possession occurred after defendant PETROSIAN had been convicted of at least one of the following felony crimes, each punishable by a term of imprisonment exceeding one year:

(1) Grand Theft Auto, in violation of California Penal Code Section 487H(a), in the Superior Court of the State of California, County of Los Angeles, case number GA028987, on or about October 16, 1996;

(2) Felon in Possession of a Firearm, in violation of California Penal Code Section 12021(a)(1), in the Superior Court of the State of California, County of Los Angeles, case number BA163129, on or about November 10, 1998;

(3) Burglary (three counts), in violation of California Penal Code Section 459, in the Superior Court of the State of California, County of Los Angeles, case number SA02481, on or about November 10, 1998.

214

COUNT ONE HUNDRED AND THIRTY-NINE

[18 U.S.C. § 922(g)(1)]

On or about February 16, 2011, in Los Angeles County, within the Central District of California, defendant HAGOP YAMALYAN, also known as ("aka") "Hago" ("YAMALYAN"), knowingly possessed firearms, namely, a Franchi model 48 AL, 12 gauge caliber, semi-automatic shotgun, bearing serial number US1365, a Spartan Gunworks model SPR 310, 12 gauge caliber, over/under shotgun, bearing serial number 042758806R, and a Butler Associates, .22 short caliber, derringer pistol, bearing serial number 50447, in and affecting interstate and foreign commerce.

Such possession occurred after defendant YAMALYAN had been convicted of a felony punishable by a term of imprisonment exceeding one year, namely: Aiding and Abetting Health Care Fraud, in violation of Title 18, United States Code, Sections 2 and 1347, in the United States District Court for the Eastern District of California, case number 2:02CR00372-01, on or about October 27, 2005.

215

COUNT ONE HUNDRED AND FORTY

[18 U.S.C. § 922(g)(1)]

On or about February 16, 2011, in Los Angeles County, within the Central District of California, defendant KARO YERKANYAN, also known as ("aka") "Guilty," aka "Gator," aka "Kane" ("K. YERKANYAN"), knowingly possessed a firearm, namely, a Walther model PPK, .380 Auto caliber, semi-automatic pistol, bearing serial number A006589, in and affecting interstate and foreign commerce.

Such possession occurred after defendant K. YERKANYAN had been convicted of a felony punishable by a term of imprisonment exceeding one year, namely: Driving with a Blood Alcohol Level above .08% Causing Bodily Injury, in violation of California Vehicle Code Section 23153(B), in the Superior Court of the State of California, County of Los Angeles, case number LAVLA04165601, on or about February 10, 2003.

FORFEITURE ALLEGATION ONE

[18 U.S.C. § 1963]

1.   Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is hereby given to the defendants charged in Count One of this Indictment that the United States will seek forfeiture as part of any sentence in accordance with Title 18, United States Code, Section 1963, in the event of any such defendant's conviction under Count One of this Indictment.

2.   Defendants MHER DARBINYAN, also known as ("aka") "Mike," aka "Hollywood Mike," aka "Little Mike," aka "Capone," aka "Caps," aka "Maher" ("DARBINYAN"); PARAMAZ BILEZIKCHYAN, aka "Parik," aka "P," aka "Parnamas Bileziktsian," aka "Bleziktsian Paramas" ("BILEZIKCHYAN"); KARO YERKANYAN, aka "Guilty," aka "Gator," aka "Kane" ("K. YERKANYAN"); ARMAN SHAROPETROSIAN, aka "Horse," aka "Dzi" ("SHAROPETROSIAN"); HAYK KARAYAN, aka "Hayko," aka "Whisper" ("H. KARAYAN"); ARMAN TANGABEKYAN, aka "Spito," aka "Spitak," aka "Villager," aka "Thick Neck," aka "Armancho" ("TANGABEKYAN"); EMIL AIRAPETIAN, aka "Clever," aka "Emo" ("AIRAPETIAN"); ARMEN HOVANISSIAN, aka "Sniper," aka "Arm" ("HOVANISSIAN"); ROMAN TEROGANESYAN, aka "Lil Boy," aka "Rome," aka "Roman Teroganesian," aka "Arthur Teroganesian" ("R. TEROGANESYAN"); EDGAR KHACHATRYAN, aka "Gunner," aka "Lil Gunner," aka "Edo" ("E. KHACHATRYAN"); GARIK GALSTYAN, aka "Stomper," aka "Stomps" ("GALSTYAN"); HARUT TOROSYAN, aka "Menace," aka "Harout Torosyan" ("H. TOROSYAN"); SOUREN SEROBYAN, aka "Suro" ("SEROBYAN"); VAZGEN TOPADZHIKYAN, aka "Lucky" ("TOPADZHIKYAN"); ARA FERMANYAN, aka "Casper," aka "Cass"

1  ("FERMANYAN"); DAVID MURADYAN, aka "Stranger," aka "Davo"

2  ("MURADYAN"); KAREN MARKOSIAN, aka "Kar," aka "Garen"

3  ("MARKOSIAN"); KAREN ZAKARYAN, aka "Kond," aka "Gond," aka

4  "Kondik," aka "Kar" ("ZAKARYAN"); ARTUR PEMBEJIAN, aka "Cham"

5  ("PEMBEJIAN"); ARAM PETROSIAN, aka "Tot," aka "Toto"

6  ("PETROSIAN"); ARMAN KARAYAN ("A. KARAYAN"); OGANES TEROGANESYAN,

7  aka "Hovo," aka "Hovik," aka "Oganes Terognesyan" ("O.

8  TEROGANESYAN"); JACK GAMBARYAN, aka "Zhak Gambarian," aka

9  "Speedy" ("GAMBARYAN"); RAYMOND TARVERDYAN, aka "Rye," aka "Ray"

10 ("TARVERDYAN"); VAHE MNATSAKANYAN, aka "V," aka "Vahik"

11 ("MNATSAKANYAN"); ARMANDO MORENO, aka "Mando," aka "Monkey," aka

12 "Blackie" ("MORENO"); ANDRANIK ALOYAN, aka "Andy," aka "Ando"

13 ("ALOYAN"); LUSINE OGANDGANYAN, aka "Lusine Ogandjianian," aka

14 "Luso" ("L. OGANDGANYAN"); and GUSTAVO ORTEGA, aka "Bam Bam," aka

15 "Bams," aka "Gus" ("ORTEGA") shall forfeit to the United States

16 the following property:

17          a.  All right, title, and interest in:

18              (1)  any and all property, real, personal, or

19 otherwise for which any interest has been acquired or maintained

20 as a result of any offense set forth in Count One of this

21 Indictment including, without limitation, any and all property

22 seized by law enforcement officers on or about February 10, 2010

23 or February 16, 2011, during the execution of search warrants;

24              (2)  any and all interests in, security of, claims

25 against, property rights, and contractual rights of the

26 enterprise identified in Count One of this Indictment; and

27              (3)  any and all property, real or personal,

28

constituting, or derived from, any proceeds obtained, directly or indirectly, as a result of any offense set forth in Count One of this Indictment, including, without limitation, any and all property seized by law enforcement officers on or about February 10, 2010 or February 16, 2011, during the execution of search warrants; and

b. A sum of money equal to the total value of the property described in subsection a. If more than one defendant is found guilty under Count One, each such defendant shall be jointly and severally liable for the entire amount forfeited pursuant to that Count.

3. Pursuant to Title 18, United States Code Section 1963(n), each defendant convicted of Count One shall forfeit substitute property, up to the value of the money and property described in the preceding paragraph, if, as the result of any act or omission of the defendant, the property described in the preceding paragraph, or any portion thereof (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to, or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

FORFEITURE ALLEGATION TWO

[18 U.S.C. § 981(a)(1)(C)

and 28 U.S.C. § 2461(c)]

1.    Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is hereby given to the defendants charged in Counts Two and Three of this Indictment that the United States will seek forfeiture as part of any sentence in accordance with Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), in the event of any such defendant's conviction under either of Counts Two through Three of this Indictment.

2.    Defendants PARAMAZ BILEZIKCHYAN, also known as ("aka") "Parik," aka "P," aka "Parnamas Bileziktsian," aka "Bleziktsian Paramas" ("BILEZIKCHYAN"); KARO YERKANYAN, aka "Guilty," aka "Gator," aka "Kane" ("K. YERKANYAN"); HAYK KARAYAN, aka "Hayko," aka "Whisper" ("H. KARAYAN"); ARAM PETROSIAN, aka "Tot," aka "Toto" ("PETROSIAN"); OGANES TEROGANESYAN, aka "Hovo," aka "Hovik," aka "Oganes Terognesyan" ("O. TEROGANESYAN"); and TIGRAN SARKISYAN, aka "Tiko" ("SARKISYAN") shall forfeit to the United States the following property:

a.  All right, title, and interest in any and all property, real or personal constituting, or derived from, any proceeds obtained, directly or indirectly, as a result of any offense set forth in Counts Two through Three of this Indictment, including, without limitation, any and all property seized by law enforcement officers on or about February 10, 2010 or February 16, 2011, during the execution of search warrants; and

220

b.   A sum of money equal to the total value of the property described in subsection a.  For each of Counts Two or Three for which more than one defendant is found guilty, each such defendant shall be jointly and severally liable for the entire amount forfeited pursuant to that Count.

3.    Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), each defendant convicted of Counts Two or Three shall forfeit substitute property, up to the value of the money and property described in the preceding paragraph, if, as the result of any act or omission of the defendant, the property described in the preceding paragraph, or any portion thereof (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to, or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

FORFEITURE ALLEGATION THREE

[18 U.S.C. § 981(a)(1)(C)

and 28 U.S.C. § 2461(c)]

1.    Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is hereby given to the defendants charged in Counts Four and Five of this Indictment that the United States will seek forfeiture as part of any sentence in accordance with Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), in the event of any defendant's conviction under either of Counts Four through Five of this Indictment.

2.    Defendants MHER DARBINYAN, also known as ("aka") "Mike," aka "Hollywood Mike," aka "Little Mike," aka "Capone," aka "Caps," aka "Maher" ("DARBINYAN"); ARMAN SHAROPETROSIAN, aka "Horse," aka "Dzi" ("SHAROPETROSIAN"); EMIL AIRAPETIAN, aka "Clever," aka "Emo" ("AIRAPETIAN"); and LUSINE OGANDGANYAN, aka "Lusine Ogandjanian," aka "Luso" ("L. OGANDGANYAN") shall forfeit to the United States the following property:

a.   All right, title, and interest in any and all property, real or personal constituting, or derived from, any proceeds obtained, directly or indirectly, as a result of any offense set forth in Counts Four through Five of this Indictment, including, without limitation, any and all property seized by law enforcement officers on or about February 16, 2011, during the execution of search warrants; and

b.   A sum of money equal to the total value of the property described in subsection a.  For each of Counts Four or

Five for which more than one defendant is found guilty, each such defendant shall be jointly and severally liable for the entire amount forfeited pursuant to that Count.

3.    Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), each defendant convicted of Counts Four or Five shall forfeit substitute property, up to the value of the money and property described in the preceding paragraph, if, as the result of any act or omission of a defendant, the property described in the preceding paragraph, or any portion thereof (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to, or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

1              FORFEITURE ALLEGATION FOUR

2        [18 U.S.C. § 981(a)(1)(C), 28 U.S.C. § 2461(c),

3        18 U.S.C. § 982(a)(2) and 18 U.S.C. § 1028(b)(5)]

4        1.    Pursuant to Rule 32.2 of the Federal Rules of

5   Criminal Procedure, notice is hereby given to the defendants

6   charged in any of Counts Six through Thirty-Seven that the United

7   States will seek forfeiture as part of any sentence in accordance

8   with Title 18, United States Code, Section 981(a)(1)(C), Title

9   28, United States Code, Section 2461(c), Title 18, United States

10  Code, Section 982(a)(2), and Title 18, United States Code,

11  Section 1028(b)(5), in the event of any defendant's conviction

12  under any of Counts Six through Thirty-Seven of this Indictment.

13       2.    Defendants MHER DARBINYAN, also known as ("aka")

14  "Mike," aka "Hollywood Mike," aka "Little Mike," aka "Capone,"

15  aka "Caps," aka "Maher" ("DARBINYAN"); ARMAN TANGABEKYAN, aka

16  "Spito," aka "Spitak," aka "Villager," aka "Thick Neck," aka

17  "Armancho" ("TANGABEKYAN"); KAREN MARKOSIAN, aka "Kar," aka

18  "Garen" ("MARKOSIAN"); VAHE MNATSAKANYAN, aka "V," aka "Vahik"

19  ("MNATSAKANYAN"); ARMANDO MORENO, aka "Mando," aka "Monkey," aka

20  "Blackie" ("MORENO"); LUSINE OGANDGANYAN, aka "Lusine

21  Ogandjanian," aka "Luso" ("L. OGANDGANYAN"); GUSTAVO ORTEGA, aka

22  "Bam Bam," aka "Bams," aka "Gus" ("ORTEGA"); HAGOP YAMALYAN, aka

23  "Hago" ("YAMALYAN"); MANUK TERZYAN, aka "Max" ("TERZYAN"); KAREN

24  HESHAM SAMAWI, aka "Karen Hesham" ("SAMAWI"); JULIO CESAR RIVAS,

25  aka "July," aka "Biggie," aka "Big Boy" ("RIVAS"); VARTAN

26  AVEDISSIAN, aka "Vardan," "aka "Voicebox" ("AVEDISSIAN"); JOSEPH

27  MARES ("MARES"); DEBRA MAY-LAWSON, aka "Sugar" ("MAY-LAWSON");

28

                              224

RAFAEL ROGER ZENDEJAS ("ZENDEJAS"); STEVEN WILSON, aka "Stutters" ("WILSON"); FNU LNU, aka "Musho" ("MUSHO"); and FNU LNU, aka "David Petrosov" ("PETROSOV") shall forfeit to the United States the following property:

       a.  All right, title, and interest in any and all property, real or personal:

       (1)  constituting, or derived from, any proceeds obtained, directly or indirectly, as a result of any offense set forth in Counts Six through Thirty-Seven of this Indictment, including, without limitation, any and all property seized by law enforcement officers on or about February 16, 2011, during the execution of search warrants; and

       (2)  used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of any offense set forth in Counts Twenty-Three through Thirty-Seven of this Indictment, including, without limitation, any and all property seized by law enforcement officers on or about February 16, 2011, during the execution of search warrants; and

       b.  A sum of money equal to the total value of the property described in subsection a.  For each of Counts Six through Thirty-Seven for which more than one defendant is found guilty, each such defendant shall be jointly and severally liable for the entire amount forfeited pursuant to that Count.

     3.  Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), Title 18, United States Code, Section 982(b) and Title 18, United States Code, Section 1028(g), each defendant convicted

of any of Counts Six through Thirty-Seven shall forfeit substitute property, up to the value of the money and property described in the preceding paragraph, if, as the result of any act or omission of a defendant, the property described in the preceding paragraph, or any portion thereof (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to, or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

FORFEITURE ALLEGATION FIVE

[18 U.S.C. § 981(a)(1)(C), 28 U.S.C. § 2461(c),

18 U.S.C. § 982(a)(2), 18 U.S.C. § 1028(b)(5)

and 18 U.S.C. § 1029(c)(1)(C)]

1.    Pursuant to Rule 32.2 of the Federal Rules of
Criminal Procedure, notice is hereby given to the defendants
charged in any of Counts Thirty-Eight through Ninety-Five of this
Indictment that the United States will seek forfeiture as part of
any sentence in accordance with Title 18, United States Code,
Section 981(a)(1)(C), Title 28, United States Code, Section
2461(c), Title 18, United States Code, Section 982(a)(2), Title
18, United States Code, Section 1028(b)(5), and Title 18, United
States Code, Section 1029(c)(1)(C), in the event of any
defendant's conviction under any of Counts Thirty-Eight through
Ninety-Five of this Indictment.

2.    Defendants MHER DARBINYAN, also known as ("aka")
"Mike," aka "Hollywood Mike," aka "Little Mike," aka "Capone,"
aka "Caps," aka "Maher" ("DARBINYAN"); ARAM PETROSIAN, aka
"Tot," aka "Toto" ("PETROSIAN"); RAYMOND TARVERDYAN, aka "Rye,"
aka "Ray" ("TARVERDYAN"); GUSTAVO ORTEGA, aka "Bam Bam," aka
"Bams," "Gus" ("ORTEGA"); RAFAEL PARSADANYAN, aka "Raffi," aka
"Raffo" ("PARSADANYAN"); SIMON ANTONYAN, aka "Simo," aka "Sim"
("ANTONYAN"); GAREN CHOULDJIAN, aka "Misak" ("CHOULDJIAN");
ANDRANIK BAKHCHADJIAN, aka "Ando," aka "Andranik Bakhcadjian"
("BAKHCHADJIAN"); VARTENIE ANANIAN ("ANANIAN"); KHACHATUR
ARAKELYAN, aka "Khecho" ("ARAKELYAN"); CATRINA BALDERRAMA
("BALDERRAMA"); and VARDAN AMIRKHANYAN ("AMIRKHANYAN") shall

227

1  forfeit to the United States the following property:

2              a.  All right, title, and interest in any and all

3  property, real or personal:

4              (1)  constituting, or derived from, any proceeds

5  obtained, directly or indirectly, as a result of any offense set

6  forth in Counts Thirty-Eight through Ninety-Five of this

7  Indictment including, without limitation, any and all property

8  seized by law enforcement officers on or about February 16, 2011

9  during the execution of search warrants; and

10             (2)  used, or intended to be used, in any manner

11 or part, to commit, or to facilitate the commission of any

12 offense set forth in Counts Sixty-Nine through Ninety-Five of

13 this Indictment, including, without limitation, any and all

14 property seized by law enforcement officers on or about February

15 16, 2011, during the execution of search warrants; and

16             b.  A sum of money equal to the total value of the

17 property described in subsection a.  For each of Counts Thirty-

18 Eight through Ninety-Five for which more than one defendant is

19 found guilty, each such defendant shall be jointly and severally

20 liable for the entire amount forfeited pursuant to that Count.

21       3.   Pursuant to Title 21, United States Code, Section

22 853(p), as incorporated by Title 28, United States Code, Section

23 2461(c), Title 18, United States Code, Section 982(b), Title 18,

24 United States Code, Section 1028(g), and Title 18, United States

25 Code, Section 1029(c)(2), each defendant convicted of any of

26 Counts Thirty-Eight through Ninety-Five shall forfeit substitute

27 property, up to the value of the money and property described in

28

                              228

the preceding paragraph, if, as the result of any act or omission of a defendant, the property described in the preceding paragraph, or any portion thereof (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to, or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

FORFEITURE ALLEGATION SIX

[18 U.S.C. § 981(a)(1)(C), 28 U.S.C. § 2461(c),

18 U.S.C. § 982(a)(2) and 18 U.S.C. § 1028(b)(5)]

1.    Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is hereby given to the defendants charged in any of Counts Ninety-Six through One Hundred and Two of this Indictment that the United States will seek forfeiture as part of any sentence in accordance with Title 18, United States Code, Section 981(a)(1)(C), Title 28, United States Code, Section 2461(c), Title 18, United States Code, Section 982(a)(2), and Title 18, United States Code, Section 1028(b)(5), in the event of any defendant's conviction under any of Counts Ninety-Six through One Hundred and Two of this Indictment.

2.    Defendants PARAMAZ BILEZIKCHYAN, also known as ("aka") "Parik," aka "P," aka "Parnamas Bileziktsian," aka "Bleziktsian Paramas" ("BILEZIKCHYAN"); KARO YERKANYAN, aka "Guilty," aka "Gator," aka "Kane" ("K. YERKANYAN"); and ANDRANIK ALOYAN, aka "Andy," aka "Ando" ("ALOYAN") shall forfeit to the United States the following property:

a.   All right, title, and interest in any and all property, real or personal:

(1)   constituting, or derived from, any proceeds obtained, directly or indirectly, as a result of any offense set forth in Counts Ninety-Six through One Hundred and Two of this Indictment, including, without limitation, any and all property seized by law enforcement officers on or about February 10, 2010 or February 16, 2011, during the execution of search warrants;

230

1  and

2          (2)   used, or intended to be used, in any manner

3  or part, to commit, or to facilitate the commission of any

4  offense set forth in Counts Ninety-Nine through One Hundred and

5  Two of this Indictment, including, without limitation, any and

6  all property seized by law enforcement officers on or about

7  February 16, 2011, during the execution of search warrants; and

8          b.  A sum of money equal to the total value of the

9  property described in subsection a.  For each of Counts Ninety-

10 Six through One Hundred and Two for which more than one defendant

11 is found guilty, each such defendant shall be jointly and

12 severally liable for the entire amount forfeited pursuant to that

13 Count.

14      3.    Pursuant to Title 21, United States Code, Section

15 853(p), as incorporated by Title 28, United States Code, Section

16 2461(c) Title 18, United States Code, Section 982(b) and Title

17 18, United States Code, Section 1028(g), each defendant convicted

18 of any of Counts Ninety-Six through One Hundred and Two shall

19 forfeit substitute property, up to the value of the money and

20 property described in the preceding paragraph, if, as the result

21 of any act or omission of a defendant, the property described in

22 the preceding paragraph, or any portion thereof (a) cannot be

23 located upon the exercise of due diligence; (b) has been

24 transferred, sold to, or deposited with a third party; (c) has

25 been placed beyond the jurisdiction of the court; (d) has been

26 substantially diminished in value; or (e) has been commingled

27 with other property that cannot be divided without difficulty.

28

FORFEITURE ALLEGATION SEVEN

[18 U.S.C. § 981(a)(1)(C), 28 U.S.C. § 2461(c),

18 U.S.C. § 982(a)(2), 18 U.S.C. § 1028(b)(5)

and 18 U.S.C. § 1029(c)(1)(C)]

1.    Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is hereby given to the defendants charged in any of Counts One Hundred and Three through One Hundred and Eleven that the United States will seek forfeiture as part of any sentence in accordance with Title 18, United States Code, Section 981(a)(1)(C), Title 28, United States Code, Section 2461(c), Title 18, United States Code, Section 982(a)(2), Title 18, United States Code, Section 1028(b)(5), and Title 18, United States Code, Section 1029(c)(1)(C), in the event of any defendant's conviction under any of Counts One Hundred and Three through One Hundred and Eleven of this Indictment.

2.    Defendants HAYK KARAYAN, also known as ("aka") "Hayko," aka "Whisper" ("H. KARAYAN"); ARMAN KARAYAN ("A. KARAYAN"); RAYMOND TARVERDYAN, aka "Rye," aka "Ray" ("TARVERDYAN"); GAGIK ZHAMKOCHYAN, aka "Manic," aka "Panther," aka "Gago," aka "Gag" ("ZHAMKOCHYAN"); KARAPET JOEY KARAMUSYAN, aka "Karo" ("KARAMUSYAN"); HAROUTIOUN ARTHUR MELKONIAN, aka "Art," aka "Art from Montebello" ("MELKONIAN"); and ARSEN AYRANJIAN ("AYRANJIAN") shall forfeit to the United States the following property:

a.  All right, title, and interest in any and all property, real or personal:

(1)  constituting, or derived from, any proceeds

232

obtained, directly or indirectly, as a result of any offense set forth in Counts One Hundred and Three through One Hundred and Eleven of this Indictment, including, without limitation, any and all property seized by law enforcement officers on or about February 10, 2010 or February 16, 2011, during the execution of search warrants; and

(2)  used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of any offense set forth in Counts One Hundred and Three through One Hundred and Eleven of this Indictment, including, without limitation, any and all property seized by law enforcement officers on or about February 10, 2010 or February 16, 2011, during the execution of search warrants; and

b.  A sum of money equal to the total value of the property described in subsection a.  For each of Counts One Hundred and Three through One Hundred and Eleven for which more than one defendant is found guilty, each such defendant shall be jointly and severally liable for the entire amount forfeited pursuant to that Count.

3.  Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), Title 18, United States Code, Section 982(b), Title 18, United States Code, Section 1028(g), and Title 18, United States Code, Section 1029(c)(2), each defendant convicted of any of Counts One Hundred and Three through One Hundred and Eleven shall forfeit substitute property, up to the value of the money and property described in the preceding paragraph, if, as the result

233

of any act or omission of a defendant, the property described in the preceding paragraph, or any portion thereof (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to, or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

234

FORFEITURE ALLEGATION EIGHT

[18 U.S.C. § 981(a)(1)(C), 28 U.S.C. § 2461(c)

and 18 U.S.C. § 982(a)(2)]

1.     Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is hereby given to the defendants charged in either of Counts One Hundred and Thirteen and One Hundred and Fourteen that the United States will seek forfeiture as part of any sentence in accordance with Title 18, United States Code, Section 981(a)(1)(C), Title 28, United States Code, Section 2461(c), and Title 18, United States Code, Section 982(a)(2), in the event of any defendant's conviction under any of Counts One Hundred and Thirteen through One Hundred and Fourteen of this Indictment.

2.     Defendants MHER DARBINYAN, also known as ("aka") "Mike," aka "Hollywood Mike," aka "Little Mike," aka "Capone," aka "Caps," aka "Maher" ("DARBINYAN"); KARO YERKANYAN, aka "Guilty," aka "Gator," aka "Kane" ("K. YERKANYAN");   EDGAR YERKANYAN, aka "Edo" ("E. YERKANYAN"); KARINE MKRTCHYAN ("MKRTCHYAN"); and NAIRA ASTGHIK TEROUNIAN ("TEROUNIAN") shall forfeit to the United States the following property:

a.  All right, title, and interest in any and all property, real or personal constituting, or derived from, any proceeds obtained, directly or indirectly, as a result of any offense set forth in Counts One Hundred and Thirteen through One Hundred and Fourteen of this Indictment, including, without limitation, any and all property seized by law enforcement officers on or about February 16, 2011, during the execution of

search warrants; and

b.   A sum of money equal to the total value of the property described in subsection a.  For each of Counts One Hundred and Thirteen through One Hundred and Fourteen for which more than one defendant is found guilty, each such defendant shall be jointly and severally liable for the entire amount forfeited pursuant to that Count.

3.   Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), and Title 18, United States Code, Section 982(b), each defendant convicted of either of Counts One Hundred and Thirteen or One Hundred and Fourteen shall forfeit substitute property, up to the value of the money and property described in the preceding paragraph, if, as the result of any act or omission of a defendant, the property described in the preceding paragraph, or any portion thereof (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to, or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

FORFEITURE ALLEGATION NINE

[18 U.S.C. § 981(a)(1)(C), 21 U.S.C. § 853

and 28 U.S.C. § 2461(c)]

1.     Pursuant to Rule 32.2 of the Federal Rules of
Criminal Procedure, notice is hereby given to the defendants
charged in any of Counts One Hundred and Fifteen through One
Hundred and Nineteen that the United States will seek forfeiture
as part of any sentence in accordance with Title 18, United
States Code, Section 981(a)(1)(C), Title 21, United States Code,
Section 853, and Title 28, United States Code, Section 2461(c),
in the event of any defendant's conviction under any of Counts
One Hundred and Fifteen through One Hundred and Nineteen of this
Indictment.

2.     Defendants PARAMAZ BILEZIKCHYAN, also known as
("aka") "Parik," aka "P," aka "Parnamas Bileziktsian," aka
"Bleziktsian Paramas" ("BILEZIKCHYAN"); KARO YERKANYAN, aka
"Guilty," aka "Gator," aka "Kane" ("K. YERKANYAN"); SUREN
TOROSYAN, aka "Suro," aka "Sunny" ("S. TOROSYAN"); OGANES
TEROGANESYAN, aka "Hovo," aka "Hovik," aka "Oganes Terognesyan"
("O. TEROGANESYAN"); ARTUR GABRELYAN, aka "Rubo," aka "Art"
("GABRELYAN"); ADAM DAVOODIAN, aka "Aram" ("DAVOODIAN"); SARKIS
AVEDISIAN, aka "Sako" ("AVEDISIAN"); ARNOLD MORADIANS; HAYK
KARAYAN, aka "Hayko," aka "Whisper" ("H. KARAYAN"); ROMAN
TEROGANESYAN, aka "Lil Boy," aka "Rome," aka "Roman
Teroganesian," aka "Arthur Teroganesian" ("R. TEROGANESYAN");
ARMAN KARAYAN ("A. KARAYAN"); JACK GAMBARYAN, aka "Zhak
Gambarian," aka "Speedy" ("GAMBARYAN"); GRIGOR GARIBYAN, aka

"Gokor" ("GARIBYAN"); ARAM KHACHATRYAN ("A. KHACHATRYAN");
ZHIRAYR KARAYAN, aka "Zhiro," aka "Jerry" ("Z. KARAYAN"); ARSEN
AYRANJIAN ("AYRANJIAN"); and HOVANNES IGARIAN, aka "Hovo"
("IGARIAN") shall forfeit to the United States the following
property:

        a.  All right, title, and interest in any and all
property, real or personal:

        (1)  constituting, or derived from, any proceeds
obtained, directly or indirectly, as a result of any offense set
forth in Counts One Hundred and Fifteen through One Hundred and
Nineteen of this Indictment, including, without limitation, any
and all property seized by law enforcement officers on or about
February 10, 2010 or February 16, 2011, during the execution of
search warrants; and

        (2)  used, or intended to be used, in any manner
or part, to commit, or to facilitate the commission of any
offense set forth in Counts One Hundred and Fifteen through One
Hundred and Nineteen of this Indictment, including, without
limitation, any and all property seized by law enforcement
officers on or about February 10, 2010 or February 16, 2011,
during the execution of search warrants; and

        b.  A sum of money equal to the total value of the
property described in subsection a.  For each of Counts One
Hundred and Fifteen through One Hundred and Nineteen for which
more than one defendant is found guilty, each such defendant
shall be jointly and severally liable for the entire amount
forfeited pursuant to that Count.

3.     Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), each defendant convicted of any of Counts One Hundred and Fifteen through One Hundred and Nineteen shall forfeit substitute property, up to the value of the money and property described in the preceding paragraph, if, as the result of any act or omission of a defendant, the property described in the preceding paragraph, or any portion thereof (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to, or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

FORFEITURE ALLEGATION TEN

[18 U.S.C. § 981(a)(1)(C), 28 U.S.C. § 2461(c),

18 U.S.C. § 982(a)(2), 18 U.S.C. § 1028(b)(5)

and 18 U.S.C. § 1029(c)(1)(C)]

1.     Pursuant to Rule 32.2 of the Federal Rules of
Criminal Procedure, notice is hereby given to the defendants
charged in any of Counts One Hundred and Twenty through One
Hundred and Twenty-Four that the United States will seek
forfeiture as part of any sentence in accordance with Title 18,
United States Code, Section 981(a)(1)(C), Title 28, United States
Code, Section 2461(c), Title 18, United States Code, Section
982(a)(2), Title 18, United States Code, Section 1028(b)(5), and
Title 18, United States Code, Section 1029(c)(1)(C), in the event
of any defendant's conviction under any of Counts One Hundred and
Twenty through One Hundred and Twenty-Four of this Indictment.

2.     Defendant ANDRANIK ALOYAN, also known as ("aka")
"Andy," aka "Ando," and ANDRANIK BAKHCHADJIAN, also known as
"Ando" shall forfeit to the United States the following property:

a.   All right, title, and interest in any and all
property, real or personal:

(1)   constituting, or derived from, any proceeds
obtained, directly or indirectly, as a result of any offense set
forth in Counts One Hundred and Twenty through One Hundred and
Twenty-Four of this Indictment, including, without limitation,
any and all property seized by law enforcement officers on or
about September 3, 2010 or February 16, 2011, during the
execution of search warrants;

240

(2)  used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of any offense set forth in Counts One Hundred and Twenty through One Hundred and Twenty-Four of this Indictment including, without limitation, any and all property seized by law enforcement officers on or about September 3, 2010 or February 16, 2011, during the execution of search warrants; and

b.  A sum of money equal to the total value of the property described in subsection a.  For each of Counts One Hundred and Twenty through One Hundred and Twenty-Four for which more than one defendant is found guilty, each such defendant shall be jointly and severally liable for the entire amount forfeited pursuant to that Count.

3.  Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), Title 18, United States Code, Section 982(b), Title 18, United States Code, Section 1028(g), and Title 18, United States Code, Section 1029(c)(2), each defendant convicted of any of Counts One Hundred and Twenty through One Hundred and Twenty-Four shall forfeit substitute property, up to the value of the money and property described in the preceding paragraph, if, as the result of any act or omission of a defendant, the property described in the preceding paragraph, or any portion thereof (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to, or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been

241

1   commingled with other property that cannot be divided without

2   difficulty.

FORFEITURE ALLEGATION ELEVEN

[18 U.S.C. § 981(a)(1)(C), 28 U.S.C. § 2461(c)

and 18 U.S.C. § 1955(d)]

1.    Pursuant to Rule 32.2 of the Federal Rules of
Criminal Procedure, notice is hereby given to the defendants
charged in Count One Hundred and Twenty-Five that the United
States will seek forfeiture as part of any sentence in accordance
with Title 18, United States Code, Section 981(a)(1)(C), Title
28, United States Code, Section 2461(c), and Title 18, United
States Code, Section 1955(d), in the event of any defendant's
conviction under Count One Hundred and Twenty-Five of this
Indictment.

2.    Defendants PARAMAZ BILEZIKCHYAN, also known as
("aka") "Parik," aka "P," aka "Parnamas Bileziktsian," aka
"Bleziktsian Paramas;" HAYK KARAYAN, aka "Hayko," aka "Whisper;"
ROMAN TEROGANESYAN, aka "Lil Boy," aka "Rome," aka "Roman
Teroganesian," aka "Arthur Teroganesian;" and JACK GAMBARYAN, aka
"Zhak Gambarian," aka "Speedy" shall forfeit to the United States
the following property:

a.   All right, title, and interest in any and all
property, real or personal:

(1)   constituting, or derived from, any proceeds
obtained, directly or indirectly, as a result of any offense set
forth in Count One Hundred and Twenty-Five of this Indictment,
including, without limitation, any and all property seized by law
enforcement officers on or about February 10, 2010 or February
16, 2011, during the execution of search warrants; and

243

(2)   used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of any offense set forth in Count One Hundred and Twenty-Five of this Indictment, including, without limitation, any and all property seized by law enforcement officers on or about February 10, 2010 or February 16, 2011, during the execution of search warrants; and

b.   A sum of money equal to the total value of the property described in subsection a.   If more than one defendant is found guilty under Count One Hundred and Twenty-Five, each such defendant shall be jointly and severally liable for the entire amount forfeited pursuant to that Count.

3.   Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), and Title 18, United States Code, Section 1955(d), each defendant shall forfeit substitute property, up to the value of the money and property described in the preceding paragraph, if, as the result of any act or omission of a defendant, the property described in the preceding paragraph, or any portion thereof (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to, or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has

///
///
///
///
///

244

1  been substantially diminished in value; or (e) has been

2  commingled with other property that cannot be divided without

3  difficulty.

4                              A TRUE BILL

5                              _/S/_____

6                              Foreperson

7

8  ANDRÉ BIROTTE JR.
   United States Attorney

9

10

11  ROBERT E. DUGDALE
    Assistant United States Attorney

12  Chief, Criminal Division

13

    ELIZABETH R. YANG

14  Assistant United States Attorney
    Chief, Violent & Organized Crime Section

15

16  E. MARTIN ESTRADA
    SARAH LEVITT

17  STEPHEN G. WOLFE
    Assistant United States Attorneys

18  Violent & Organized Crime Section

19

    CRISTINA MORENO

20  Department of Justice Trial Attorney
    Organized Crime and Racketeering Section

21

22

23

24

25

26

27

28

                              245